# EXHIBIT 5

## QUEEN'S BENCH DIVISION
## (COMMERCIAL COURT)

Apr. 26 and 30, 1990

---

RICHCO INTERNATIONAL LTD.
v.
ALFRED C. TOEPFER INTERNATIONAL
G.M.B.H.

(THE "BONDE")

Before Mr. Justice POTTER

Sale of goods (f.o.b.) — Carrying charges — Sellers guaranteed to load vessel at rate of 3000 tonnes — Buyers obtained extended delivery period — Sellers unable to achieve guaranteed loading rate — Whether buyers liable for carrying charges during extended delivery period — Whether sellers taking advantage of own breach — Whether contract contained implied term.

The sellers sold to the buyers about 30,000 tonnes Saudi Arabian wheat to be delivered f.o.b. stowed and trimmed Damman for shipment Apr. 20/May 20, 1988. The contract provided inter alia:

Sellers guarantee to load vessel at the rate of 3,000 metric tonnes per weather working day of 24 hours, Thursday afternoon/Friday, holidays excluded, even if used. Time to count at 08.00 next business day after Friday/Holiday. Time to begin to count at 00.00 next working day after presentation of notice of readiness, vessel having passed inspection and declared ready to load.

Demurrage/despatch: to be for sellers' account at charter-party rate but maximum 8,000/4,000 US $/day.

Carrying charges: none if vessel files with (sic) shipment period otherwise 0.25 per MT/day till last B/L day.

The contract incorporated the arbitration rules of GAFTA 125 and the terms and conditions of GAFTA 64, cl. 8 of which provided that the contract period of delivery could be extended by an additional period of 21 days if the buyers gave notice not later than the next business day following the last day of the delivery period.

On May 20, 1988 the last day of the shipment period the buyers claimed a 21-day extension of the delivery period. The buyers' vessel *Bonde* filed at the load port outside the shipment period. Notice of readiness was tendered and accepted on May 21, 1988 and loading commenced on May 29.

Loading was completed on June 10, within the extended delivery period but the sellers were unable to achieve the guaranteed loading rate of 3000 tonnes per weather working day of 24 hours. The sellers claimed that the buyers were liable to pay carrying charges for the 21 day period between May 21 and June 1988.

The buyers denied liability and the dispute was referred to arbitration. The buyers argued that they were not liable for the carrying charges in respect of any period when loading was delayed through the sellers inability to load at the guaranteed loading rate.

The Board of Appeal held that the sellers were entitled to the full amount of the carrying charges claimed and stated inter alia that:

4.7 Carrying charges in the manner in which they appear in the contract are liquidated damages and this fact has been determined by case law.

4.8 The fact of an elevator breakdown during loading does not cause carrying charges or demurrage to cease during that period. It is beyond the control of either party.

The buyers appealed against the award contending that the sellers could not recover carrying charges for the time taken in loading the vessel after the permitted loading time had expired because:

(i) the buyers were entitled to recover as damages for breach of the loading rate guaranteed, alternatively for breach of the sellers' obligation to deliver the contract quantity within the extended delivery period at the agreed loading rate, a sum equivalent to the carrying charges levied for the excess period and therefore had a defence of circuity of action; and/or

(ii) to allow such recovery would be to allow the sellers to profit from their breach contrary to the presumption, which operated as a basic rule of construction, that no party to a contract can be permitted to take advantage of his own wrong as against the other party. The carrying charges provision must therefore be construed so as not to apply insofar as the "last B/L day" fell outside the permitted loading time; and/or

(iii) the contract contained an implied term, such term being implied because it went without saying and/or was necessary for business efficacy, to the effect that — (a) neither party shall be entitled to take advantage of his own breach as against the other; alternatively (b) no carrying charges were payable in respect of any period after the permitted loading time had expired and the recovery of carrying charges for any such period would be a breach of that implied term.

———*Held*, by Q.B. (Com. Ct.) (POTTER, J.), that (1) where a charter-party contained a demurrage clause, then in order to recover damages in addition to demurrage for breach of the charterers' obligation to complete loading within the lay days, it was a requirement that the plaintiff demonstrate that such additional loss was not only different in character from the loss of use but stemmed from breach of an additional and/or independent obligation; and by analogy the same conclusion was to be drawn in respect of the rights and obligations of the buyer and seller under an f.o.b. contract into which provisions relating to payment of demurrage and rates of loading were incorporated (see p. 142, col. 1);

———Aktieselskabet Reidar v. Arcos Ltd., (1926) 25 Ll.L.Rep. 513 considered.

(2) the sellers were right in their submissions that the purpose for the importation from the charter-party of a loading rate clause was to provide the mechanism for effecting the reimbursement of demurrage as between buyer and seller and the purpose for inserting the laytime provisions was because it was anticipated that the buyer would charter a vessel and would have to agree with the owner of the vessel on the time for loading; there was good reason for construing the buyer's right to demurrage as being the sole remedy for breach of the loading rate guarantee which was inserted simply to trigger the right to demurrage (see p. 142, col. 2; p. 143, col. 1);

(3) as a broad proposition governing f.o.b. contracts for carriage by sea it could be said that loading of the goods was delivery; the buyers had failed to establish a breach additional to or separate from that of failing to load within the lay days and/or at the agreed rate and no separate right to damages in addition to demurrage arose (see p. 143, col. 2; p. 144, col. 1);

———Tradax Export S.A. v. Italgrani di Francesco Ambrosia, [1986] 1 Lloyd's Rep. 112, considered.

