# EXHIBIT 6

[IN THE COURT OF APPEAL.]

INVERKIP STEAMSHIP COMPANY, LIMITED *v.* BUNGE & CO.

*Ship—Charterparty—Demurrage—Period of Demurrage not specified— Detention of Ship beyond a reasonable Time—Damages.*

C. A.
1917
March 29, 30;
April 26.

A charterparty provided: Steamer to be loaded with customary berth despatch, and, if detained longer than five days, charterers to pay demurrage at the rate of fourpence per ton per day, provided such detention shall occur by default of charterers or their agents. The original port of loading having been wrecked by a tidal wave the ship was by agreement diverted to another port, where great difficulty was experienced in loading and despatching ships at and from that port. At the expiration of a reasonable time beyond the lay days the charterers had not commenced to load the steamer, and she was further detained for the purpose of loading. The plaintiffs claimed damages for the detention beyond the reasonable time :—

*Held,* affirming the decision of Sankey J. [1917] 1 K. B. 31, that the demurrage rate of compensation applied to the whole period of detention, and therefore that the plaintiffs were not entitled to damages as distinguished from the demurrage rate for the extra period of detention.

*Western Steamship Co.* v. *Amaral Sutherland & Co.* [1913] 3 K. B. 366 followed.

Dictum of Lord Trayner in *Lilly & Co.* v. *Stevenson & Co.* (1895) 22 R. 278 disapproved.

*Ardan Steamship Co.* v. *Andrew Weir & Co.* [1905] A. C. 501 distinguished.

APPEAL from the decision of Sankey J. (1)

The plaintiffs, the owners of the steamship *Inverkip*, claimed damages from the defendants, the charterers, for thirteen days' detention of the vessel from September 17 to September 29, 1915, at 200*l.* per day. By the charterparty the vessel was to proceed to New Orleans or Galveston and load a grain cargo for a safe port in the Mediterranean not east of the west coast of Italy and excluding Africa, "steamer to be loaded according to berth terms, with customary berth despatch, and if detained longer than five days, Sundays and holidays excepted, charterers to pay demurrage at the rate of fourpence British sterling, or its equivalent, per net

(1) [1917] 1 K. B. 31.

C. A.
1917

INVERKIP
STEAMSHIP
COMPANY,
LIMITED
v.
BUNGE & Co.

register ton per day, or pro rata, payable day by day, provided such detention shall occur by default of charterers or their agents." The charterparty also contained this clause: "Time for loading, if required by charterers, not to commence before August 25, 1915." It also provided that in certain events the charterers should have the option of cancelling the charter at noon on September 15. The *Inverkip* was to have loaded at Galveston, but owing to serious damage to that port by a tidal wave she was directed to load at Newport News, where she arrived on August 18. Her lay days began on August 25, but owing to the difficulty of getting the grain to that port, the congestion of the port, and the fact that a grain elevator there was destroyed by fire, there was great delay in the loading. Demurrage at the agreed rate, which amounted to 46l. 15s. 4d. per day, was paid by the defendants from September 1 to September 17. On the latter date, the loading not having then been begun, the plaintiffs' solicitors wrote as follows to the defendants: "We are instructed to give you notice that our clients contend that the vessel is no longer on demurrage and that as from this date they will claim damages for detention, which they estimate at 200l. per day. They have therefore instructed the master not to accept any further payment of demurrage." To that letter the defendants replied: "We must protest against the course which the owners threaten to adopt, and we must refer them to the charterparty, which defines the rights of the parties." The vessel waited for her cargo, and the defendants tendered the demurrage rate day by day till September 29, on which date the loading was completed, but as it was refused by the master it was deposited, and the defendants brought the amount into Court. The plaintiffs contended that it was an implied term of the charterparty that the defendants should not be allowed to keep the vessel on demurrage at the specified demurrage rate for more than a reasonable time, which time, they said, expired on September 17. The defendants denied that there was any implied term in the charterparty as alleged by the plaintiffs, and they further denied that a reasonable time was exceeded in the loading of the vessel. On the evidence Sankey J. held that on September 17 a reasonable time for keeping the vessel on demurrage had expired, that the demurrage rate of compensation applied to the whole period of detention, and that the

2 K. B.        KING'S BENCH DIVISION.                              195

plaintiffs were not entitled to damages as distinguished from the demurrage rate in respect of the detention after September 17.

