# EXHIBIT 7

[1927]  352
1 K.B.

[IN THE COURT OF APPEAL.]

AKTIESELSKABET REIDAR          v.
ARCOS                                              LIMITED.

[1924. A. 2321.]

1926 June 29, 30                           BANKES, ATKIN and SARGANT L.JJ.
July 1, 22

*Shipping - Charterparty - "Full and complete cargo" - Demurrage - Summer Cargo - Winter Cargo - Dead Freight.*

A charterparty provided that the chartered vessel should proceed to a named port on the White Sea and there load a full and complete cargo of 850 standards of sawn timber and proceed therewith to an English port and there deliver the cargo on being paid freight at a fixed sum per standard. The vessel was to be loaded at the rate of so many standards per weather working day. If she were detained beyond the time stipulated for loading, demurrage was to be paid at so much a day. The vessel arrived at the port of loading early in October. If she had loaded at the specified rate she could have loaded and could lawfully have carried to the port of discharge on or before October 31 a full and complete cargo of 850 standards, and the shipowners would have earned freight on the full cargo; but, from causes for which the owners were not responsible, she had loaded no more than 544 standards by October 17, and could not then reach the port of discharge by October 31, and so could not carry more than this amount of cargo without infringing s. 10 of the Merchant Shipping Act, 1906. The owners claimed dead freight on 306 standards:-

*Held,* that the charterers were not entitled as of right, upon payment of the sum due for demurrage, to detain the vessel beyond the time stipulated for loading; but that in so detaining her they had committed a breach of the charterparty; that as through this breach they were prevented from loading a full cargo, they were liable in damages as for dead freight beyond the sum due for demurrage; and further, that the sum named for demurrage was not intended as liquidated damages for breach of the obligation to load a full cargo.

Dictum of Lord Trayner in *Lilly & Co. v. Stevenson & Co.* (1895) 22 R. 278, 286, explained.

*Judgment of Greer J.* [1926] 2 K. B. 83 affirmed.

APPEAL from the judgment of Greer J. [(1)](#)

By a charterparty made in London on May 26, 1923, it was agreed between the agents for Aktieselskabet Reidar, the owners of the steamer *Sagatind* of 964 tons net register and of about 850 St. Petersburg standards deals capacity, and Arcos, Ld., of London, that the steamer should after

(1) [1926] 2 K. B. 83.

[1927]                                                                                                                    353
1 K.B.                    AKTIESELSKABET REIDAR v. ARCOS, LD.

delivering a cargo proceed to Mesane and there load from the agents of the charterers a full and complete cargo of mill sawn deals, etc. The steamer was to be provided with a deck load, at full freight, at the charterers' risk, not exceeding what she could reasonably stow and carry over and above her tackle, provisions, and furniture, and being so loaded, was to proceed therewith to London or east coast of the United Kingdom or west coast of England or Scotland or the English Channel or North France or Holland or Belgium or French Bay-port not south of Bordeaux at the charterers' option, one port only, as ordered on signing the bill of lading or at Lodingen, and to deliver the cargo on being paid freight as follows:-

The freight to London, east coast of the United Kingdom, North France (not west of Calais), Holland, or Belgium was for deals, battens, and boards for cargo 3*l*. 10*s*. 6*d*. per St. Petersburg standard hundred of 165 cubic feet; and 3*s*. per standard extra for deals, etc., under 1 inch, boards exceeding one-third of the cargo, bundled goods and ends beyond such as were required for broken stowage. To the west coast of England, Scotland, English Channel, North France (west of Calais) 3*l*. 13*s*. To a French Bay-port, not south of Bordeaux, 3*l*. 15*s*.

By clause 3 of the charterparty the steamer was to be reckoned as a four-hatch steamer and the cargo was to be loaded at the rate of 80 standards per weather working day for deals and battens and 60 standards for other goods, the steamer having four winches, and being discharged with the customary steamship dispatch as fast as the steamer could receive and deliver during the ordinary working hours of the respective ports but according to the custom of the respective ports, Sundays and general or local holidays in both loading and discharging excepted. Should the steamer be detained beyond the time stipulated as above for loading or discharging, demurrage was to be paid at 25*l*. per day, and pro rata for any part thereof. The cargo to be brought to and taken from alongside the steamer at charterers' risk and expense as customary. ....

