# EXHIBIT 8

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Dec. 16 and 17, 1964

SUISSE ATLANTIQUE SOCIETE D'ARMEMENT MARITIME S.A.
v. N.V. ROTTERDAMSCHE KOLEN CENTRALE

Before Mr. Justice MOCATTA

Charter-party — Consecutive voyages — Detention — Delays by charterers in loading and discharging cargoes preventing vessel performing more voyages in charter time — Whether shipowners entitled to damages (less demurrage payments) for loss of further freights — Effect of deliberate breach by charterers — Whether payments of demurrage by charterers precluded shipowners from recovering further damages.

Charter-party entered into between claimants, disponent owners of motor vessel *General Guisan*, and respondent charterers for carriage of coal from U.S. ports to Northern European Continental ports on consecutive voyages during two-year period — Eight voyages performed during charter — Except for loading on first voyage, lay days exceeded during loading and discharging on each voyage — 149,993.08 U.S. dols. demurrage (at 1000 dols. per day) paid by charterers — Claim by shipowners for additional sum (about 750,000 U.S. dols. or 500,000 U.S. dols.) damages against charterers alleging that, if loading and discharging had been completed within laytime, nine or six additional voyages would have been possible — Arbitration — Consultative case stated — Questions for Court:

Whether . . .

(A) (i) The Claimants are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the Respondents having failed to load and discharge the Vessel within the laydays whereby the Charterparty was (if so proved) rendered less profitable to the Claimants by consequent loss of voyages or voyage time.

(ii) Upon the assumption that such loss of profitability resulted from the Respondents having deliberately (i.e. with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel:

(a) With such ordinary despatch as the circumstances permitted
or
(b) within the laydays

the Claimants are entitled to recover any damages suffered by the Claimants through the Charterparty having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the Respondents.

Contentions by shipowners: (1) that, under charter-party, charterers, during the two-year period, were under obligation to load and discharge cargoes on a minimum number of consecutive voyages; and that that minimum number, ascertainable at the end of the two-year period, was the number of voyages compatible with charterers' loading and discharging within the laytime; (2) that shipowners, under charter-party, had the right and duty to perform that minimum number of voyages; (3) that it was an implied term of charter-party that charterers would not, by breaking express term as to time for loading and discharging, prevent shipowners from earning freight; (4) that, as charterers were admittedly in breach of laytime provisions and that had caused more than mere detention of vessel (shipowners had lost freights on additional voyages), demurrage provisions did not provide correct measure of damages — Allegations by shipowners that freight rates had fallen; that market freight rates were lower than charter freight rates; and that it paid charterers to delay vessel and incur demurrage rather than pay charter freight on additional voyages — Contentions by charterers that charter-party expressly provided for payment of liquidated damages (demurrage) for exceeding laytime; and that the result of charterers' breaches was that vessel was detained and demurrage was an exclusive remedy.

———*Held*, by MOCATTA, J., (1) (a) that a consecutive voyage charter was an indivisible contract for the number of voyages to which it applied and was not a series of charters for a separate voyage; (b) that shipowners' obligation to proceed with dispatch, in this charter-party, applied to every voyage in ballast and with cargo under the charter; (2) (i) that the charter was for a total of "two years consecutive voyages"; that, each time vessel tendered for loading during that period, charterers were under obligation to load and discharge her within laytime provisions; and that there was no justification for spelling out of those provisions a separate obligation to load and discharge vessel on a specific number of voyages only ascertainable with difficulty at the end of the two-year period; (ii) that no implications should be made because shipowners could have protected themselves by insisting on demurrage rates commensurate with charter freight rates; (3) that there was no justification for implying a term that charterers would not break express terms

of the contract; (4) that *Reidar v. Arcos* had the special feature that the delay in loading affected the quantity of cargo which could have been carried on the very voyage in which the delay arose; that, in the absence in this case of that special feature, shipowners were prevented from establishing that their claim was other than one for detention, in that shipowners' loss was indistinguishable in principle from that suffered by a shipowner under a single voyage charter when his ship was detained beyond her lay days; (5) that the intention of a contract breaker was irrelevant; and that, therefore, Questions A (i) and (ii) would be answered "No".

————*Aktieselskabet Reidar v. Arcos, Ltd.*, [1927] 1 K.B. 352; (1926) 25 Ll.L.Rep. 513, distinguished.

———

The following cases were referred to:

Aktieselskabet Reidar v. Arcos, Ltd., [1927] 1 K.B. 352; (1926) 25 Ll.L.Rep. 513;
Ambatielos v. Grace Brothers & Co., Ltd., (1922) 13 Ll.L.Rep. 227;
Anglo-Saxon Petroleum Company, Ltd. v. Adamastos Shipping Company, Ltd., [1957] 2 Q.B. 233; [1957] 1 Lloyd's Rep. 79; (C.A.) [1957] 1 Lloyd's Rep. 271;
Chandris v. Isbrandtsen-Moller Company, Inc., [1951] 1 K.B. 240; (1950) 83 Ll.L.Rep. 385;
Compagnie Primera de Navagaziona Panama v. Compania Arrendataria de Monopolio de Petroleos S.A., [1940] 1 K.B. 362; (1939) 65 Ll.L.Rep. 7;
Ethel Radcliffe Steamship Company, Ltd. v. W. & R. Barnett, Ltd., (1926) 24 Ll.L.Rep. 277; (1926) 31 Com. Cas. 222;
Mackay v. Dick and Another, (1881) 6 App. Cas. 251.

———

This was a consultative case stated by arbitrators in a dispute between the claimants, Suisse Atlantique Societe d'Armement Maritime S.A., and the respondents, N.V. Rotterdamsche Kolen Centrale, in respect of delays in loading and discharging the motor vessel *General Guisan*, which vessel was by an agreement dated Oct. 8, 1957, and a charter-party dated Dec. 21, 1956, chartered to the respondents by the claimants.

According to the consultative case, the arbitrators found the following facts:

(1) By an agreement in writing dated Oct. 8, 1957, between the claimants and the respondents it was agreed that the motor vessel *General Guisan* (whereof the claimants were at all material times the disponent owners) should thenceforth perform a charter-party dated Dec. 21, 1956.