(4) as a matter of construction (or at least in a case which did not involve morality or policy) the application of the presumption that no man may take advantage of his own breach of contract so as to deprive him of the benefit of a provision, which on its face entitled him to recover the sum claimed, was to do no more than to imply a term that the right expressly given should not be available whenever the plaintiff was in breach of some parallel term in the contract, and the basis on which the Court ought to act in considering whether to imply such a term was the basis of business efficacy and/or the officious bystander; the inter-relation of the carrying charges clause with the demurrage clause depended on the terms of the special conditions agreed between the parties and there was no reason to depart from the test of business efficacy and/or the officious bystander of commercial experience faced with those terms and the particular circumstances arising (see p. 144, col. 2; p. 145, col. 1);

(5) if asked at the time of contract whether a breach of the guaranteed loading rate should automatically disentitle the seller pro tanto to his carrying charges, neither the parties nor the officious bystander would necessarily have answered yes (see p. 145, col. 1);

(6) since the buyer had a right to extend the shipment period on giving proper notice, the obligation to pay carrying charges was better regarded as the price to be paid for that extension than as liquidated damages provisions in respect of a breach; it did not follow that the absolute obligation represented by the loading rate guarantee for the purposes of triggering demurrage should be applied equally to impose a limit on the extent to which carrying charges should be paid; the provision that carrying charges were to be paid at the daily rate "till last B/L day" was an express provision of the contract intended to take effect whether or not the loading rate guarantee was fulfilled and/or to resolve the conflict between the guarantee and cl. 8 which might otherwise arise; the award would be upheld and the appeal dismissed (see p. 145, col. 2).

———

The following cases were referred to in the judgment:

Adelfa, The [1988] 2 Lloyd's Rep. 466;
Aktieselskabet Reidar v. Arcos Ltd., (C.A.) (1926) 25 Ll.L.Rep. 513; [1927] 1 K.B. 352;
Alghussein Establishment v. Eton College (H.L.), [1988] 1 W.L.R. 587;
Altus, The [1985] 1 Lloyd's Rep. 423;
Bunge Corporation v. Tradax Export S.A., (H.L.) [1981] 2 Lloyds Rep. 1; [1981] 1 W.L.R. 723; [1980] 1 Lloyd's Rep. 294;
Chandris v. Isbrandtsen-Moller Co. Inc., (1950) 83 Ll.L.Rep. 385;
John Michalos, [1987] 2 Lloyd's Rep. 189;
Suisse Atlantique Societé d'Armement Maritime S.A. v. N.V. Rotterdamsche Kolen Centrale (C.A.) [1965] 1 Lloyd's Rep. 533 (H.L.) [1966] 1 Lloyd's Rep. 529; [1967] 1 A.C. 361;
Toepfer (Alfred C.) v. Peter Cremer, (C.A.) [1975] 2 Lloyd's Rep. 118;
Tradax Export S.A. v. Italgrani di Francesco Ambrosia [1986] 1 Lloyd's Rep. 112.

———

The plaintiff buyers Richco International Ltd. appealed from the award of the Board of Appeal of GAFTA dated Jan. 4, 1990 by which the board awarded the defendant sellers Alfred C. Toepfer International G.m.b.H. $141,700 on appeal from one arbitration ward in favour of the buyers. The issue for decision was whether the buyers were liable to pay the carrying charges in respect of the time taken by the sellers to load the vessel in excess of the loading time permitted in the contract.

Mr. A. M. D. Havelock-Allan (instructed by Messrs. Richards Butler) for the plaintiffs; Mr. Richard Wood (instructed by Messrs. Middleton Potts) for defendants.

The further facts are stated in the judgment of Mr. Justice Potter.

Judgment was reserved.

Wednesday May 23, 1990

| POTTER, J.] | The "Bonde" | [Q.B. (Com. Ct.) |

### JUDGMENT

**Mr. Justice POTTER:** In this case the plaintiffs, Richco International Ltd., ("the buyers"), appeal from the award of the Board of Appeal of the Grain and Feed Trade Association ("GAFTA") dated Jan. 4, 1990 by which the board awarded to the defendants, Alfred C. Toepfer International G.m.b.H. ("the sellers") a sum of U.S. $141,750, together with interest thereon and sums by way of costs, on appeal from an arbitration award dated Aug. 10, 1989 in favour of the buyers.

The question of law arising out of the award is stated to be whether the buyers are liable to pay carrying charges in respect of the time taken by the sellers loading the vessel in excess of the loading time permitted in the contract.

The matter arises out of an f.o.b. contract for the sale by the sellers to the buyers of some 30,000 tonnes of Saudi Arabian wheat to be delivered f.o.b. stowed and trimmed Damman for shipment Apr. 20/May 20, 1988.

The special conditions contained in the brokers' sale confirmation contract provided inter alia:

> Sellers guarantee to load vessel at the rate of 3,000 metric tons per weather working day of 24 hours, Thursday afternoon/Friday, holidays excluded, even if used. Time to count at 08.00 next business day after Friday/Holiday. Time to begin to count at 00.00 next working day after presentation of notice of readiness, vessel having passed inspection and declared ready to load.
>
> Demurrage/despatch: to be for sellers' account at charter-party rate but maximum 8,000/4,000 US $/day.
>
> Carrying charges: none if vessel files with (sic) shipment period otherwise 0.25 per MT/ day till last B/L. day.