C. A.
1917

INVERKIP
STEAMSHIP
COMPANY,
LIMITED
v.
BUNGE & CO.

The plaintiffs appealed.

R. A. *Wright* (*Roche*, K.C., with him), for the appellants. Where, as here, a charterparty provides for a number of lay days, and then for demurrage at a fixed rate, without specifying any period during which demurrage shall be paid, the ship can only be kept on demurrage for a reasonable period after the expiration of the lay days, and after that reasonable period has elapsed the shipowner is entitled to damages at large. The appellants' case is based on the meaning of "demurrage," which from its nature refers to a detention of a defined or limited extent. Where its extent is not expressly defined a reasonable period is to be implied. Where the demurrage days have expired and no cargo is forthcoming the charterer is in breach and the owner may repudiate and take the ship away; and his right to damages has accrued: *Nolisement (Owners)* v. *Bunge & Born.* (1) Where the demurrage days are not limited by the contract they will be limited by law to what is reasonable in the circumstances: *Wilson & Coventry* v. *Otto Thoresen's Linie* (2); *Lilly & Co.* v. *Stevenson & Co.* (3) See also Carver's Carriage by Sea, 5th ed., s. 609. The stipulated rate of demurrage only applies to a rightful detention; but the charterer cannot insist on detaining the ship after a reasonable time has expired. Where there is subsequent detention the shipowner is entitled to damages. In *Western Steamship Co.* v. *Amaral Sutherland & Co.* (4) Bray J. decided the point against our contention. That was decided on a point of law, and on appeal the Court took the view that the facts ought to be further ascertained and discharged the order of Bray J. without assenting to or dissenting from his judgment. (5) The point, therefore, is still open.

[WARRINGTON L.J. referred to *Sanguinetti* v. *Pacific Steam Navigation Co.* (6), where Brett J.A. said: "The question of whether payment or compensation to be made over the lay days is to be considered as demurrage, or whether it is to be considered as

(1) [1917] 1 K. B. 160.
(2) [1910] 2 K. B. 405.
(3) 22 R. 278.
(4) [1913] 3 K. B. 366.
(5) [1914] 3 K. B. 55.
(6) (1877) 2 Q. B. D. 238, 251.

O 2                                          2

Case 1:07-cv-07469-JGK   Document 19-7   Filed 10/25/2007   Page 5 of 13

C. A.
1917
___
INVERKIP
STEAMSHIP
COMPANY,
LIMITED
*v.*
BUNGE & Co.

detention, generally depends upon this, whether there is a fixed number of demurrage days mentioned in the charterparty, because if there is a fixed number of days beyond lay days, and the ship is delayed by the fault of the charterer, then the detention beyond that is what is called a detention, to be compensated for by damages; but here the number of demurrage days is not mentioned at all, and, therefore, all the detention beyond the lay days seems to me to be demurrage, and quite within the demurrage clause."]

Brett L.J. was not there considering the case of abnormal detention, i.e., whether you can have demurrage days for ever. Assuming that a reasonable time has elapsed, is the owner placed in this dilemma, either he must withdraw the ship or else accept payment at the demurrage rate?—Scrutton's Charterparties and Bills of Lading, 7th ed., p. 283. In the judgment appealed from Sankey J. said (1): "In my opinion the parties have in this case agreed that one and the same rate, namely, fourpence per net register ton per day, shall be paid however long the ship is detained. I do not of course mean that the ship can be detained for ever; I mean while she is detained for the purpose for which she has gone to the port—in this case to load a grain cargo." He draws a distinction between detention for the purpose of loading and for an ulterior motive, such as malice or spite. Delay in furnishing a cargo is just as much a by-motive as malice or spite. In *Ardan Steamship Co.* v. *Andrew Weir & Co.* (2) the charterers were held liable in damages on the ground that it was their primary duty to furnish the stipulated cargo. The detention there, as here, was not due to delay in loading, but to not having a cargo ready for loading. In this charter "if detained longer" means if detained in the loading. Detention for an extraneous purpose is not within the agreed rate of demurrage, and the damages are at large. [They also referred to *Harris* v. *Jacobs*. (3)]

*Leck*, K.C., and *Theobald Mathew*, for the respondents. The cause of the default is immaterial. If the charterers are in breach they must pay demurrage at the agreed rate. It is said that the words "if detained longer" are subject to some limitation. There is no ground for any limitation, and the cause of the detention is

(1) [1917] 1 K. B. 36.    (2) [1905] A. C. 501.
(3) (1885) 15 Q. B. D. 247.