By clause 20 the steamer was "to pay the charterers 9*s*. per standard on the quantity of cargo on which freight is paid to cover the cost of stevedoring, port dues, pilotages, etc., at the loading port, and the steamer to be free of any other expenses there, notwithstanding anything in this charterparty which may appear to the contrary, excepting that the steamer is to clear with the Russo-Norwegian Navigation Co., Ld., at the loading port paying an agency fee of 10 guineas and to give the use of winches in loading."

Through no fault of the owners the steamer was delayed in London in discharging her former cargo until the middle of September, 1923, and therefore, in the fear that Mesane might be inaccessible owing to ice, the following document was signed by agents for the parties: "Agreement. Referring to the charterparty per ss. *Sagatind* dated May 26, 1923, from Mesane to the United Kingdom or Continent it is hereby mutually agreed that the steamer is to load at Archangel instead of at Mesane and at the basis rate of freight of 67*s*. 6*d*. per standard. All other conditions of charterparty to apply."

The steamer arrived at Archangel on October 3. Notice of readiness to load was given on October 4. If she had loaded within the time stipulated for loading she would have taken on board a full summer cargo of 850 standards by October 17. By October 23 she had loaded no more than 544 standards. She was ordered to Manchester, a port in the United Kingdom to which the provisions of the Merchant Shipping Act, 1906, apply. The learned judge held that he was entitled to read the charterparty as if it had named Manchester as the port of discharge.

The plaintiffs claimed dead freight on 306 standards at 70*s*. per standard, i.e. 1101*l*. less the cost of discharging the 306 standards, i.e. 112*l*. 13*s*., leaving a sum of 988*l*. 7*s*.

The defendants pleaded that on October 24, when the steamer left Archangel for Manchester, a full and complete cargo was a winter deck load and that the vessel was loaded with a winter deck load. They admitted that they had incurred demurrage for $11\frac{1}{4}$ days at 25*l*. a day on account of which they had paid for $6\frac{1}{4}$ days.

The learned judge held that on the true construction of the charterparty a full and complete cargo meant a full summer cargo of 850 standards; that the obligation of the defendants was to load the vessel within the time specified for loading and that they had committed a breach of this obligation, notwithstanding the provision relating to demurrage, which did not, in his opinion, convert the demurrage days into mere lay days in accordance with the view expressed by Lord Trayner in *Lilly & Co. v. Stevenson & Co.* [1] He therefore gave judgment for the plaintiffs for 988*l.* 7*s.*

The defendants appealed.

*Le Quesne K.C.* and *Somervell* for the appellants. The learned judge was wrong in holding that the appellants committed any breach of the charterparty in failing to load the ship within the lay days and in becoming liable for demurrage. "Days stipulated for by the merchant, on demurrage, are just lay days, but lay days that have to be paid for": per Lord Trayner, *Lilly & Co. v. Stevenson & Co.* [1]; and see the opinion of the same learned judge in *Gardiner v. Macfarlane & Co.* [2] Demurrage, properly so called, is not in the nature of liquidated damages for a breach of a charterparty; it is an agreed payment for the use of the ship beyond the lay days: *Lockhart v. Falk* [3]; Carver on Carriage by Sea, 7th ed. (1925), § 609, p. 829; Scrutton on Charterparties, 12th ed. (1925), art. 128, p. 347; Abbott's Merchant Shipping, 14th ed. (1901), p. 371. Under the old system of pleading, indebitatus assumpsit lay for demurrage, but a plaintiff claiming liquidated damages was obliged to declare specially: Bullen and Leake's Precedents, 3rd ed., pp. 130, 217.

[SARGANT L.J. referred to *Patrick v. Milner* [4] and *Howe v. Smith.* [5]]

The better opinion is that a charterer is entitled to keep the ship at least a reasonable time beyond the lay days:

(1) 22 R. 278, 286.

(2) (1889) 16 R. 658, 660.

(3) (1875) L. R. 10 Ex. 132.

(4) (1877) 2 C. P. D. 342.

(5) (1884) 27 Ch. D. 89.