(2) By that charter-party dated Dec. 21, 1956, a vessel was chartered from the claimants for the carriage of coal for two years consecutive voyages between Hampton Roads or Baltimore or Philadelphia and one port Belgium, Holland or Germany (North Sea).

(3) The charter-party provided that the motor vessel *Silvretta* would perform thereunder until replaced by the claimants' newbuilding vessel then under construction.

(4) The *General Guisan* (hereinafter called the vessel) performed a total of eight voyages under that agreement.

(5) The times occupied by the vessel at the loading and discharging ports during each of these voyages were as set out in a schedule annexed to the case.

(6) With the exception of loading at Norfolk on the first voyage (when the respondents earned dispatch money) the lay days were exceeded during loading and discharging on each of the eight voyages.

(7) The respondents had paid to the claimants and the claimants had accepted demurrage as and when due in the sum of not less than 149,993.08 dols. in respect of discharging at Rotterdam on the first voyage and loading and discharging on each of the remaining seven voyages.

(8) By reason of the periods spent by the vessel at the loading and discharging ports during the eight voyages in respect whereof the demurrage was paid the vessel was able to perform fewer voyages during the period of the charter-party than would have been possible if the loading and discharging had been completed within the laytime.

The claimants contended (*inter alia*) that

(i) The respondents' failure to load and discharge the vessel within the laytime was a breach of the charter-party.

(ii) The claimants' rights in respect of that breach were not limited to the demurrage due under the charter-party, and extended to a right to damages in respect of any loss which was a reasonably foreseeable consequence of the breach. In the present case such loss included the claimants' alleged loss of profit in respect of voyages which would have been performed if the vessel had been loaded within the laytime.

168 LLOYD'S LIST LAW REPORTS [Q.B. (Com. Ct.)

[1965] Vol. 1]         Suisse Atlantique v. N.V. Rotterdamsche         [Mocatta, J.

(iii) It was an implied term of the charter-party and/or of the agreement that the respondents would co-operate with the claimants in doing all things necessary to enable the claimants to perform the maximum number of voyages and earn the maximum amount of freight under the charter-party and/or agreement and/or would not wilfully delay the vessel during loading and discharging.

(iv) The respondents were in breach of the charter-party and/or agreement in that they deliberately failed to load and discharge the vessel with such dispatch as the circumstances permitted and/or within the lay days.

(v) The mere payment and receipt of demurrage did not constitute an accord and satisfaction of the claimants' claims.

The respondents contended (*inter alia*) that

(i) The charter-party rate of demurrage quantified the claimants' rights in respect of delay at the loading and discharging ports, and no additional damages were recoverable in respect of such delay.

(ii) The charter-party was not subject to any implied term as alleged.

(iii) Alternatively, the claimants' rights in respect of any breach of that implied term were limited to the demurrage prescribed by the charter-party.

(iv) The payment of demurrage by the respondents and the receipt thereof by the claimants constituted an accord and satisfaction of the claimants' claims in respect of delay at the loading and discharging ports.

The questions of law for the opinion of the Court were as follows:

Whether upon the facts found and upon the true construction of the charter-party dated Dec. 21, 1956, and the agreement dated Oct. 8, 1957:

(A) (i) The claimants were entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the respondents' having failed to load and discharge the vessel within the lay days whereby the charter-party was (if so proved) rendered less profitable to the claimants by consequent loss of voyages or voyage time.

(ii) Upon the assumption that such loss of profitability resulted from the respondents having deliberately (i.e., with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel:

(a) With such ordinary dispatch as the circumstances permitted

or

(b) within the lay days

the claimants were entitled to recover any damages suffered by the claimants through the charter-party having been rendered less profitable as above subject to giving credit for the demurrage payments received by them and for any such dispatch money as would have been earned by the respondents.

(B) If the answer to any of the questions under (A) be "Yes", the payment by the respondents and acceptance by the claimants of demurrage in respect of those periods when the lay days were exceeded precluded the claimants from recovering any damages otherwise recoverable by them in accordance with such answer or answers.

Mr. R. A. MacCrindle, Q.C., and Mr. A. Evans (instructed by Messrs. Richards, Butler & Co.) appeared for the claimants; Mr. J. F. Donaldson, Q.C., and Mr. Colin Staughton (instructed by Messrs. William A. Crump & Son) represented the respondents.

Judgment was reserved.

---

Monday, Jan. 11, 1965

---

### JUDGMENT

Mr. Justice MOCATTA: The novel problems arising on this consultative case stated by two arbitrators under Sect. 21 (1) (a) of the Arbitration Act, 1950, are of great importance to the shipping community and of considerable legal difficulty. They originate from the use by charterers and shipowners, no doubt for good commercial reasons, of a hybrid form of charter-party, namely one for consecutive voyages, constituted by making a number of alterations and additions to a well-known form of voyage charter. Consecutive voyage charters may have a lengthy lineage, but, so far as the researches of Counsel in this case have revealed, they did not trouble the Courts prior to 1922, when *Ambatielos v. Grace Brothers & Co., Ltd.*, (1922) 13 Ll.L.Rep. 227, raised a point of construction on the cancelling clause in such a charter for decision by the House of Lords. Of more recent years reported cases seem to indicate that

| Q.B. (COM. CT.)] | LLOYD'S LIST LAW REPORTS | 169 |
|---|---|---|
| MOCATTA, J.] | Suisse Atlantique v. N.V. Rotterdamsche | [1965] VOL. 1 |

this category of charter has been more frequently used, and this accords with my own experience and that of Counsel. Consecutive voyage charters may give rise to special problems, and there is little direct guidance to be obtained in their solution from decided cases. Such problems have to be resolved on general principles of law and by analogy, where such can safely be drawn, from the decisions of the Courts relating to the older established and much litigated categories of time and voyage charter-parties.

In the arbitration giving rise to this consultative case, the claimants are a Swiss company (hereinafter called "the owners"), who were at the material time owners of the motor vessel *General Guisan*. The respondents are a Dutch company of Rotterdam, whom I will hereinafter call "the charterers".