The word "with" was plainly an error for "within".

The general conditions provided that other conditions not in contradiction of the special conditions should be as per GAFTA 64, with arbitration in London as per rules of GAFTA 125.

By cl. 8, GAFTA 64 provides:

> EXTENSION OF DELIVERY — The Contract period of delivery shall, if desired by the Buyers, be extended by an additional period of 21 consecutive days, provided that Buyers give notice in accordance with the Notices Clause not later than the next business day following the last day of the delivery period. In this event Sellers shall carry the goods for Buyers' account and all charges for storage, interest, insurance and other such normal carrying expenses shall be for Buyers' account. Any differences in export duties, taxes, levies etc, between those applying during original shipment period and those applying during the period of extension shall be for the account of Buyers . . . Should Buyers not have taken delivery by the end of this extension period, Sellers shall have the option of declaring the Buyers to be in default or shall be entitled to demand payment at contract price for such charges as stated above, less current FOB charges, against warehouse warrants . . .

On May 20, 1988, the last day of the shipment period, the buyers claimed a 21-day extension of the delivery period. The buyers' vessel, *Bonde*, filed at the load port outside the shipment period. Notice of readiness was tendered and accepted on May 21, 1988. Loading commenced on May 29, 1988 and was completed at 15 38 hours on June 10. That was within the extended delivery period and, hence, the sellers were not in breach in that respect; however the sellers did not achieve the guaranteed loading rate of 3000 tonnes per weather working day of 24 hours. There was no issue in the arbitration as to the loading time or the demurrage payable by the sellers for the excess time used. The demurrage account had been settled prior to the arbitration. However, the sellers claimed that the buyers were liable to pay carrying charges for the 21-day period between May 21 and June 10, 1988 at U.S.$0.25 per day, amounting to U.S.$141,750.00 in total.

The buyers rejected the carrying charges claimed and the sellers referred the matter to arbitration. The principal ground for such rejection was the buyers' assertion that the vessel in fact filed during the delivery period. In that respect they were unsuccessful and there is no appeal against the board's findings. However, the buyers also submitted to the board that they should not be liable to the sellers for carrying charges in respect of any period when loading was delayed through the sellers' inability to load at the guaranteed loading rate.

For the purpose of that argument, the buyers contended that the terms of the loading guarantee were such that they meant that 3000 tonnes of cargo should be loaded *each* day. The board rejected that interpretation, holding that the guarantee only required the sellers to load the vessel at an *aggregate* rate of not less than 3000 tonnes per day. The buyers now accept such interpretation, but the substance of their argument that they should not be liable to carrying

charges arising out of a failure to achieve the guaranteed loading rate remains.

The board did not deal specifically with that point in their award. However, there had apparently been argument before the board as to the causes for the delay which in fact occurred, which included a substantial period when the loading elevator had broken down. In finding that the sellers were entitled to the full amount of their carrying charges claimed, the board stated as follows:

> 4.7 Carrying charges in the manner in which they appear in the contract are liquidated damages and this fact has been determined by case law.
>
> 4.8 The fact of an elevator breakdown during loading does not cause carrying charges or demurrage to cease during that period. It is beyond the control of either party.

The buyers contend that the form and extent of those findings was not a complete answer to the contention of the buyers that the defendants had guaranteed to load the cargo at the specified period rate, since, whatever may have been the reason for the buyers' failure, once the aggregate of the loading time calculated at that rate expired, they were in breach of the guarantee provision. It is the effect of that failure/breach, and in particular whether it disentitles the sellers to recover carrying charges to the extent to which the loading period was unduly extended which I am asked to decide on this appeal.

If I find that the board erred in law in a material respect in awarding the sellers carrying charges for the entire period until completion of loading, it is not clear from the board's award by what sum the total carrying charges will fall to be reduced. It is expected by the parties that they will be able to agree the amount of the necessary reduction; however, it appears that it will be necessary for the award as made to be set aside and the matter of quantum to be remitted to the board for them to substitute for the figure presently awarded the amount of the carrying charges agreed or found to be due for the aggregate period calculated in accordance with the guaranteed loading rate.

The buyers have put the legal basis of their challenge in three ways in the originating notice of motion, as amended pursuant to leave granted by me in the course of the hearing. They say that the sellers cannot recover carrying charges for the time taken in loading the vessel after the permitted loading time had expired because —

(i) the Buyers are entitled to recover as damages for breach of the loading rate guaranteed, <u>alternatively for breach of the Sellers' obligation to deliver the contract quantity within the extended delivery period at the agreed loading rate</u>, a sum equivalent to the carrying charges levied for the excess period and therefore have a defence of circuity of action; and/or

(ii) to allow such recovery would be to allow the Sellers to profit from their breach contrary to the presumption, which operates as a basic rule of construction, that no party to a contract can be permitted to take advantage of his own wrong as against the other party. The carrying charges provision must therefore be construed so as not to apply insofar as the "last B/L day" falls outside the permitted loading time; and/or

(iii) the contract contains an implied term, such term being implied because it goes without saying and/or is necessary for business efficacy, to the effect that — (a) neither party shall be entitled to take advantage of his own breach as against the other; alternatively (b) no carrying charges are payable in respect of any period after the permitted loading time has expired and the recovery of carrying charges for any such period would be a breach of that implied term.