2 K. B.         KING'S BENCH DIVISION.                    197

immaterial. The shipowner has his remedy in the right to withdraw the ship. Sankey J. has rightly held that the demurrage rate of compensation applies to the whole period of detention.

*Roche, K.C.*, in reply. "If detained longer" means "if detained in the loading." Delay in the loading is one thing, and failure to provide a cargo is another. The demurrage clause refers only to delay in the loading. The obligation upon the charterer is to provide a cargo and have it at the port of loading.

[SCRUTTON L.J. referred to *Jackson v. Union Marine Insurance Co.* (1)]

The cases on frustration of contracts do not apply.

C. A.
1917
INVERKIP STEAMSHIP COMPANY, LIMITED
*v.*
BUNGE & CO.

April 26. WARRINGTON L.J. The question in this case is whether the plaintiffs (shipowners) are entitled to recover from the defendants (the charterers of one of the plaintiffs' vessels), in respect of the detention of the ship, damages of an unliquidated amount or demurrage at the rate per ton per day fixed by the charterparty. The learned judge, Sankey J., has accepted the defendants' view and awarded the agreed rate. This is very much less than the plaintiffs claim to be entitled to on the other footing, and they appeal to this Court.

The learned judge was of opinion that the detention was for a period longer than was reasonable, but that, notwithstanding this fact, the clause providing for the payment of the rate per ton per day was wide enough to cover the detention which had occurred, and that even if the shipowners might properly have withdrawn the ship, they did not do so and therefore must accept what the contract allows them. In so deciding the learned judge was following the decision of Bray J. in *Western Steamship Co. v. Amaral Sutherland & Co.* (2)

I think the case is simply one of construction. Does the provision as to demurrage payable for detention after the fixed lay days apply to the detention which actually took place, or did such detention constitute a breach of contract not covered by the special provision and therefore giving rise to a claim for damages at large? [The Lord Justice stated the terms of the charterparty and the material facts, more fully given above, and proceeded:]

(1) (1874) L. R. 10 C. P. 125.        (2) [1913] 3 K. B. 366.

C. A.
1917
___
INVERKIP
STEAMSHIP
COMPANY,
LIMITED
v.
BUNGE & Co.
___
Warrington L.J.

There was evidence that the delay was occasioned by the defendants' failure to provide a cargo in this sense, that owing to the change of ports and the other circumstances I have mentioned it was impossible to obtain a cargo at Newport News for the ship—a new cargo had to be obtained elsewhere and was not ready so as to enable the ship to be loaded earlier than the actual time.

It was contended that on the true construction of the charterparty the clause I have read is confined to mere delays in loading and does not extend to cover detention occasioned by failure to provide a cargo. Reliance was placed on the case of *Ardan Steamship Co. v. Andrew Weir & Co.* (1) as establishing that the obligation to load in accordance with the charterparty and the obligation to provide a cargo are separate and distinct obligations, and I accept that view. But I cannot hold that in the present case the provision for demurrage is confined to delay in loading. The demurrage becomes payable only in case of default by the charterers; there are no words limiting that default, as the plaintiffs contend it should be limited, and I can find nothing in the contract sufficient to introduce such a limitation. It is true that the clause begins with the words "Steamer to be loaded," &c., but this seems to me to do no more than indicate that the detention referred to is detention at the port of loading, detention at the port of discharge being dealt with by a subsequent clause.

I think the answer to the plaintiffs' claim is that, whether deliberately or by inadvertence, the parties have provided that the shipowners shall accept compensation at a fixed rate in respect of the detention which has in fact occurred and therefore they must be content with that.

I prefer to express no opinion on the question whether or not the plaintiffs were entitled to withdraw the ship on September 17 or on any other day. That question does not arise.

The result is that in my opinion the appeal fails.

SCRUTTON L.J. The Inverkip Steamship Company, owners of the steamship *Inverkip*, appeal against a decision of Sankey J. that the sum paid into Court by the defendants, Bunge & Co., the charterers of the *Inverkip*, for demurrage at her port of loading is sufficient.