*Wilson v. Otto Thoresen's Linie* [1]; *Inverkip Steamship Co. v. Bunge. & Co.* [2]

But assuming that this is not the meaning of demurrage in this charterparty, and that the word means, in the language of Lord Salvesen in *Moor Line v. Distillers Co.* [3], "agreed damages to be paid for delay of the ship in loading .... beyond an agreed period," the owners cannot recover anything beyond the agreed damages: *Ethel Radcliffe Steamship Co. v. W. & R. Barnett, Ld.* [4]

[ *Procter Garrett Marston, Ld. v. Oakwin SS. Co.* [5] was also cited.]

*A. T. Miller K.C.* and *Sir Robert Aske* for the respondents. The obligation of the appellants under this charterparty was twofold: first, to load a full cargo; secondly, to load that cargo within the lay days, i.e., by October 17. It follows that they were bound in the first instance to load such a cargo as would answer the description of a full cargo at that time, that is to say a cargo of 850 standards. By their own fault or misfortune, in no way contributed to by any act of the respondents, they have failed to do this, and have consequently committed a breach of the charterparty which they must make good.

Their second obligation was to load in a fixed number of lay days, or the equivalent of a fixed number, that is a number which can be ascertained by mere calculation. For breach of this obligation, but not for breach of the obligation to load a full cargo, the damages are agreed by clause 3 of the charterparty at 25*l.* a day. The appellants have committed a breach of this obligation and must pay the agreed damages; but that does not absolve them from what Greer J. has called the primary obligation to load a cargo of 850 standards.

[ *William Alexander & Sons v. Aktieselskabet Hansa* [6] was also cited.]

*Le Quesne K.C.* in reply.

*Cur. adv. vult.*

(1) [1910] 2 K. B. 405.

(2) [1917] 2 K. B. 193.

(3) 1912 S. C. 514, 520.

(4) (1926) 31 Com. Cas. 222.

(5) [1926] 1 K. B. 244.

(6) [1920] A. C. 88.

July 22. The following written judgments were delivered.

BANKES L.J. This appeal raises a question of very considerable general importance, and one upon which there appears to have been some difference of judicial opinion.

The action was brought by shipowners against charterers for damages for breach of a charterparty. The breach alleged was a failure to load a full and complete cargo. Greer J. decided in the plaintiffs' favour, and he founded his decision upon the view that what constituted a full and complete cargo must be ascertained by reference to those stipulations of the charterparty which provided for the rate at which the charterers had undertaken to load. For the reason which I refer to later the plaintiffs' claim (if any) must, I think, be based upon a breach of the stipulations as to the rate of loading, and the case thus presented raises the two important questions: whether, having regard to the terms of the charterparty, there was any breach on the part of the charterers; and, if there was, then whether the breach is satisfied by a payment of demurrage at the stipulated rate.

The material facts are as follows. The charterparty was dated May 26, 1923, and it provided that the steamer should proceed to Mesane after completing her then intended voyage and there load a full and complete cargo of timber for a port in the United Kingdom or North France, Holland or Belgium at the charterers' option. Orders were to be given on signing bills of lading or at Lodingen. Time was not to count before July 15. The clause dealing with the loading and discharging was, so far as is material, in the following terms. "Steamer to be reckoned as a four-hatch steamer and the cargo to be loaded at the rate of 80 standards per weather working day for deals and battens and 60 standards for other goods. Should the steamer be detained beyond the time stipulated for loading demurrage to be paid at 25*l.* per day and pro rata for any part thereof." Owing to delay in completing her then intended voyage, the vessel was not ready to proceed to Mesane at the time contemplated by the charterparty. After some discussion as to what should be done, the parties

ultimately agreed on September 19 to substitute Archangel for Mesane at an altered rate of freight, "all other conditions of charterparty to apply." The vessel proceeded to Archangel and arrived there on October 3. The position created by the delay in arriving at the port of loading was a peculiar one, if the vessel was ordered to a port in the United Kingdom, owing to the provisions of the Merchant Shipping Act, 1906. Unless the vessel could arrive on or before October 31, the master or owner would be liable to a fine if he carried a larger deck cargo than is specified in s. 10 of that Act. If the vessel could have been fully loaded, and could have sailed on or before October 20 so as to arrive at a port in the United Kingdom on or before October 30, she could have carried 850 standards. If the loading was delayed so as to prevent the vessel sailing on or before October 20 she could only carry 544 standards without infringing the provisions of s. 10. If the charterers had commenced to load the vessel as soon as notice of readiness had been received, and had loaded her on an average at the agreed rate for $11^3/_4$ days, the full 850 standards would have been put on board and the vessel could have sailed in plenty of time to enable her to have arrived in a United Kingdom port before October 30. What in fact happened was that the cargo was not loaded at the agreed rate, and by October 23 she had only 544 standards on board. By that time it was impossible for the vessel to arrive at a United Kingdom port before October 30, and the master anticipating, or being told (it does not appear which), that he would be ordered to a United Kingdom port, refused to take any more cargo. The entry in the deck log is as follows: "Tuesday 23rd. Loading from 8 A.M. until 4.30. Was then fully loaded. Height of deck cargo is level with the railings," clearly indicating that the master had in mind the restrictive provisions of s. 10 of the Merchant Shipping Act. The orders given to the master on signing the bill of lading were that he was to proceed to Lodingen for orders. When he arrived there he was ordered to Manchester.