By a written agreement between the parties dated Oct. 8, 1957, it was agreed, among other things, that the parties would thenceforward perform an earlier charter-party dated Dec. 21, 1956, for the carriage of coal from United States to Northern European Continental ports upon the return of the *General Guisan* to Hampton Roads, it being expected that notice of readiness would be tendered on or about Oct. 16, 1957. According to the facts found by the arbitrators, what subsequently happened was as follows. The vessel performed a total of eight voyages pursuant to the agreement. With the exception of loading at Norfolk on the first voyage (when the charterers earned dispatch money), the lay days were exceeded during loading and discharging on each of the eight voyages. The charterers paid the owners demurrage as and when due in the sum of not less than 149,993.08 dols. in respect of discharging at Rotterdam on the first voyage and loading and discharging on each of the remaining seven voyages. By reason of the periods spent by the vessel at the loading and discharging ports during the eight voyages, the vessel was able to perform fewer voyages during the period of the charter-party than would have been possible if the loading and discharging had been completed within the laytime.

Disputes arose between the parties in relation to claims by the owners for damages arising from alleged breaches by the charterers of implied or express terms of the charter-party, and these were referred to arbitration in London pursuant to the provisions of Clause 3 of the charter-party.

Pleadings were delivered in the arbitration, and from the points of claim it appears that the owners are (*inter alia*) claiming, after giving credit for the sum of demurrage I have mentioned, the equivalent of over three-quarters of, or alternatively nearly half, a million United States dollars as damages due to their deprivation by the charterers' breaches of contract of the profits the owners would have earned on nine or six additional voyages under the charter-party. The charterers, in par. 7 of their points of defence, pleaded that the demurrage paid was all that the owners were entitled to by reason of breaches of the charter.

At the request of the owners, the two arbitrators stated in the form of a consultative case for the decision of the Court the following questions of law:

Whether upon the facts found and upon the true construction of the Charterparty dated the 21st December 1956 and the agreement dated the 8th October 1957:—

(A) (i) The Claimants are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the Respondents having failed to load and discharge the Vessel within the laydays whereby the Charterparty was (if so proved) rendered less profitable to the Claimants by consequent loss of voyages or voyage time.

(ii) Upon the assumption that such loss of profitability resulted from the Respondents having deliberately (i.e. with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel:

(a) With such ordinary despatch as the circumstances permitted

or

(b) within the laydays

the Claimants are entitled to recover any damages suffered by the Claimants through the Charterparty having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the Respondents.

(B) If the answer to any of the questions under ("A") be "Yes", the payment by the Respondents and acceptance by the Claimants of demurrage in respect of those periods when the

170           LLOYD'S LIST LAW REPORTS           [Q.B. (Com. Ct.)

[1965] Vol. 1]    Suisse Atlantique v. N.V. Rotterdamsche    [Mocatta, J.

laydays were exceeded preclude the Claimants from recovering any damages otherwise recoverable by them in accordance with such answer or answers.

During the course of the argument before me it was agreed by both Counsel that I should confine my decision to answering Questions A (i) and (ii). It was also agreed by Counsel for the owners that the words " or voyage time " at the end of Question (A) (i) added nothing to what went before.

It is convenient at this stage to refer to the provisions of the charter-party most relevant to the questions I have to answer and the arguments of Counsel.

The charter-party consisted of a printed form entitled " Americanized Welsh Coal Charter ", with certain adaptations, containing 21 clauses and appended typed sheets containing Clauses 22 to 38. It was dated in London, Dec. 21, 1956, and purported to be made between the owners and the charterers. I say "purported" since there is a separate dispute between the parties, with which I am not concerned, whether the original signature of the charter on behalf of the charterers was made with their authority.

The charter, after reciting that the claimants were disponent owners of the motor vessel *Silvretta*, provided in Clause 1:

> That the said Vessel being tight, staunch and strong, and in every way fitted for the Voyage, shall, with all possible dispatch, sail and proceed to Hampton Roads, Va. - or - Baltimore, Md. - or - Philadelphia, Pa. and there load, always afloat, in the customary manner from the Charterer, in such Dock as may be ordered by him, on each voyage a full and complete Cargo of Coal not exceeding 11,000 tons, nor less than 9,000 tons, quantity at Vessel's option, and not exceeding what she can reasonably stow and carry, over and above her Tackle, Apparel, Provisions and Furniture; and being so loaded, shall therewith proceed, with all possible dispatch, to One Safe Port Belgium or Holland, or at Charterers option One Safe German North Sea Port, or so near thereunto as she can safely get, and there deliver her cargo alongside any Wharf and/or Vessel and/or Craft, as ordered . . .

It is not necessary for me to complete the reading of the remainder of Clause 1. The words " on each voyage " were inserted in typescript.

Clause 3 was a very long clause and it is unnecessary that I should read it *verbatim*. It provided that the cargo was to be loaded into the vessel at the average rate of 1500 tons per running day of 24 hours, with certain excepted periods such as Sundays and local holidays etc., commencing 24 hours after the vessel tendered and was ready to load. There followed an extremely long and widely drawn provision excluding from loading time any time lost through a variety of events and causes. At line 37 the clause continued:

> . . . If longer detained, Charterer to pay $1000 U.S. Currency per running day (or pro rata for part thereof) demurrage. If sooner dispatched, Vessel to pay Charterer or his Agents $500 U.S. Currency per day (or pro rata for part thereof) dispatch money for lay time saved. . . .

By Clause 4 the cargo was

> . . . to be loaded, dumped and trimmed by men appointed by the Charterer at the tariff rate of the Port at Vessel's expense.

Clause 7 was a fairly elaborate exceptions clause incorporating the Harter Act.

Clause 8 was the discharging clause, and, so far as material, provided:

> The Cargo to be taken from alongside by Consignee at Port of Discharge, free of expense and risk to the Vessel, at the average rate of (Clause No. 22) tons per day, weather permitting . . .

this was subject again to certain excepted periods such as Sundays, etc. It continued:

> . . . If longer detained, Consignee to pay Vessel demurrage at the rate of $1000 U.S. Currency per running day (or pro rata for part thereof). If sooner dispatched, Vessel to pay Charterer or his Agents $500 U.S. Currency per day (or pro rata for part thereof) dispatch money for lay-time saved. . . .