The passage underlined shows the form of the amendment allowed by me in the course of the hearing.

I shall deal with each of those grounds in turn.

*Circuity of action*

The buyers' submission on this point rests on the premise that breach of a loading rate guarantee in the f.o.b. sale contract can give rise to a claim for general damages in addition to an entitlement to demurrage provided for in the contract. I am not aware that it is an argument which has previously been advanced in any of the reported cases on f.o.b. contracts. It may be none the worse for that. However, if correct, it seems to me it would have quite far reaching consequences. It might, for instance, be relied upon to assert that in the event of breach of such a clause in a fluctuating market, the buyer has a claim for damages for any difference between the market price at the actual bill of lading date and the date on which the bill would have been issued if the goods had been loaded at the contractual rate. The proposition therefore needs to be closely examined.

Not surprisingly, its examination before me has started on both sides with reference to the

| Potter, J.] | The "Bonde" | [Q.B. (Com. Ct.) |

cases on laytime and demurrage provisions in voyage charter-parties.

Mr. Havelock-Allan has relied upon the definition of a demurrage clause as —

> . . . the parties' estimate of the loss of prospective freight which the owner is likely to suffer if his ship is detained beyond the lay days [per Mr. Justice Devlin in *Chandris v. Isbrandtsen-Moller*, (1950) 83 Ll.L.Rep. 385 at p. 395, col. 1; [1951] 1 K.B. 240 at p. 249, cp the treatment by Lord Justice Diplock in *Suisse Atlantique Societé d'Armement Maritime S.A. v. N.V. Rotterdamsche Kolen Centrale*; [1965] 1 Lloyds Rep. 533 at p. 540] . . .

and has sought to apply it in the context of an f.o.b. contract for the sale of goods. In that context, Mr. Havelock-Allan says that a stipulation for demurrage is presumably the parties' estimate of that amount which the buyer is likely to have to pay to the owner of the ship which lifts the goods in order to compensate him for the loss of prospective freight which he will suffer if the ship is detained beyond the lay days allowed in the sale contract. If that is right, he says, demurrage is not and/or should not be the exclusive compensation where failure to load within the contractual laytime has consequences other than the detention of the ship. As agreed compensation for detention of a ship, it does not cover what he calls the separate and independent head of loss represented by the necessity to pay carrying charges for the excess time taken in loading.

Mr. Havelock-Allan relies on four charter-party cases in which he submits it has been held, or at least stated, that damages in addition to demurrage can be recovered for breach by the charterer in failing to complete loading within the lay days if those damages constitute a proved head of loss of a different character from the loss of use of the ship. They are the cases of *Aktieselskabet Reidar v. Arcos Ltd.*, (1926) 25 Ll.L.Rep. 513; [1927] 1 K.B. 352, *Chandris v. Isbrandtsen Moller Co. Inc.*, (1950) 83 Ll.L.Rep. 385; [1951] 1 K.B. 240, *The Altus*, [1985] 1 Lloyd's Rep. 423 and *The Adelfa*, [1988] 2 Lloyd's Rep. 466. He acknowledges that various observations in the Court of Appeal and House of Lords in the case of *Suisse Atlantique* C.A. [1965] 1 Lloyd's Rep. 533 and H.L. [1966] 1 Lloyd's Rep. 529; [1967] 1 A.C. 361 stand in his path. However, he suggests that, on careful examination, they do not present any obstacle to a finding in his favour.

In the light of the detailed analysis to which the case of *Reider v. Arcos* has been submitted in subsequent cases at all levels, it seems presumptuous for me to add any separate observations of my own. I certainly propose to restrict them to a minimum. In that case, shipowners chartered a vessel to charterers to load a full and complete cargo of timber, the charter-party providing for loading in a fixed time and for demurrage to be payable at a fixed rate per day thereafter. The charterers exceeded the fixed time and demurrage became payable. If the vessel had been loaded within the time fixed, summer cargo would have been loaded, but by the time she was loaded she could only legally carry to the United Kingdom a winter cargo of a smaller quantity. The Court of Appeal upheld the decision of Mr. Justice Greer (as he then was) that, in addition to recovery of demurrage at a fixed rate, the ship owners were entitled to recover damages representing the difference in freight between the summer cargo and the winter cargo.

Although the reasoning in the judgments of each member of the Court gave rise to the same result, the detail of that reasoning is not easy (indeed it is impossible) to reconcile. In the leading judgment, Lord Justice Bankes held that the charterers had committed a breach of a single obligation, namely failing to load at the stipulated rate, which gave the owners two distinct claims in the sense that there were two heads of damage which were each of a different character, one for detention of the vessel and one for loss of freight. It is worth noting in parenthesis that his decision that the owners could recover deadfreight as damages for breach in failing to load at the agreed rate was not one for which the owners had contended, a position which Lord Justice Bankes acknowledged at the outset of his judgment (p. 514; p. 357) where he stated that the breach alleged was the failure to load a full and complete cargo. Lord Justice Sergeant considered that there had been two breaches of two separate obligations, each giving rise to separate recoverable losses, the first being failure to load a complete cargo giving rise to a claim for loss of freight (deadfreight) as the owners had contended and the second being breach of the "mere" demurrage provision which gave rise simply to a right to liquidated damages for detention (as the owners acknowledged).