(1) [1905] A. C. 510.

The charter, dated July 16, 1915, provided that the steamer should call at Key West for orders for New Orleans or Galveston to load a grain cargo—" Steamer to be loaded according to berth terms, with customary berth despatch, and if detained longer than five days, Sundays and holidays excepted, charterers to pay demurrage at the rate of four pence (4d.) British sterling, or its equivalent, per net register ton per day, or pro rata, payable day by day, provided such detention shall occur by default of charterers or their agents." This was a printed clause, and, from my experience, the rate of demurrage (about 47l. a day) was low for that time. By a written clause the steamer was to be discharged at the rate of 500 tons per running day, demurrage at the rate of 100l. per running day. "Time for loading, if required by charterers, not to commence before the 25th day of August, 1915." Option of cancelling if steamer not ready to load by September 15, 1915.

Just before the vessel arrived at Key West for orders a tidal wave seriously damaged the shipping facilities at Galveston, and great delay was probable at that port, for which the steamer would get no demurrage. It was accordingly arranged that the steamer should be ordered to Newport News at 6d. reduction in freight. She arrived there on August 18, and her lay days began on August 25. The five lay days in the demurrage clause expired on the evening of August 31.

Unfortunately the same idea had occurred to the persons interested in numerous other ships going to Galveston, and they also were diverted to Newport News. There was great congestion of the ships in the harbour, and of their cargoes on the rail to Newport News, and on September 5 one of the two elevators in the port was burnt. In the result many ships had long delays. Out of a list of thirty-three ships furnished to us six went away in ballast after waiting an average of twelve days; some ships which arrived in the beginning of September took nearly a month to load. The ships, however, which arrived about the same time as the *Inverkip* were loaded in an average of about a fortnight; but the *Inverkip* and the *Ampleforth*, both chartered by Messrs. Bunge, and with cargo to be supplied by the same shippers, took over five weeks to load. It is difficult to draw accurate conclusions from the list, as it does not distinguish between the ships originally destined for Newport

C. A.
1917

INVERKIP
STEAMSHIP
COMPANY,
LIMITED
v.
BUNGE & CO.

Scrutton L.J.

C. A.
1917

INVERKIP
STEAMSHIP
COMPANY,
LIMITED
*v.*
BUNGE & Co.

Scrutton L.J.

and those diverted thereto; but I have no doubt on the evidence (1.) that there was considerable and unusual delay owing to congestion of shipping and railways due to the Galveston disaster, so that the "customary berth despatch" would be much longer than in normal times; (2.) that the shippers of Messrs. Bunge were in default in sending down cargo, perhaps through financial weakness. The charterers paid demurrage daily up to September 17, when the shipowners claimed they were not bound to wait any longer and proposed to withdraw the steamer. They were no doubt influenced in this by the fact that the rate of demurrage was low. The charterers repudiated this claim and proposed to take proceedings in the American Courts to detain the steamer. The captain waited but refused to accept the daily chartered demurrage which the charterers paid into the bank. On September 20 the shipowners issued a writ claiming a declaration that the charterers were not entitled to keep the ship on demurrage after September 17, and damages for detention. Towards the end of September the charterers supplied cargo, and the *Inverkip* was loaded by September 29. The shipowners then claimed thirteen days damages for detention at 200*l.* per day, and the charterers paid into Court thirteen days demurrage at the chartered rate.

Sankey J. found that the vessel was "kept an unreasonable time" every day after September 17, but, following a decision of Bray J. in *Western Steamship Co.* v. *Amaral Sutherland & Co.* (1), held that as the vessel stayed and loaded cargo under the charter she could only claim the charter rate of demurrage, and the amount paid into Court was therefore sufficient. He gave judgment for the charterers with costs.

The shipowners appeal.