I see a difficulty upon the facts in saying that the vessel did not load a full and complete cargo, as it appears to me

| [1927] | | 359 |
|---|---|---|
| 1 K.B. | AKTIESELSKABET REIDAR v. ARCOS, LD. | Bankes L.J. |

that the time for ascertaining whether she had or had not a full cargo is the time when she sailed. At that time, assuming her destination to be a port in the United Kingdom, she had a full and complete cargo. Whether this is or is not a correct view of the facts is really immaterial, because assuming that the obligation to load a full and complete cargo, and the obligation to load the cargo (that is, the goods of which the cargo consists) at a stipulated rate are separate and distinct obligations, which I think they are, the plaintiffs are still entitled to say that but for the failure to load at the agreed rate they would have received 850 standards on board instead of the 544 which they in fact received. In whichever way the case is put the same two questions arise to which I have already referred, both of which are of importance, and upon neither of which can I find any direct authority which is binding upon this Court, though upon the first of the two questions judicial opinion has been by no means unanimous.

The answer to the first question depends upon what is the true view of a contract expressed as this charterparty is, with a fixed number of lay days, and with a provision as to the demurrage rate, but with no provision for any fixed number of days on demurrage. The view of Cleasby B. of what is meant by demurrage as expressed by him in *Lockhart v. Falk* [1] is often referred to and may well be quoted again. He says: "The word 'demurrage' no doubt properly signifies the agreed additional payment (generally per day) for an allowed detention beyond a period either specified in or to be collected from the instrument; but it has also a popular or more general meaning of compensation for undue detention, and from the whole of each charterparty containing the clause in question we must collect what is the proper meaning to be assigned to it." It will be noted that the learned judge draws the distinction between the "allowed detention" and the "undue detention." It may well be that where a charterparty, as in *Francesco v. Massey* [2], provides for a given number of days (in that case ten days) on demurrage, so much of the much discussed judgment of Lord Trayner in

(1) L. R. 10 Ex. 132, 135.

(2) (1873) L. R. 8 Ex. 101.

*Lilly & Co. v. Stevenson & Co.* [(1)], as holds that "days stipulated for by the merchant, on demurrage, are just lay days, but lay days that have to be paid for," is well founded. In the present case it is not necessary to express any opinion upon that particular point.

What we are here dealing with is what Cleasby B. refers to as undue detention. In dealing with this question it is necessary to bear in mind one of the outstanding features of the contract contained in a charterparty. It is well established that even where the number of lay days for loading and discharging, or for loading or discharging, is fixed, time is not of the essence of the contract. The shipowner is not entitled, merely because the lay days have expired, and the contract is not completed, to treat the contract as at an end and to withdraw his ship. It is for this reason, I think, that the stipulation for a demurrage rate is so often inserted in the contract in order that, if the vessel has to remain so as to enable the charterer to complete his obligation, either of loading or discharging, the parties may know what sum will have to be paid for the detention. In the *Ethel Ratcliffe* case [(2)] it appears that Roche J. in the *Procter* case [(3)] and this Court in the *Ethel Ratcliffe* case [(4)] left the point over for future decision whether the obligation upon the shipowner to keep his ship at the port of loading or discharge or at the port of call, as the case may be, after the expiration of the time limited by the charterparty for the performance by the charterer at the port of some obligation undertaken by him to be performed there, rests upon an implied term of the contract, or upon the necessity that the master shall remain a reasonable time before he is in a position to say that the conduct of the charterers in not performing their obligation amounts to a repudiation of the contract. I see no sufficient reason for construing the provision for demurrage as contained in the charterparty in the present case as a contractual extension of the lay days either for a reasonable time or for any other time, or as an

(1) 22 R. 278, 286.