There was a short but widely expressed exception providing that time was not to count in certain events unless the vessel was already on demurrage. The consignee was to effect the discharge of the cargo free of risk and expense to the vessel save for the provision of steam, steam-winches, gins and falls.

Under Clause 9 freight was to be paid within seven days after surrender of signed bills of lading less agreed dispatch earned at loading port. Clause 12 read as follows:

Q.B. (COM. CT.)]     LLOYD'S LIST LAW REPORTS     171

MOCATTA, J.]     Suisse Atlantique v. N.V. Rotterdamsche     [1965] VOL. 1

Vessel not to tender before 9 a.m. on 10th February 1957 and if Vessel be not ready at Loading Port as ordered before 9 a.m. on 10th March 1957, or if any wilful misrepresentation be made respecting the size, position or state of the Vessel, Charterer to have the option of cancelling this Charter, such option to be declared on notice of readiness being given.

In the margin to this clause appeared the words

for the first voyage only. See also Clause No. 23.

Clause 22 provided rates of freight for Holland and Belgium and for German North Sea ports respectively, and similarly for rates of discharge, which were to be 3000 tons per day for the former ports and 2500 tons for the latter. It is desirable that I should read Clauses 23, 30 and 37. Clause 23 provides as follows:

It is agreed that the m.v. *Silvretta* will perform under this Charter until replaced, in June/July 1957 by Owners Newbuilding No. 445, of 12,000 tons ten percent more or less, now under construction at RIJEKA. It is understood that No. 445 will be classed 100 A1 in Lloyds Register or equivalent and the name is to be given to Charterers as soon as is known, Owners undertaking to keep Charterers regularly advised of the position of the vessel, giving at least 30 days approximate notice of first readiness to load in addition to the notices as called for under Clause 30. This Charter is to remain in force for a total of two years consecutive voyages, with final cancelling date on last voyage 10th March, 1959, vessel always returning in ballast between trips. Ten days prior to vessel's expected sailing from her last discharge port before final cancelling date, Charterers are to give Owners notice that vessel will be accepted in accordance with Clause No. 3 if vessel tenders after her final cancelling date i.e. 10th March 1959, or that vessel will not be accepted and therefore the contract can be considered fulfilled upon completion of discharge.

Clause 30 provides:

Owners to give Charterers or their Agents ten (10) days notice of Vessel's expected time of arrival at loading port and approximate quantity required, this is to be followed by seven (7) and three (3) days notice of Vessel's expected time of arrival.

Clause 37 reads:

Owners to have the privilege of dry docking during the currency of the Charter Party as and when considered necessary but any time used to be added to the period of the Charter and final cancelling date to be proportionately extended at Charterers option but such option to be declared two months before final cancelling date.

It is of some importance to note that Clause 23, which is the operative clause converting the form of charter from one for a single voyage to one for a series of voyages, does not specifically mention the number of voyages to be performed under it. It is, however, clear that the charter covers a period of time, since it is to remain in force for a total of "two years consecutive voyages". It is not expressly stated when the two years are to be treated as beginning nor when the mutual rights and obligations are to end. In some consecutive voyage charters (see, for example, that in *Anglo-Saxon Petroleum Company, Ltd. v. Adamastos Shipping Company, Ltd.*, [1957] 2 Q.B. 233; [1957] 1 Lloyd's Rep. 79; (C.A.) [1957] 1 Lloyd's Rep. 271, the latter point is covered by a clause providing that the charter is to remain in force for as many consecutive voyages as the vessel can tender for loading for by a stated date. In such cases the terms of the charter no doubt continue to apply throughout the last voyage notwithstanding that much, if not the great majority, of the time taken in its performance is after the stated date. It is unnecessary for me to determine when the mutual rights and obligations of the parties ended or might have ended under this charter, though it will be observed that there are exactly two years between the two cancelling dates mentioned in Clauses 12 and 23. I assume for the purposes of this judgment that, provided the vessel tendered at the loading port ordered before Mar. 10, 1959, the charter would have continued to apply until completion of discharge of the cargo thereafter loaded and payment of freight therefor. For ease of reference, I will also assume that the two years mentioned ended on midnight Mar. 9/10, 1959.

Two further preliminary matters may usefully be mentioned. It is clear from the decision of the Court of Appeal in *Compagnie Primera de Navagaziona Panama v. Compania Arrendataria de Monopolio de Petroleos S.A.*, [1940] 1 K.B. 362; (1939) 65 Ll.L.Rep. 7, that a consecutive voyage

| 172 | LLOYD'S LIST LAW REPORTS | [Q.B. (COM. CT.) |
|---|---|---|
| [1965] VOL. 1] | Suisse Atlantique v. N.V. Rotterdamsche | [MOCATTA, J. |

charter is one indivisible contract for the number of voyages to which it applies; it is not a series of charters each for a separate voyage. Secondly, it is clear that the owners' obligation to proceed with all possible dispatch, which in Clause 1 is expressly stated in regard to the voyages to the loading port and also to the discharging port, must, as a matter of construction, apply to every voyage in ballast and with cargo under the charter: see the *Anglo-Saxon case, sup.*, per Lord Justice Parker at p. 273\*, and Lord Justice Sellers at p. 276†.

Mr. MacCrindle's arguments for the owners were mainly directed to Question A (i) in the consultative case. While conceding that there was some overlap between them, he put forward the following major submissions: First, on the true construction of the charter-party as a whole, it was the obligation of the charterers during the two years to load and discharge cargoes on a number of consecutive voyages which should not be less than the number compatible with the performance by them of their obligations to provide a cargo and load and discharge it on each occasion in the laytime provided. This obligation was, of course, subject to the operation of the various exception clauses and to the owners for their part proceeding with all possible dispatch. The obligation as framed used the words "should not be less than" in order to cover the possibility of the charterers loading and discharging quickly so as to earn dispatch with the result that time might be available within the two years for one or more voyages additional to the number possible if loading and discharging occupied the full laytime allowed.