The judgment of Lord Justice Atkin presents some difficulties as a matter of analysis. Mr. Havelock-Allan would align him with the judgment of Lord Justice Bankes as having allowed recovery of two types of damage for a single breach; Mr. Wood seeks to put him with Lord Justice Sergeant. In my view, while the matter is far from easy, Lord Justice Atkin is properly

to be regarded as a "two breach" man. At p. 516; p. 363 the breach identified by him as giving rise to the owners' right to recover was the charterer's failure —

> ... to *complete* the loading of the ship within the lay days.

So identified, that breach was not ipso facto one which entitled the owners to recover demurrage. It is not the failure to load a complete cargo by the expiration of laytime which gives rise to the right to demurrage; it is the subsequent detention of the vessel at the loading port. This was implicitly recognized by Lord Justice Atkin later in his judgment where he remarked that "demurrage days are days in which the charterer is in breach". The phrase which has given rise to the difficulty and which, taken alone, might seem to suggest that Lord Justice Atkin is to be regarded as a "one breach" man is his remark that —

> ... the provisions as to demurrage quantify the damages, not for *the complete breach*, but only such damages as arise from the detention of the vessel.

In my opinion, viewed in context, those words were used as no more than a shorthand method of referring to the entirety of the charterers' breaches, namely (i) failure to load a complete cargo by expiry of laytime and (ii) subsequent detaining of the vessel in port. I am fortified in this view by the fact that in the case of *Suisse Atlantique*, in the Court of Appeal at p. 539, Lord Justice Sellers (with whom Lord Justice Harman and Lord Justice Diplock agreed) considered that the judgment of Lord Justice Atkin was to the effect that —

> ... the damages recovered for dead freight were for a separate breach of contract and were wholly independent of the detention of the vessel, although it was of course the delay beyond the lay days that created the inability to perform the other aspect of the obligation which was to load a full and complete cargo.

Lord Justice Diplock remarked for his part that—

> ... there was, of course, one act which constituted a breach, namely the failure to load during the lay days. Mr. Justice Greer, certainly Lord Justice Sergeant and, I think, Lord Justice Atkin, took the view that that constituted a breach of two obligations: one the obligation to load during lay time, and the other obligation to load a full and complete cargo.

In the House of Lords, Viscount Dilhorne at p. 539, cols. 1 and 2; p. 389 was plainly of the view that the effect of the judgment of Lord Justice Atkin and Lord Justice Sargeant was that it was necessary for a party to establish a breach of charter-party other than by the detention of the vessel if damages are to be obtainable over and above the demurrage payments and Lord Hodson (at p. 549, col. 2 p. 408B) and Lord Upjohn (at p. 555, col. 1; p. 418B) were of a similar view. Lord Reid and Lord Wilberforce expressed no separate view upon the point.

Despite these succinct statements at the highest level, Mr. Havelock-Allan sought to rely upon the analysis of *Reidar v. Arcos* by Mr. Justice Devlin in *Chandris v. Isbrandtsen-Moller* (above) at pp. 397-398; pp. 254-255. In that case there had been a clear breach of charter-party separate from the detention of the vessel beyond the permitted laytime, namely the loading of dangerous cargo. That separate breach had resulted in the delay and the issue was whether the owners could recover, as damages for the breach in loading the dangerous cargo, compensation for the period of delay rather than demurrage. The issue to which *Reidar* gave rise (i.e. whether damages apart from demurrage can ever be claimed for breach of the laytime provision) was not the subject of decision by Mr. Justice Devlin. However, in *Chandris* the owners sought to rely on the judgment of Lord Justice Sargeant in *Reidar v. Arcos* in support of their principle contention that the demurrage clause could not apply in a situation where the charterer had committed a fundamental breach of the charter-party. While it is true that at the end of his judgment (at p. 398, col. 2; p. 255) Mr. Justice Devlin expressed the view that the ratio decidendi in *Reidar v. Arcos* was to be found in the judgments of Lords Justices Bankes and Atkin, that was in a context where he was dealing with the question of fundamental breach and was not purporting to decide whether the particular breach identified by Lord Justice Atkin was the same breach as that which gave rise to the right to demurrage. It is quite clear from a passage at p. 398, col. 1; p. 254 that Mr. Justice Devlin considered that the breach with which *Reidar v. Arcos* was concerned was "breach of the obligation to provide a cargo", which obligation he plainly regarded as distinct from the obligation to load the cargo within the lay days (see p. 396, col. 2; p. 252). I do not consider that the case of *Chandris* assists Mr. Havelock-Allan.

Nor do I consider that he is assisted by the decision of Mr. Justice Webster in *The Altus*. In that case, Mr. Justice Webster applied the decision in *Reidar v. Arcos* in a situation where

owners claimed damages for breach by a charterer of his obligation to provide a minimum contractual load, and held that the owner was not only entitled to the liquidated damages directly recoverable for the breach of the obligation to load (deadfreight) but also to damages flowing indirectly or consequentially from any failure to load a complete cargo. In that case he appeared to be of the view that Lord Justice Atkin was, like Lord Justice Bankes a "one breach" man. However, surprisingly, he appears not to have had the decision in *Suisse Atlantique* brought to his attention and, helpful as I have found the analysis which Mr. Justice Webster gave to the *Reidar* case, I do not find it reliable for that reason. It is also at odds with the view of Mr. Justice Leggatt (as he then was) shortly expressed in *The John Michalos*, [1987] 2 Lloyd's Rep. 189 at p. 191.