The sum agreed for freight in a charter covers the use of the ship for an agreed time for loading or discharging, known as "the lay days," and for the voyage. But there is almost invariably a term in the agreement providing for an additional payment, known as demurrage, for detention beyond the agreed lay days. This is sometimes treated as agreed damages for detaining the ship, sometimes as an agreed payment for extra lay days. In my view the mere fact that the charterer has not loaded the ship in the lay days

(1) [1913] 3 K. B. 366.

| 2 K. B. | KING'S BENCH DIVISION. | 201 |

does not entitle the shipowner to withdraw the ship from the service; and whether the payment for these days after the lay days on which the ship is detained is treated as agreed liquidated damages or as an agreed payment for time which the charterer has a right to use at his option, the amount to be paid for these days is fixed by the charter. On the other hand it is obvious that the charterer is not entitled to keep the ship on demurrage "for ever." What is the time when he may treat his obligation to stay as removed and sail away?

C. A.
1917
INVERKIP
STEAMSHIP
COMPANY,
LIMITED
*v.*
BUNGE & Co.

Scrutton L.J.

Counsel for the shipowners said that this time came when a reasonable time had elapsed. Asked " a reasonable time for what ? " they had some difficulty in answering. Take a charter " to load with customary steamship despatch," which, under the decision in *Hulthen* v. *Stewart & Co.* (1), means " to load in a reasonable time, having regard to the existing circumstances for a charterer having a cargo ready," or to pay 50*l.* a day demurrage for every day on which the vessel is detained beyond the lay days. The reasonable time for loading is exhausted by the lay days. What is the second reasonable time at the end of which the ship may leave? Her days on demurrage are part of an unreasonable time for loading. Is the Court to determine what is a reasonable degree of unreasonableness? In my view the test of reasonable time is not one that is applicable. To enable the ship to abandon the charter without the consent of the charterer I think the shipowner must show either such a failure to load as amounts to a repudiation of or final refusal to perform the charter, which the shipowner may accept as a final breach and depart claiming damages—*Mersey Steel and Iron Co.* v. *Naylor, Benzon & Co.* (2)—or such a commercial frustration of the adventure by delay under the doctrine of *Jackson* v. *Union Marine Insurance Co.* (3) as puts an end to the contract. Neither of these positions avails here; the charterers were not repudiating the contract, but were paying the agreed demurrage under it, and were promising and expecting to begin to load the ship every day. While, as the charter contemplated under the cancelling clause lay days which might begin as late as September 14 and days in demurrage after lay days expiring in that case on September 20, and the ship was in fact

(1) [1903] A. C. 389.   (2) (1884) 9 App. Cas. 434, 439.
(3) L. R. 10 C. P. 125.

C. A.
1917

INVERKIP
STEAMSHIP
COMPANY,
LIMITED
v.
BUNGE & Co.

Scrutton L.J.

loaded by September 29, I cannot make any finding of commercial frustration of the adventure, the delay being provided for by demurrage.

One main argument of the shipowners' counsel as I understood it was that as the charterer was bound to have a cargo ready for loading, and had not such a cargo, the demurrage provision did not apply. This is in my experience an entirely novel argument. Ships with twenty lay days have frequently loaded no cargo for, say, twelve days because none was there and either finished in their lay days or in some demurrage days; but it has never been contended or understood to be the law that because there was no cargo there when the ship was ready to load the charterer had lost the benefit of the demurrage days or lay days and was bound to load in a reasonable time or pay damages for detention. It would often be greatly to the disadvantage of the ship that such a view should be taken. Counsel founded this argument on the case of *Ardan Steamship Co. v. Andrew Weir & Co.* (1), a Scotch appeal relating to the great glut of ships in 1900 at Newcastle, N.S.W. The decision is not very easy to understand, in that the noble Lords do not state their views as to the correctness of two decisions of the English Court of Appeal as to the same port and glut of ships—*Barque Quilpué, Ld. v. Brown* (2) and *Jones v. Green & Co.* (3) Coal is loaded at Newcastle from collieries a short distance from the quays and cranes, at which there are no storing facilities for coal, the custom of the port being to load in regular colliery turn. In *Barque Quilpué, Ld. v. Brown* (2) the charter was to load in regular turn from D. Colliery. In *Jones v. Green & Co.* (3) it was to load in the usual and customary manner (blank for name of colliery) as ordered by purchasers, who ordered Wallsend Colliery. There was great pressure of orders at all collieries. The ships were loaded in regular colliery turn, but after very long delay. The English Court of Appeal decided each case in favour of the charterers. In *Ardan Steamship Co. v. Andrew Weir & Co.* (1) the charter was "to load in the usual and customary manner a full and complete cargo of Australian coal as ordered by the charterers." The ship loaded in her turn, but after a long delay. The House of Lords decided in favour of the ship, and Lord Halsbury said that

(1) [1905] A. C. 501.       (2) [1904] 2 K. B. 264.
        (3) [1904] 2 K. B. 275.