(2) 31 Com. Cas. 222, 230.

(3) [1926] 1 K. B. 244.

(4) 31 Com. Cas. 222.

Case 1:07-cv-07469-JGK   Document 19-8   Filed 10/25/2007   Page 11 of 18

[1927]
1 K.B.                     AKTIESELSKABET REIDAR v. ARCOS, LD.                     361
                                                                            Bankes L.J.

implied term of the contract that the vessel shall remain for any time. I prefer to rest the necessity for remaining upon the ground that, time not being of the essence of the contract, the shipowner will not, except under some exceptional circumstances, be in a position to assert that the contract has been repudiated unless the vessel does remain a sufficient time to enable that question to be tested. If this is the correct view it follows that where a charterparty is in the terms of the present charterparty, and the charterers fail to load or to discharge, as the case may be, within the agreed lay days, or at the stipulated rate, they do commit a breach of contract. So far as there is any authority on the point I think that it is in favour of the view which I have expressed. I do not feel sure that Lord Trayner's language [1], in the passage in which he says that where the demurrage days are not limited by contract they will be limited by law to what is reasonable in the circumstances, has not been strained beyond what was really intended. It is, I think, consistent with that language that what the learned judge had in mind was the obligation of the vessel to remain even after the expiration of fixed lay days where there is a provision for demurrage. Be that as it may, Lord Trayner's view and Mr. Carver's approval of it have quite recently been expressly disapproved by Scrutton L.J. in this Court in *Inverkip Steamship Co. v. Bunge & Co.* [2] The only case which I can find in which any approval of Lord Trayner's view has been expressed in this Court is the *Saxon Ship Co. v. Union Steamship Co.* [3], where A. L. Smith L.J. was dealing with a case as between vendor and purchaser of coal in whose contract the colliery guarantee was incorporated. The guarantee provided for lay days and for demurrage. The point for decision was the date when the purchasers made default, and it was in that connection that the Lord Justice referred to Lord Trayner's decision with approval, and he may well have been confining his remarks to so much of that decision as referred to the fixed days on demurrage. Thinking, as I do, that this

(1) 22 R. 286.

(2) [1917] 2 K. B. 193, 203.

(3) (1899) 4 Com. Cas. 298, 303.

Case 1:07-cv-07469-JGK   Document 19-8   Filed 10/25/2007   Page 12 of 18

[1927]  
1 K.B.                    AKTIESELSKABET REIDAR v. ARCOS, LD.                    362  
                                                                                  Bankes L.J.

particular point is free from authority, and that I am at liberty to express my own opinion, I agree with Greer J. in coming to the conclusion that at the termination of the fixed lay days the charterers in the present case were in breach.

The only question which remains for decision, therefore, is the question of damages. If the plaintiffs' claim was in substance, though not in form, a claim for detention of the vessel, the special damage here claimed for would not be recoverable: *Inverkip Steamship Co. v. Bunge & Co.* (1) Upon the special facts of this case the plaintiffs' claim appears to me to be, both in substance and in form, essentially distinct from any claim for the detention of the vessel. In substance what the plaintiffs are saying is that if the charterers had loaded the goods at the agreed rate they would have earned freight on 850 standards, whereas owing to the failure to load at that rate they could only earn freight on 544 standards, and that their loss directly flowing from the breach of contract is the difference between the amount of freight which they would have earned and the amount which they in fact earned. This loss is, in my opinion, on the facts of this case recoverable as damages for the breach of contract to load at the agreed rate.

At one time I was inclined to think that where parties had agreed a demurrage rate, the contract should be construed as one fixing the rate of damages for any breach of the obligation to load or discharge in a given time. On further consideration I do not think this view is sound. I can find no authority on the point, and it is noticeable that in the *Saxon Ship Co. v. Union Steamship Co.* (2) it was not suggested that the claim for demurrage excluded the additional claim for special damage arising from the detention of the vessel.

In my opinion the appeal fails and must be dismissed with costs.

ATKIN L.J. This case raises a question of considerable importance in shipping circles, and it is surprising that there is so little direct authority to guide us. The question is

---

(1) [1917] 2 K. B. 193.