Secondly, on the true construction of the charter-party as a whole, the owners were given the right and duty of performing at the agreed rates of freight a programme of voyages totalling in all not less than that number which could, by the exercise of all possible dispatch by the owners and subject to the operation of the various exception clauses, be performed in two years if the charterers for their part provided cargoes and loaded and discharged them in the laytime provided. The corollary flowing from this was that, by agreeing to perform the charter-party, the charterers must be taken as having promised that they would employ the vessel in fulfilling such a programme and not otherwise.

---
\* [1957] 1 Lloyd's Rep., at p. 280.
† *Ibid.*, at p. 282.

Thirdly, it was an implied term of the charter-party that the charterers would not, by breaking the express terms of the charter-party, that is, those as regards the time allowed for loading and discharging, prevent the owners earning freight under the charter-party.

Fourthly, the charterers were admittedly in breach of the laytime provisions of the charter-party and, as this had caused the owners more than the mere detention of their vessel, the demurrage provisions did not provide the correct measure of the owners' damages. The owners were, therefore, entitled to a favourable answer to Question A (i) on this ground even if their first three submissions failed.

Mr. MacCrindle had prefaced the submissions I have just set out by reminding me that the date of the charter-party was shortly after the blocking of the Suez Canal in November, 1956, when freight rates in consequence were high, and that after the re-opening of the Canal in April, 1957, freight rates fell heavily. The explanation of the excessive times taken in loading and discharging the vessel was, he suggested, that with market rates of freight substantially lower than the charter rates, it paid the charterers to delay the vessel and incur demurrage rather than to have to pay the charter rates of freight on additional voyages. There were no findings of fact in the consultative case on which to base these suggestions, but the facts as to the effect on freight rates of the blocking and subsequent re-opening of the Suez Canal are common knowledge to anyone who has been engaged in any capacity in this Court since November, 1956. Without going so far as to take judicial knowledge of these matters, one can, I think, quite properly consider the legal issues on the basis that Mr. MacCrindle's explanation of the charterers' conduct may be true. Another explanation might be that the charterers unexpectedly found themselves unable to dispose profitably of the quantities of coal that would have been carried had loading and discharging been completed within the lay days with the result that the vessel would during the remainder of the two years have performed a greater number of voyages than eight. Whether either of these or some other explanation be the true one, it is readily understandable that if there is a substantial discrepancy between the demurrage rate and the daily profit a vessel can make on a round voyage at the charter rates of freight,

it may make a startling difference to the profitability of a charter-party like this to shipowners if laytime is so exceeded as to reduce the number of voyages that would otherwise have been performed within the charter period. Similarly, it may in certain market conditions be less costly for charterers to pay substantial demurrage than extra freights. Mr. MacCrindle's submissions would, in such circumstances, protect shipowners from such risks.

For the charterers, Mr. Donaldson submitted that since the charter-party expressly provided for the times allowed for loading and discharging and for the payment of liquidated damages under the name demurrage for exceeding such times, there was no room for the implications to be found in Mr. MacCrindle's first three submissions, while if the first two did not depend upon implied terms, they were merely stating in more elaborate language what Clauses 3, 8 and 22 of the charter provided. As regards the fourth submission for the owners, Mr. Donaldson submitted that the result of the breaches by the charterers was that the owners had suffered in that their vessel had been detained and for that the payment of demurrage was, on the authorities, an exclusive remedy. The pith of Mr. Donaldson's argument was that there was here only one material obligation, namely to load and discharge in the fixed times provided, and one loss, namely detention, for which demurrage was the only legal remedy. The owners' troubles were due to their having agreed to an unduly low demurrage rate, and the elaborate legal arguments advanced on their behalf all sprang from this commercial error of judgment.

The relevance of Mr. MacCrindle's first three submissions is that, if any of them be right, he has established an obligation upon the charterers different from or in addition to that imposed upon them expressly by the application of the laytime provisions to each consecutive voyage and may thus be afforded a means of recovering damages other than demurrage.

It is convenient to deal with the first two of the owners' submissions together, and seek to discover whether there is any ground for holding that, under this charter-party, the charterers were under any obligation relative to the questions I have to answer other than on each occasion when the vessel tendered at a loading port within the two-year period to load her in the lay days provided, and similarly, on her arrival at the nominated European port, to discharge her in the lay days. It is, of course, clear that the charterers, in addition to the duty to load (and subsequently discharge) the vessel at the fixed rates on each voyage, were under the separate and distinct obligation to furnish a cargo of the contractual quality and quantity on each voyage: see the well-known authorities cited in *Chandris v. Isbrandtsen-Moller Company, Inc.*, [1951] 1 K.B. 240, at p. 252; (1950) 83 Ll.L.Rep. 385, at pp. 396 to 397. I can omit further reference to this since the obligation was performed each time the vessel tendered. It is true that, if charterers under a charter in this form load and discharge within the lay days and the owners perform their part with all possible dispatch, then, subject to the operation of exceptions, *x* number of voyages will be performed within the charter period. But can it be truly said that there is a separate obligation on charterers so to act that not less than that number of voyages can be performed or to employ the vessel in fulfilling such a programme and not otherwise?

The obligation, whichever way it be stated, would have strange consequences. In the first place it would be extremely difficult for charterers to know when they were in breach of it. A few days on demurrage here and there, even if they were aggregated, could not constitute a breach unless and until they amounted in total to the length of time the vessel would take to return in ballast to and tender at the American port of loading. I do not know what such time would be: on average it might be between 14 and 21 days. Presumably, there could be no breach until the point of no return had been reached, that is to say when accumulated time on demurrage was at a figure that was bound to deprive owners of the opportunity of tendering for at least one further voyage despite the exercise of all possible dispatch by charterers in loading and discharging. The actual or potential operation of the exceptions clauses in the charter might create further practical difficulties for charterers in ascertaining when they were in breach of the obligation. Indeed, I think that Mr. MacCrindle expressly or impliedly admitted in argument that the formulae as to the number of contractual voyages to be performed contained within his first two submissions could only be applied retrospectively at the end of the two-year period when all the facts were known on the principle *id certum est quod certum reddi potest.*

174　　　　　　　　　　　LLOYD'S LIST LAW REPORTS　　　　　[Q.B. (Com. Ct.)

[1965] Vol. 1]　　　　Suisse Atlantique v. N.V. Rotterdamsche　　　　[Mocatta, J.