Finally, Mr. Havelock-Allan cited to me the case of *The Adelfa*. In that case, in a passage containing brief reference to the authorities and, in particular, the judgments of Mr. Justice Devlin in *Chandris* and Mr. Justice Webster in *The Altus*, Mr. Justice Evans expressed the view that the —

> . . . authoritative statements of the law . . . in *Suisse Atlantique* . . in my respectful view do not necessarily preclude the submission on behalf of shipowners that an independent head of damages may be recovered in the circumstances of a particular case.

In that passage Mr. Justice Evans does indeed appear to have been contemplating an independent head of damages stemming simply from a charterer's breach of contract in failing to complete loading within the lay days, rather than damages stemming from a separate breach of contract. However, his view was obiter and expressed in somewhat tentative terms. It does not dissuade me from the opinion which I have formed upon analysis of the cases which is that, where a charter-party contains a demurrage clause, then in order to recover damages in addition to demurrage for breach of the charterers' obligation to complete loading within the lay days, it is a requirement that the plaintiff demonstrate that such additional loss is not only different in character from loss of use but stems from breach of an additional and/or independent obligation.

The question then arises as to whether, by transposition and/or analogy the same conclusion should be drawn in respect of the rights and obligations of the seller and buyer under an f.o.b. contract into which provisions are imported in relation to rates of loading and payment of demurrage. I think that it should.

In the course of his submissions Mr. Havelock-Allan has concentrated on the nature and purpose of demurrage as compensation for loss of use of a vessel. He submits that in a charter-party, where the obligation of the shipowner is simply to provide a ship to load at the relevant place and the obligation of the charterer is to load on board a cargo of certain minimum size it is rare for any consequence to flow from exceeding the lay days other than detention of the ship beyond the time contractually agreed with consequent loss of use. On the other hand, he says, in the case of an f.o.b. contract for the sale of goods, where the seller's obligation to load the buyer's ship at the agreed rate is part of a wider obligation of the seller to effect delivery of the contract goods at the required time and place for the price, other consequences than mere detention of the ship will more frequently arise from exceeding the laytime. He cites as examples a potential liability to carrying charges payable on a daily rate as in this case and the situation, common in the sale of oil and oil products, where goods may be priced by reference to a discount based on the bill of lading date so that delay in loading may cause the contract price to be increased where the market is rising.

Mr. Wood, on the other hand says that the f.o.b. contract is an a fortiori case for limitation of the buyer's right of recovery to an indemnity in respect of demurrage. He points out that in voyage charter-party cases the obligation to load in time which is embodied in the laytime provision goes right to the heart of the contract, the laytime provision defining what that time shall be. In an f.o.b. sale contract on the other hand the essence of the sellers' obligation so far as time of delivery is concerned is the shipment period clause, the buyers' entitlement being to have goods shipped within the agreed period (or the agreed period as extended). Mr. Wood suggests that the relevant inquiry is not into the purpose or ambit of the demurrage provision in the charter-party so much as the purpose of the loading rate provision in a contract of sale in which the time for completion of delivery is already provided for. The purpose (and Mr. Woods submits the only purpose) for the importation from the charter-party of a loading rate clause is to provide the mechanism for effecting the reimbursement of demurrage as between buyer and seller. The laytime provision is inserted because it is anticipated that the buyer will charter a vessel and will have to agree with the owner of that vessel on the time for loading. If loading (which is the sellers' operation) exceeds that time, the buyer will

incur liability to the owners which it is agreed as part of the bargain the seller should reimburse. Given that ancillary and limited purpose for the importation of the laytime provision into the contract of sale there is good reason for construing the buyer's right to demurrage as being the sole remedy for "breach" of the loading rate guarantee which is inserted simply as the trigger to the right to demurrage.

In my view Mr. Wood is correct in his submissions and the importation of the charter-party "regime" into the Sale of Goods Act regime so far as the incidence of demurrage is concerned should carry with it mutatis mutandis the restrictions which apply to the parties' remedies so far as breach of laytime/loading rate provision is concerned.

Assuming that to be the case, Mr. Havelock-Allan nonetheless submits that he can show breach of an additional obligation to that of loading within the lay days. He submits that not merely were the sellers in breach of their obligation to *load* at the guaranteed rate but also their obligation —

> . . . to *deliver* the contract quantity within the extended delivery period *at the agreed contractual rate*.