2 K. B.    KING'S BENCH DIVISION.    203

delay in loading was one thing, failure to provide a cargo and load another; and the ship was given damages for detention (there being no demurrage days in the charter), her loading time being calculated not from her getting a berth in regular colliery turn, but from her arrival.

C. A.
1917

INVERKIP
STEAMSHIP
COMPANY,
LIMITED
v.
BUNGE & CO.

Scrutton L.J.

I, like Sankey J., am unable to see the bearing of this decision on the present case. Here the cargo had to be provided at the port on August 25; the lay days have been calculated from that day and demurrage paid according to charter terms. If there was a breach in not having cargo ready on August 25 the only consequence is detention of the ship, and the damages for that, which is the same detention, however it arises, are agreed in the charter and have been paid. The truth is the shipowners have made a bad bargain as to demurrage rate in loading, emphasized by their having secured an agreement for a much higher demurrage rate for discharging, and are anxious to get out of it. I can see no valid legal or business reasons for helping them to do so.

As to the authorities cited, Lord Trayner's dictum in *Lilly & Co.* v. *Stevenson & Co.* (1) was not necessary for the decision of the case, the facts of which were nothing like the present case, and turned on the somewhat unusual application of excepted perils to the demurrage period. For the reasons already stated I cannot agree with it, or with the late Mr. Carver's approval of it. So far as Bray J.'s decision in *Wilson & Coventry* v. *Otto Thoresen's Linie* (2) follows these dicta in allowing the ship to sail at "a reasonable time after the expiration of the lay days," I cannot agree with it, and indeed the learned judge fixed his "reasonable time" partly by the future engagements of the ship, which is a little puzzling. The decision negatives the right of the ship to sail at the expiration of the lay days when there is a provision for demurrage, and in this I agree. In *Western Steamship Co.* v. *Amaral Sutherland & Co.* (3) Bray J. explained his decision in *Wilson & Coventry* v. *Otto Thoresen's Linie* (2), and held that where the ship stayed and loaded she could only claim the charterparty rate of demurrage. This was followed and adopted by Sankey J. in the present case, and in this I agree, though on the facts of this case I think the result would have been

(1) 22 R. 278.   (2) [1910] 2 K. B. 405.
(3) [1913] 3 K. B. 366.

204 KING'S BENCH DIVISION. [1917]

C. A.
1917
___
INVERKIP
STEAMSHIP
COMPANY,
LIMITED
v.
BUNGE & CO.

the same had she left; she could not have claimed damages for detention.

The judgment appealed from was in my opinion correct in result, and the appeal must be dismissed with costs.

LORD COZENS-HARDY M.R. I agree.

*Appeal dismissed.*

Solicitors for appellants: *William A. Crump & Son.*
Solicitors for respondents: *Thomas Cooper & Co.*

G. A. S.

---

C. A.
1917
Feb. 9, 26.

[IN THE COURT OF APPEAL.]

ARMEMENT ADOLF DEPPE v. JOHN ROBINSON & CO., LIMITED.

*Ship—Demurrage—Lay Days—Arrival at Place of Discharge—Readiness to discharge.*

> Where a charterparty or berth contract does not contain any express provision to name a berth and does not provide for delivery at a berth "as ordered," and the ship arrives at the end of the specified voyage and is anchored or moored waiting for orders, and is ready to discharge in the sense that there is nothing to prevent her being made ready at once, if desired, the lay days commence to run.

APPEAL of the plaintiffs from the judgment of Bray J. at the trial of the action without a jury.

The following statement of facts is taken from the written judgment of Swinfen Eady L.J. :—

"The plaintiffs, as owners of the steamship *Elizabeth van Belgie*, claimed against the defendants, as indorsees of bills of lading and receivers of cargo, eight days' demurrage for the detention of the ship at Avonmouth. The case was tried before Bray J. and the plaintiffs recovered for three days only. The plaintiffs appealed and claimed for the remaining five days. During the argument it was conceded that for one of the days the plaintiffs could not maintain their claim, and the case proceeded with regard to four days only.