(2) 4 Com. Cas. 298.

whether, if the charterer has failed to complete the loading of the ship within the lay days, and the ship during the demurrage days becomes, without the default of the shipowner, unable to carry as much cargo as she would have carried if loaded within the lay days, but receives from the charterer a full cargo for her diminished capacity, the loss falls upon the charterer in addition to the demurrage. In my opinion our decision should be for the shipowner. The result of the authorities appears to be that in a contract fixing a number of lay days and providing for days at demurrage thereafter, the charterer enters into a binding obligation to load a complete cargo within the lay days subject to any default by the shipowner or to the operation of any exceptions, matters which do not arise in this case. If the lay days expire without a full cargo having been loaded the charterer has broken his contract. The provisions as to demurrage quantify the damages, not for the complete breach, but only such damages as arise from the detention of the vessel. For correlative to the ship's right to receive the agreed damages is the charterer's right to detain the ship for the purpose of enabling him, if possible, to perform his broken contract and so mitigate any further damage. If however, for reasons other than the shipowner's default, the charterer becomes unable to do that which he contracted to do - namely, put a full and complete cargo on board during the fixed lay days, the breach is never repaired, the damages are not completely mitigated, and the shipowner may recover the loss that he has incurred in addition to his liquidated demurrage or his unliquidated damages for detention. It appears to me to be incorrect to say that days on demurrage are extended lay days, unless the contract is so drawn. On the contrary demurrage days are days in which the charterer is in breach, and this view alone explains what I conceive to be the well established principle that, unless by express stipulation, exceptions that would protect the charterer during lay days no longer protect him during demurrage days. If a stipulation for demurrage either directly extended the contract time for performance or waived a breach, there

could be no difference between illegality supervening during the lay days, or after the lay days and during demurrage days. Yet in *Reid v. Hoskins* and *Avery v. Bowden* [1] and *Esposito v. Bowden* [2], all in the Exchequer Chamber, it is plain that the decisions treated as material the allegation or proof that the illegality (outbreak of war and consequent trading with the enemy) occurred during the lay days, that is, during the time for performance and before breach. In those circumstances the charterer was excused. I know of no authority that subsequent illegality would relieve the charterer of the consequences of his accrued breach. If the occurrence were one which would occasion the frustration of the contract, then on principles established in England, though not in Scotland, the contract would end, with accrued liabilities left subsisting.

It is said, however, that in this case there is no evidence that the charterers had not furnished and were not willing to load a cargo sufficient to satisfy a summer loading. I will assume that such a cargo was available. Nevertheless it appears to me that, the charterers having exercised their option to order the ship to the United Kingdom, the charter must be treated for all purposes as a United Kingdom charter. In the circumstances of this case I am satisfied that they made it clear to the master when they ceased loading that the eventual destination was the United Kingdom. If this be so the charterers had no right to put on board, and the master was entitled to reject, any further cargo that would expose him to penalties under the Merchant Shipping Act if carried within the winter months. The excess cargo over the winter load would not be a lawful cargo. The ship therefore sailed with what was a complete cargo at the date of sailing, but less than a complete cargo if the loading had been completed within the lay days. For any damages caused thereby I think that the charterers are liable. No question of the amount of damages arises here.

I think, therefore, that the appeal fails and should be dismissed with costs.

(1) (1856) 6 E. & B. 953, 972.

(2) (1857) 7 E. & B. 763.

SARGANT L.J. In my opinion the judgment of Greer J. should be affirmed.

The original charterparty of May 26, 1923, undoubtedly contemplated that the ship should carry a full cargo of 850 standards. And when on the failure of that contract the charterparty now in question was made on September 19, 1923, by indorsement on the original charterparty, and adopted with some variations the terms of the original contract, it seems to me that the parties must have been contemplating the same full cargo. There was ample time, as was proved by the event, for the ship to reach Archangel in good time to load a full cargo and sail with it for any of the specified British ports without the risk of any objection on arrival. And it is not immaterial in construing this part of the contract to observe that the charterers had the option of proceeding to any one of a number of foreign ports at which no objection could arise. This view gives a plain and straightforward meaning to the words used and does not, I think, impose any unreasonable obligation on the charterers. For it is no doubt implied that the ship shall reach Archangel in time to load a full cargo, either for a British port or for a foreign port at the option of the charterers; and, should the arrival of the ship at Archangel be delayed so as to render the alternative of proceeding to a British port with a full cargo unavailable, the charterers if electing to proceed to a British port and loading a winter cargo only could set up the default of the ship in arrival against any claim for failure to load more than such a cargo as would satisfy the requirements of British ports.