A second curious consequence would be that the provisions as to demurrage in Clauses 3 and 8, which by reason of Clause 23 must, in my view, be read as applying to any exceeding of the fixed times for loading and discharging on each voyage during the charter period, would have an unusually restricted and almost capricious application. Thus, if the extra time used in loading and discharging throughout the two-year period did not aggregate to a total sufficient to permit of the vessel tendering for an additional voyage, demurrage would have to be paid in the ordinary way. It would similarly have to be paid if the vessel were lost by an excepted peril during the course of the two-year period at a time before delays in loading and discharging had amounted to sufficient in total to constitute a breach of the separate obligation contended for. In a case with facts like the present, however, Mr. MacCrindle did not shrink from saying that the demurrage provisions were irrelevant, and the owners have, as I have said, given credit for the demurrage paid in their pleadings. Presumably, demurrage would, strictly speaking, be payable as liquidated damages as soon as the figures could be worked out after the completion of loading or discharging on each voyage. But, if at the end of the two-year period it appeared that the suggested obligation had been broken, then, except for any odd period left over too short to have allowed the vessel to tender again within the two-year period, any accrued liability to pay demurrage that had not been met would disappear and any demurrage paid would be relevant by way of credit only. The vagaries of liability under the demurrage provisions in the charter involved in Mr. MacCrindle's first two submissions, in my judgment strongly suggest they are fallacious.

Mr. MacCrindle supported his first two submissions by arguing that the special feature of this case was that the charter was one for a number of voyages within a period. The number could not be stated until after the end of the two-year period, but it was then ascertainable. The charter could therefore be compared to one for, say, 20 voyages within two years. Under such a charter, he argued that demurrage would be no answer to a claim for damages for lost earnings on voyages not performed due to exceeding the permitted laytime. The position was different from a charter for 20 consecutive voyages without any provision for the time within which they were to be completed. In such a case it was admitted that no more than demurrage could be recovered for breach of the lay day provisions. He further argued that, unless his submissions were right, the charterers could in an extreme case load only one cargo under the charter and, if the owners did not terminate the charter on the ground of repudiation, but allowed it to remain in force, as was their right, they would be limited to one freight and a claim for demurrage.

In my judgment, neither of Mr. Mac-Crindle's first two submissions is sound, whether based merely on construction of the clauses of the charter or on implied terms derived therefrom. Since by Clause 23 the charter is to remain in force for a total of "two years consecutive voyages", it follows as a matter of construction, as I have already said, that each time the vessel tenders for loading within that period the charterers are under the obligation to load her in the laytime provided for by Clause 3 and to discharge her in the laytime provided for by Clauses 8 and 22. I see no justification for spelling out of these reasonably clear provisions any independent and distinct obligation on the part of the charterers to load and discharge the vessel on a specific number of voyages only ascertainable with considerable difficulty at the end of the two-year period. No doubt, if the laytime is never exceeded, then, subject to the operation of exceptions and to the owners proceeding with all possible dispatch, a number of voyages will be performed within the period. But that will be the result of the performance by the charterers of their obligations under Clauses 3, 8 and 22 and by the owners of their obligations under Clauses 1 and 23; it will not, in my judgment, be the result of the charterers performing any other relevant and distinct obligation.

If it be sought to base either of the submissions on implied terms, it must be shown that such implications are not only reasonable but necessary to give business efficacy to the charter. Judged by this test, in my view the implications should not be made since the owners could have protected themselves at the time of contracting by insisting on demurrage rates commensurate with the freight rates in the charter when converted to a daily profit basis. As Mr. Justice Devlin said in *Chandris v. Isbrandtsen-Moller Company, Inc., sup.*, at p. 249\*, a demurrage clause

---
\* (1950) 83 Ll.L.Rep., at p. 395.

Q.B. (COM. CT.)]    LLOYD'S LIST LAW REPORTS    175

MOCATTA, J.]    Suisse Atlantique v. N.V. Rotterdamsche    [1965] VOL. 1

. . . is presumably the parties' estimate of the loss of prospective freight which the owner is likely to suffer if his ship is detained beyond the lay days. . . .

As has been stated in Scrutton on Charter-parties in successive editions of that book going back at least to the 10th ed. in 1921, for which the author was responsible,

> Demurrage, in its strict meaning, is a sum agreed by the charterer to be paid as liquidated damages for delay beyond a stipulated time for loading or unloading. . . .

It is, no doubt, a matter of some difficulty to ascertain the loss an owner suffers when his ship is delayed and an agreed figure is used to lessen disputes and the expense involved in resolving them. In the case of a charter for consecutive voyages at agreed rates of freight, one difficulty in arriving at an agreed figure is eliminated in that speculation about the future course of freight markets is unnecessary. If, as Mr. MacCrindle submitted was the case here and as the owners' pleadings disclose, there is a great disparity adverse to the owners between the demurrage rates in the charter and the freight rates, then the owners have only themselves to blame for having agreed too low a figure for demurrage.

Finally, I should add on the first two submissions, in deference to the supporting arguments I have mentioned advanced on behalf of the owners, that I have not found it possible to derive any assistance in this case from considering what might be the position under a different form of consecutive voyage charter providing for, say, 20 voyages to be performed within two years, since in that case, if such a form of charter were ever entered into, which I beg leave to doubt, there would be an express obligation for a particular number of voyages. The extreme case of one voyage only being performed under this charter does not, in my view, strengthen the arguments based on construction or implication.