In this respect he relies on the words of Lord Justice Megaw in *Bunge Corporation v. Tradax Export S.A.*, [1980] 1 Lloyd's Rep. 294 at p. 303, col. 1. as approved by Lord Roskill in the House of Lords at [1981] 2 Lloyd's Rep. 1; [1981] 1 W.L.R. 723 and the judgment of Lord Justice Kerr in *Tradax Export S.A. v. Italgrani di Francesco Ambrosia*, [1986] 1 Lloyd's Rep. 112 at pp. 117–118. He also relies on the exposition of the seller's position in Benjamin on Sale (3rd ed.) at par. 1829 (express provisions as to notice and rate of loading) where *Bunge v. Tradax* is discussed as well as on par. 1830 (effect of sellers' failure to load within the required time). He says that in this case the sellers were not simply in breach of the agreed laytime provision. Their breach also constituted a breach of the obligation to deliver the goods on board the buyers' ship within the time allowed after the ship's notice of readiness. The breach in not making timeous delivery of the goods resulted in carrying charges being payable which would not otherwise have had to be paid, that being a loss for which demurrage was not (and not intended to be) compensation.

I consider that the distinction which Mr. Havelock-Allan seeks to make between loading and delivery in an f.o.b. contract of this type represents an inappropriate refinement of the position so far as the duties of the seller are concerned. As a broad proposition governing f.o.b. contracts for carriage by sea, it may be said that loading of the goods *is* delivery. Certainly that is the position so far as this contract is concerned. As stated in Benjamin at par. 1810:

> . . . the duties of an F.O.B. Seller are hard to state in general terms, for the obvious reason that they vary according to the type of F.O.B. contract in question. A further difficulty in discussing the duties of the Seller results from the fact that shipment under an F.O.B. contract is in many respects a joint enterprise, involving co-operation between Buyer and Seller.

and at par. 1811:

> . . . it is the duty of an F.O.B. Seller to put the goods on board the ship nominated or designated by the Buyer. Under section 32(1) of the Sale of Goods Act 1979 the Seller is, by performing this duty, prima facie deemed to have delivered the goods to the buyer; and the place at which the goods are thus delivered is considered to be the place of performance under the F.O.B. contract.

The broad proposition, as I have called it, is exemplified in cll. 1, 7 and 8 of GAFTA 64 where the processes of loading, shipment and delivery appear to be treated as interchangeable as a matter of drafting. As to the judicial remarks relied on by Mr. Havelock-Allan, it seems to me that Lord Justice Kerr in *Tradax v. Italgrani* expressly treated loading and delivery as synonymous when he stated that —

> The respective obligations of the parties are . . . designed to bring about a concurrence of the vessel provided by the Buyers being ready to load the contractual goods and of the Sellers' obligation to deliver the goods by loading them on board the vessel when so provided in accordance with the contract.

Nor does the passage of the judgment of Lord Justice Megaw in *Bunge v. Tradax* suggest a different view. It is also worth noting that in a later passage in his judgment (p. 117) Lord Justice Kerr stated:

> . . . there is nothing in the passages which I have quoted from Benjamin on Sale to suggest that, by failing to complete loading within a reasonable time, or within the time prescribed by the loading rate (if any) laid down in the contract, the sellers can be held to be in breach of condition even if the loading is completed before the expiry of the shipment period. Prima facie the sellers would be liable in damages in the first case and for demurrage in the second.

Although no doubt the mind of Lord Justice

POTTER, J.]                         The "Bonde"                         [Q.B. (Com. Ct.)

Kerr was not directly upon the point in issue in this case, his view appears to have been that demurrage was the appropriate remedy and not damages for failure to load at the prescribed loading rate.

Accordingly I do not consider that the buyers have demonstrated a breach additional to or separate from that of failing to load within the lay days and/or at the agreed rate and I hold that no separate right to damages in addition to demurrage arises for the purposes of the argument as to circuity of action.

*Construction/implied term*

On the basis that circuity of action is not available as defence, Mr. Havelock-Allan nonetheless submits that if the sellers recover carrying charges for the period beyond the aggregate allowed under the guaranteed loading rate, they will be obtaining a benefit from their own breach of contract and/or taking advantage of their own wrong. He relies upon the principle stated at Chitty on Contracts (26th ed.) vol. 1 par. 912 that—

> . . . as a matter of construction, in the absence of clear express provisions to the contrary it will be presumed it was not the intention of the parties that either should be entitled to rely on his own breach of the contract to avoid the contract or obtain a benefit under it . . .

and to the authorities referred to in the note thereunder. In particular he has referred me to the speech of Lord Jauncey in *Alghussein Establishment v. Eton College*, [1988] 1 W.L.R. 587 where the various statements to that effect made in certain leading authorities were reviewed in the context of arguments over the construction of an agreement for a lease, and in particular whether a party in default of his obligations to commence a development provided for therein was entitled nonetheless to the grant of a lease under a clause which anticipated a grant even though the development was not complete at the time the grant was sought. The matter was treated throughout as one of construction and Lord Jauncey's speech ended with the remark that:

> It only remains to refer to the . . . argument that there is an absolute rule of law and morality which prevents the party taking advantage of his own wrong whatever the terms of the contract. . . . I do not find it necessary to deal with this. For my part I have no doubt that the weight of authority favours the view that in general the principle is embodied in a rule of construction rather than in an absolute rule of law . . . that is not to say there cannot be situations such as self-induced frustration, . . . where an absolute rule exists. It is neither necessary nor would it be profitable to explore the matter further in this case.