Further, if the meaning of the phrase "full and complete cargo" in clause 1 is to be interpreted (as the appellants have urged) with reference to the cargo which could lawfully be carried to a British port, the result must be the same. For the time at which that cargo must be ascertained is, in my judgment, the time when the charterers received the ship for loading, that is October 4, and not the time at which they ceased to load in fact. It cannot be that by their delay in loading they were entitled to diminish the extent of the

cargo which they were under obligation to load, and thus take advantage of their own default.

It is next necessary to consider the effect of clause 3 of the charterparty. Here I agree with the view of the learned judge that the second sentence of that clause does not enlarge the express obligations as to time of loading expressed in the first sentence of the clause, but merely assesses damages at 25*l.* a day for any detention of the ship due to a failure of the charterers to load at the prescribed rate, and incidentally indicates that their obligations in this respect are not of the essence of the contract, and that some unpunctuality in this respect will not entitle the owners to treat the contract as repudiated and to withdraw their ship. Such a construction gives full effect to the language of the clause and is consistent with the views expressed in the text-books on the subject which summarize the general effect of the decisions: see Scrutton on Charterparties, 12th ed., p. 348, and Carver on Carriage by Sea, 7th ed., pp. 828-9 and note on p. 907. And this is in accordance with the view taken of somewhat analogous provisions in contracts for the sale and purchase of property: see *Patrick v. Milner* [1] and *Howe v. Smith*. [2]

On the footing then that clause 3 of the charterparty fixes the damages for the detention of the ship at 25*l.* a day, does the payment of a sum calculated on this basis form an agreed compensation for the loss which the owners have sustained in the circumstances of this case? I cannot think so. The loss inflicted on the owners and claimed by them is loss of another character - namely, loss of freight caused by the breach by the charterers of their contract to load a full and complete cargo, as prescribed by clause 1 of the charterparty. The obligation of clause 1 is, in my judgment, rightly described by the learned judge as the primary obligation. The object of the second sentence of clause 3 is to provide compensation for a detention of the vessel in the course of fulfilling this primary obligation, not to give compensation for the breach of the primary obligation itself. No doubt the same delay

(1) 2 C. P. D. 342.

(2) 27 Ch. D. 89.

in loading, which might give rise to a claim for detention, also resulted in a breach of the obligation to load a full cargo, but the breach of this latter obligation caused a definite separate loss independent of and largely exceeding any loss arising from mere detention. Or, to put the matter in another way, the object of the second sentence in clause 3 being to ascertain the damages arising from a delay in loading for the purpose and in the course of fulfilling the primary obligation of clause 1 - namely, the loading of a full cargo, it would unwarrantably widen the scope of this second sentence, if it should also ascertain the damages arising from a breach of the primary obligation itself.

The same result would I think follow if, contrary to the view above expressed, the second sentence of clause 3 were to be read as an agreement that the charterers might have some extra time for loading at an agreed rate per day. Even on this interpretation this could not in my view be read as extending further than an agreement to allow some extra time for the purpose of loading a full cargo. It could not properly be construed as an agreement that such an extra time might be occupied in loading as to diminish the quantity of cargo that had ultimately to be loaded.

There was a further contention on the part of the appellants that should perhaps be noticed - namely, that they had only to provide cargo, not to load it, and that there was no evidence that they had not provided a full summer cargo. In my judgment, under this charterparty, the charterers had both to provide and load; and there is no evidence that there was any default on the part of the ship to provide the assistance mentioned in clause 20. Nor is it shown that the master at any time declined to accept more than a winter cargo. From his letters of October 10 and 19 I should gather that he was willing to accept a full summer cargo provided that, if he was ordered to sail after October 20 to a British port, provision was made for the fines he might incur. The points mentioned in this paragraph are not the real points in issue between the parties, they are not raised by the charterers'

defence in the action, and they do not seem to have been argued before the learned judge.

*peal dismissed.*

Solicitors for appellants: *Wynne-Baxter & Keeble.*

Solicitors for respondents: *Botterell & Roche.*

W. H. G.

[1927] 1 K.B. 352