Mr. MacCrindle did not put his third submission in the forefront of his argument, and no doubt for good reasons. Clauses 3, 8 and 22 provide for loading and discharging within fixed times. If these times are exceeded it is clear from the decision in the Court of Appeal in *Aktieselskabet Reidar v. Arcos, Ltd.*, [1927] 1 K.B. 352; (1926) 25 Ll.L.Rep. 513, that the charterers are in breach of their contract. For such breaches the owners are entitled to the damages which the law allows, and I can see no justification for implying into the contract an implied term that the charterers will not break express terms of it. The case is far removed from the *Mackay v. Dick and Another*, (1881) 6 App. Cas. 251, type of case. Indeed, in his reply Mr. MacCrindle frankly admitted that he would only have needed this type of implied term if suing for freight as such, which was not the case, or in countering an argument that the owners could not recover damages at large for loss of freight because they had been paid freight for each voyage for which their vessel had tendered. This argument was, however, not advanced.

I accordingly decide against the owners on the first three submissions advanced on their behalf.

The fourth submission is different in character. It is based on the established breaches by the charterers of the laytime provisions in the charter. The loss of earnings under the voyages that would have been performed under this charter are special damages not covered by demurrage. This submission depends upon a close analysis of the judgments in *Reidar v. Arcos, sup.*, and especially that of Lord Justice Bankes in relation to the facts of this case.

In *Reidar v. Arcos, sup.*, the plaintiffs' vessel was chartered to go to Archangel and there load a full and complete cargo and then proceed to one port out of a range as ordered. She was eventually ordered to Manchester. The charter contained a clause providing for loading within a fixed time to be ascertained by applying daily rates by quantities for different types of wood goods and for the payment of demurrage at a daily rate in default. The charter was entered into late in the season. Had the rate of loading stipulated in the charter been observed the vessel could have lawfully loaded and carried to Manchester a full and complete cargo of 850 standards on her summer marks. In the event, however, the stipulated laytime was exceeded and she could only carry 544 standards, the maximum cargo required to bring her down to her winter marks. The plaintiffs claimed damages by way of dead freight on 306 standards over and above the demurrage they had been paid for $6\frac{1}{4}$ days, the time by which laytime for a cargo of 850 standards had been exceeded. Alternatively, they claimed additional demurrage for the excess over the laytime allowed for loading 544 standards. They succeeded on their larger claim both before Mr. Justice Greer and the

176         LLOYD'S LIST LAW REPORTS         [Q.B. (Com. Ct.)

[1965] Vol. 1]         Suisse Atlantique v. N.V. Rotterdamsche         [Mocatta, J.

Court of Appeal, but the reasoning of the four judgments in their favour was very different. Thus, the difference between freight on 850 and 544 standards, less a small allowance for savings in the cost of discharge, can be concisely stated to have been held recoverable by Lord Justice Bankes as damages for failure to load in the agreed time; by Lord Justice Atkin as damages for failure to load a full and complete cargo in the agreed time; and by Lord Justice Sargant as damages for failure to load a full and complete cargo. The reasoning of Mr. Justice Greer had been similar to that of Lord Justice Sargant.

I have already mentioned earlier that the Court of Appeal decided that a charterer, who exceeds the permitted laytime under a fixed time charter with provision for demurrage, thereby breaks his contract. On this all the judgments were unanimous. The further question that had to be answered in that case was whether the liquidated damages payable under the name of demurrage were on the facts an exclusive remedy. Lord Justice Bankes said at p. 362* that

> . . . If the plaintiffs' claim was in substance, though not in form, a claim for detention of the vessel, the special damage here claimed for would not be recoverable . . .

while at p. 363† Lord Justice Atkin said that the provisions as to demurrage quantified the damages arising from the detention of the vessel. Again, at p. 366‡, Lord Justice Sargant said that the demurrage provisions merely assessed damages for any detention of the vessel due to a failure to load at the prescribed rate. These statements are naturally relied upon by the charterers here.

Lord Justice Bankes took the view that there had only been one breach of contract committed by the charterers, namely, failure to load in the agreed time, since he thought that whether the charterers had failed in their separate and distinct obligation to load a full and complete cargo had to be decided at the time the vessel sailed, when she could only lawfully have carried 544 standards to Manchester. After the passage in his judgment at p. 362, which I have already quoted, Lord Justice Bankes continued:

---
\* (1926) 25 Ll.L.Rep., at p. 516.
† Ibid.
‡ Ibid., at p. 517.

. . . Upon the special facts of this case the plaintiffs' claim appears to me to be, both in substance and in form, essentially distinct from any claim for the detention of the vessel. In substance what the plaintiffs are saying is that if the charterers had loaded the goods at the agreed rate they would have earned freight on 850 standards, whereas owing to the failure to load at that rate they could only earn freight on 544 standards, and that their loss directly flowing from the breach of contract is the difference between the amount of freight which they would have earned and the amount which they in fact earned. This loss is, in my opinion, on the facts of this case recoverable as damages for the breach of contract to load at the agreed rate.

At one time I was inclined to think that where parties had agreed a demurrage rate, the contract should be construed as one fixing the rate of damages for any breach of the obligation to load or discharge in a given time. On further consideration I do not think this view is sound. I can find no authority on the point, and it is noticeable that in the *Saxon Ship Company, Ltd. v. Union Steamship Company, Ltd.*, (1899) 4 Com. Cas. 298, it was not suggested that the claim for demurrage excluded the additional claim for special damage arising from the detention of the vessel.

The owners argue that the facts of the present case bring them within the reasoning of the judgment. There, although there was no breach, in the view of Lord Justice Bankes, of the separate obligation to load a full and complete cargo, nevertheless the shipowners were entitled to recover as special damages over and above demurrage damages for the loss of the freight they would have earned under the charter had the charterers not been in breach of their obligation to load the vessel within the laytime. The owners here can show an exactly comparable breach of the obligation to load in the lay days by the charterers and they are claiming loss of earnings through being denied the freight they would have received under this charter had there been no breach. They give credit for the demurrage paid since otherwise they would be in a better position by reason of the charterers' breach than had there been none. The same could not have been said in *Reidar v. Arcos, sup.* The damages claimed here were not for the detention of the vessel, but for loss of

| Q.B. (COM. CT.)] | LLOYD'S LIST LAW REPORTS | 177 |
|---|---|---|
| MOCATTA, J.] | Suisse Atlantique v. N.V. Rotterdamsche | [1965] VOL. 1 |

earnings under the charter. As Mr. Mac-Crindle succinctly put it, demurrage covers detention, but not a claim for non-feasance of a contract which is a by-product of a breach of it.