Despite the fact that the principal authorities relate to situations concerning the granting or avoidance of leases it seems clear to me that the principal of construction referred to is one of wide application. Indeed it is plain that it is one which has been considered and/or applied in the case of a commodity contract, as a species of quasi-estoppel (see *Alfred C. Toepfer v. Peter Cremer*, [1975] 2 Lloyd's Rep. 118 per Lord Denning at p. 124), and in *The Altus* (see above) at p. 436, where Mr. Justice Webster commented:

> . . . the defence ought in any event, in my view, to fail for a third reason, namely that the defendants should not be able to benefit, by paying a lower demurrage rate, from their own wrong in failing to load a full and complete cargo.

I am prepared to accept the principle as stated in Chitty subject to the reservation that as an exercise in construction the requirement of "clear express provisions to the contrary" should not be read as meaning more than a clear contractual intention to be gathered from the express provisions of the contract. In my view, any exercise in construction must be considered in the context of the particular contract, and must pay particular regard to the nature and purpose of the term in relation to which the party seeking the remedy is said to have been in breach and to the nature of the benefit or advantage said to accrue by permitting recovery on his part. It seems to me that this is particularly so bearing in mind that, treating the matter as one of construction (at least in a case where no question of morality or policy arises) the application of the so-called presumption that no man may take advantage of his own wrong (in the sense of his own breach of contract) so as to deprive him of the benefit of a provision which on its face entitles him to recover the sum claimed, is to do no more than to imply a term that the right expressly given shall not be available whenever the plaintiff is in breach of some parallel term in the contract.

If that is so, upon what basis must the Court act in considering whether to imply the term contended for? Usually it is the basis of business efficacy and/or "the officious bystander" as traditionally expounded, though both are but a route to the presumed intention of the parties: see Chitty, vol. 1 pars. 904–907. It is true that in certain classes of contract, terms are implied

[1991] Vol. 1            LLOYD'S LAW REPORTS            145

Q.B. (Com. Ct.)]            The "Bonde"            [POTTER, J.

less on the basis of the inferred intention of the parties in the individual transaction than on the basis of general rules laid down for contracts of the particular class in question, of which sale of goods and contracts for carriage by sea are plainly examples (see Chitty, par. 903). Nonetheless in this case the inter relation of the carrying charges clause with the demurrage provision depends on the terms of the special conditions agreed between the parties and I see no reason to depart from the test of business efficacy and/or of the officious bystander of commercial experience faced with those terms and the particular circumstances arising.

The circumstances are in essence that under the contract the buyers had the right to require an extension of the contractually agreed shipment period (cl. 8 of GAFTA 64), the quid pro quo for which was the obligation to pay carrying charges incurred during the extended period at a rate fixed as the pre-estimate of the likely cost to the sellers. Although the rate was one assessed per diem that does not alter the character of the obligation undertaken which is that of a price to be paid for the extension obtained, without which the buyer would be in breach of a condition of the contract. On the other hand the obligation imposed by the loading rate guarantee in association with the demurrage clause was virtually an absolute one, given the limited nature of the exceptions clauses available to the seller under cll. 20 and 21 of GAFTA 64, which I need not trouble to quote but which it is plain did not cover such incidents as elevator breakdown which might arise through no fault of the seller. In that connection it is to be noted that there was no finding by the board that the delay in loading was caused by any wilful default or any failure within the sellers' control and, to the contrary, it found that the elevator breakdown was beyond the control of either party.

In those circumstances I do not consider that the parties or the officious bystander, if asked at the time of contract whether a "breach" of the guaranteed loading rate should automatically disentitle the seller pro tanto to his carrying charges, would necessarily have answered "Yes". It seems clear to me that it was the incidence of demurrage liability regardless of blame which weighed with the board when considering the inter relation of the obligations at pars. 4.7 and 4.8 of their findings. In this respect the members of the board were better qualified than I to discharge the function of the officious bystander familiar with the intentions and expectations of businessmen when making a contract of this kind. They were plainly of the view the answer to the question should be "No", on the basis that the buyers' obligation to pay carrying charges "till last B/L day" on the one hand and the seller's obligation to pay demurrage on the other might justly and sensibly run in parallel, the latter compensating the buyer for delay caused as a result of failure to comply with the loading rate, while in effect the former compensated the seller for the original failure of the buyer to comply with the shipment period agreed.

Since the buyer has a right to extend the shipment period on giving proper notice, it seems to me that the obligation to pay carrying charges as provided is better regarded as the price to be paid for that extension than as a liquidated damage provision in respect of a breach. Nonetheless, like the board, I do not think it follows that the absolute obligation represented by the loading rate guarantee for the purposes of triggering demurrage should be applied equally to impose a limit upon the extent to which carrying charges should be paid. If and insofar as that construction may be said to involve the sellers in taking advantage of their own breach in claiming the carrying charges, I would hold that the provision that carrying charges be paid at the daily rate "till last B/L day" is an express provision of the contract intended to take effect whether or not the loading rate guarantee was fulfilled and/or to resolve the conflict between that guarantee and cl. 8 of GAFTA 64 which might otherwise arise.

Mr. Havelock-Allan suggested that such a construction should not commend itself because it could give rise to potential abuse in a case where the carrying charges recoverable by the seller exceeded their liability for demurrage in respect of delay. I do not regard this as a point of weight, since Counsel were agreed that such a situation would rarely if ever, be encountered in practice and certainly was not the position in this case.

Accordingly, I find against the buyers on the point of construction and I uphold the award. The appeal is dismissed.