Mr. Donaldson's answer was that the distinction between the two cases lay in the fact that in *Reidar v. Arcos, sup.*, the freight lost would have been earned on the same voyage as that during which the detention occurred, while in the present case the freight lost would have been earned under different voyages, albeit made under the same contract. The claim was one for damages for detention and was indistinguishable in principle from a claim under a single voyage charter without the peculiar feature that was present in *Reidar v. Arcos, sup.* In such a case, freight covered the expenditure of the shipowner during the agreed laytime and the sea voyages involved; demurrage covered time spent in port in excess of the laytime in that, were such extra time not used by the charterer, the shipowner would be free to earn further freight under a new charter to be negotiated on the market, if not already concluded. Under the present charter, had the charterers not been in breach, the owners would not have been free to charter their ship elsewhere, but they would have performed further voyages and received more freight under this charter. The loss of such freight by reason of the excess time taken in loading and discharging was just as much damage by detention as was the loss of future freight under another charter in the case of detention under a single voyage charter and was indistinguishable in principle from it.

The competing arguments on this fourth submission advanced on behalf of the owners are nicely balanced, and I confess that my mind has fluctuated in their consideration. Where it not for *Reidar v. Arcos, sup.*, I would readily have accepted Mr. Donaldson's argument that the loss suffered by the owners here was indistinguishable in principle from that suffered by a shipowner under a single voyage charter when his ship is detained beyond her lay days. In consequence, I would have decided without much doubt that, just as the consequential loss of future freight in such a case would be a loss by detention covered by the demurrage provisions, so should losses of freight under the additional voyages that could have been performed under this charter be treated as covered by demurrage. I have to consider, however, whether there is anything in the reasoning in *Reidar v. Arcos, sup.*, and in particular in the judgment of Lord Justice Bankes, which should lead me to a contrary conclusion.

A major difficulty here is that the reasoning of the three Lords Justices differed, that of Lord Justice Bankes being the most favourable to the owners in the present case. It seems to me, however, that I cannot exclude in considering that case the fact that it had the special feature, absent here, that the delay in loading affected the quantity of cargo that could be carried on the very voyage in which the delay in loading arose. This led Lord Justice Sargant, as well as Mr. Justice Greer, to find there had been a breach of a separate obligation to which demurrage did not apply. It led Lord Justice Bankes to find that the delay had caused special damage different in substance from damages for detention, notwithstanding that there had in his view been only one breach. The demurrage rate could not compensate for this, but only for the excess time taken, which, had the charterers loaded within the lay days, would have been available to the shipowners for the purpose of earning *pro tanto* freight under a new charter. This element in the shipowners' loss, absent from the present case, is clearly brought out in the judgment of Lord Justice Atkin in the following passage at p. 363\*:

. . . If the lay days expire without a full cargo having been loaded the charterer has broken his contract. The provisions as to demurrage quantify the damages, not for the complete breach, but only such damages as arise from the detention of the vessel. For correlative to the ship's right to receive the agreed damages is the charterer's right to detain the ship for the purpose of enabling him, if possible, to perform his broken contract and so mitigate any further damage. If however, for reasons other than the shipowner's default, the charterer becomes unable to do that which he contracted to do— namely, put a full and complete cargo on board during the fixed lay days, the breach is never repaired, the damages are not completely mitigated, and the shipowner may recover the loss that he has incurred in addition to his liquidated demurrage or his unliquidated damages for detention. . . .

---

\* (1926) 25 Ll.L.Rep., at p. 516.

178 LLOYD'S LIST LAW REPORTS [Q.B. (Com. Ct.)

[1965] Vol. 1]   Suisse Atlantique v. N.V. Rotterdamsche   [Mocatta, J.

In my judgment, the absence from this case of the special feature I have mentioned prevents the owners from being able to establish that their claim, either in substance or in form, is one other than for damages for detention. Accordingly, I do not think they can bring themselves within the reasoning of Lord Justice Bankes, and the general principle agreed by all members of the Court of Appeal must apply, namely that, for a claim for detention by a shipowner due to the laytime provisions in a charter being exceeded, the demurrage provisions quantify the damages recoverable.

I would add that this conclusion has, to my mind, the additional advantage of avoiding the vagaries of liability under the demurrage provisions which I mentioned earlier in dealing with the first two submissions advanced for the owners.

It follows from the above that my answer to Question (A) (i) is in the negative.

I can deal very shortly with Question (A) (ii), to which Mr. MacCrindle directed little argument. If one party to a commercial contract commits a breach of it, I know of no principle that makes his intention in so acting relevant, at any rate when his conduct is not treated as a repudiation by the other party. If authority is required to demonstrate the irrelevance of the intention of the contract breaker in such circumstances, it is to be found in the decision of the Court of Appeal in *Ethel Radcliffe Steamship Company, Ltd. v. W. & R. Barnett, Ltd.*, (1926) 24 Ll.L.Rep. 277; (1926) 31 Com. Cas. 222.

I accordingly answer Question (A) (ii) in the negative.

Mr. DONALDSON: Then I ask your Lordship to answer the questions in the way in which your Lordship has indicated in your Lordship's judgment, namely, "No" to (A) (i) and "No" to (A) (ii), no answer to (B), and I ask for the costs of the argument before your Lordship.

Mr. MACCRINDLE: I do not resist any of that.

Mr. Justice MOCATTA: So be it.

Mr. MACCRINDLE: As this is a consultative case, I have, as your Lordship knows, no automatic right to appeal. I would ask for leave to appeal.

Mr. Justice MOCATTA: Yes.

Mr. MACCRINDLE: And I would ask your Lordship to be kind enough to say that the time for the notice of appeal to be lodged should be the usual time for an appeal, namely, six weeks.

Mr. DONALDSON: Much as I would like to oppose that, I cannot think of any reason.

Mr. Justice MOCATTA: Very well. So be it.