# EXHIBIT 9

*Page 529*

# LLOYD'S LIST

# LAW REPORTS

### Editor: E. S. MATHERS
of the Middle Temple, Barrister-at-Law

### Assistant Editor: G. M. HALL
of the Middle Temple, Barrister-at-Law

[1966] Vol. 1]    FRIDAY, JUNE 10, 1966    [PART 11

## HOUSE OF LORDS

Nov. 2, 3, 1965,
Jan. 11, 12, 13, 17, 18, 19, 1966

---

SUISSE ATLANTIQUE SOCIETE
D'ARMEMENT MARITIME S.A.
v. N.V. ROTTERDAMSCHE KOLEN
CENTRALE

Before Viscount DILHORNE, Lord REID,
Lord HODSON, Lord UPJOHN and Lord
WILBERFORCE

**Charter-party—Consecutive voyages—Detention —Alleged fundamental breach—Delays by charterers in loading and discharging cargoes preventing vessel performing more voyages in charter time—Whether shipowners entitled to damages (less demurrage payments) for loss of further freights—Effect of deliberate breach by charterers—Whether payments of demurrage by charterers precluded shipowners from recovering further damages— Whether demurrage clause was an exceptions or limiting clause which was not applicable because of fundamental breach—Consideration of fundamental breach and breach of fundamental term.**

Charter-party was entered into between claimants, disponent owners of motor vessel *General Guisan*, and respondent charterers for carriage of coal from U.S. ports to Northern European Continental ports on consecutive voyages during two-year period. Eight voyages were performed during charter and except for loading on first voyage, lay days were exceeded during loading and discharging on each voyage. 149,993.08 U.S. dols. demurrage (at 1000 dols. per day) was paid by charterers. Owners claimed for additional sum (about 750,000 U.S. dols. or 5,000,000 U.S. dols.) damages against charterers alleging that, if loading and discharging had been completed within laytime, nine or six additional voyages would have been possible. Consultative case was stated by arbitrators. Questions for Court:

Whether . . .

(A) (i) The Claimants are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the Respondents' having failed to load and discharge the Vessel within the laydays whereby the Charterparty was (if so proved) rendered less profitable to the Claimants by consequent loss of voyages or voyage time.

(ii) Upon the assumption that such loss of profitability resulted from the Respondents having deliberately (i.e. with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel:

(a) With such ordinary despatch as the circumstances permitted

or

(b) within the laydays

the Claimants are entitled to recover any damages suffered by the Claimants through the Charterparty having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the Respondents.

Owners contended: (1) that, under charter-party, charterers, during the two-year period, were under obligation to load and discharge cargoes on a minimum number of consecutive voyages; and that that minimum number, ascertainable at the end of the two-year period, was the number of voyages compatible with charterers' loading and discharging within the laytime; (2) that owners, under charter-party, had the right and duty to perform that minimum number of voyages; (3) that it was an implied term of charter-party that charterers would not, by breaking express term as to time for loading and discharging, prevent owners from earning freight; (4) that, as charterers were admittedly in breach of laytime provisions and that had caused more than mere

detention of vessel (owners had lost freights on additional voyages), demurrage provisions did not provide correct measure of damages. Owners alleged that freight rates had fallen; that market freight rates were lower than charter freight rates; and that it paid charterers to delay vessel and incur demurrage rather than pay charter freight on additional voyages. Charterers contended that charter-party expressly provided for payment of liquidated damages (demurrage) for exceeding laytime; and that the result of charterers' breaches was that vessel was detained and demurrage was an exclusive remedy.

————Held, by MOCATTA, J., (1) (a) that a consecutive voyage charter was an indivisible contract for the number of voyages to which it applied and was not a series of charters for a separate voyage; (b) that shipowners' obligation to proceed with dispatch, in this charter-party, applied to every voyage in ballast and with cargo under the charter; (2) (i) that the charter was for a total of "two years consecutive voyages"; that, each time vessel tendered for loading during that period, charterers were under obligation to load and discharge her within laytime provisions; and that there was no justification for spelling out of those provisions a separate obligation to load and discharge vessel on a specific number of voyages only ascertainable with difficulty at the end of the two-year period; (ii) that no implications should be made because owners could have protected themselves by insisting on demurrage rates commensurate with charter freight rates; (3) that there was no justification for implying a term that charterers would not break express terms of the contract; (4) that Aktieselskabet Reidar v. Arcos, Ltd., [1927] 1 K.B. 352; (1926) 25 Ll.L.Rep. 513, could be distinguished, in that it had the special feature that the delay in loading affected the quantity of cargo which could have been carried on the very voyage in which the delay arose; that, in the absence in this case of that special feature, owners were prevented from establishing that their claim was other than one for detention, in that shipowners' loss was indistinguishable in principle from that suffered by a shipowner under a single voyage charter when his ship was detained beyond her lay days; (5) that the intention of a contract breaker was irrelevant; and that, therefore, Questions A (i) and (ii) would be answered "No".

————Appeal by owners dismissed by C.A. (SELLERS, HARMAN and DIPLOCK, L.JJ.).

————Owners appealed, contending, in supplementary case, that delays amounted to fundamental breach of contract and that accordingly demurrage clause was not applicable in that it was an exceptions or limiting clause.

————Held, by H.L. (Viscount DILHORNE, Lord REID, Lord HODSON, Lord UPJOHN and Lord WILBERFORCE), (1) affirming Mocatta, J., and C.A., that owners' appeal on original case should be dismissed; (2) that demurrage clause provided for payment of agreed damages for detention of vessel; that it was for benefit of both parties and not an exceptions or limiting clause; (3) that, even if there were a fundamental breach; owners, with full knowledge of delays, affirmed charter, and, accordingly, were bound by its provisions, including demurrage clause; and that, therefore, owners' appeal on supplementary case should be dismissed.

————U.G.S. Finance, Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A., [1964] 1 Lloyd's Rep. 446, per PEARSON, L.J., at p. 453, approved.

————

The following cases were referred to:

Aktieselskabet Reidar v. Arcos, Ltd., [1926] 2 K.B. 83; (1926) 25 Ll.L.Rep. 30; (C.A.) [1927] 1 K.B. 352; (1926) 25 Ll.L.Rep. 513;
Alexander v. Railway Executive, [1951] 2 K.B. 882;
Astley Industrial Trust, Ltd. v. Grimley, [1963] 1 W.L.R. 584;
Balian and Sons v. Joly, Victoria & Co., Ltd., (1890) 6 T.L.R. 345;
Bontex Knitting Works, Ltd. v. St. John's Garage, (1943) 60 T.L.R. 44;
Boshali v. Allied Commercial Exporters, Ltd. (unreported);
Brandt and Another v. Liverpool, Brazil and River Plate Steam Navigation Company, Ltd., [1924] 1 K.B. 575; (1923) 17 Ll.L.Rep. 142;
Cap Palos, [1921] P. 458;
Cellulose Acetate Silk Company, Ltd. v. Widnes Foundry (1925), Ltd., [1933] A.C. 20;
Chandris v. Isbrandtsen-Moller Company, Inc., [1951] 1 K.B. 240; (1950) 83 Ll.L.Rep. 385;
Chanter v. Hopkins, (1838) 4 M. & W. 399;
Charterhouse Credit Company, Ltd. v. Tolly, [1963] 2 Q.B. 683;
Cunard Steamship Company, Ltd. v. Buerger, [1927] A.C. 1; (1926) 25 Ll.L.Rep. 215;
Davis v. Garrett, (1830) 6 Bing. 716;
Empresa Maritime de Transportes, S.A. v. A. T. Massey Coal Company, et al., [1965] A.M.C. 517;
Ethel Radcliffe Steamship Company, Ltd. v. W. & R. Barnett, Ltd., (1926) 24 Ll.L.Rep. 277; (1926) 31 Com. Cas. 222;

Gibaud v. Great Eastern Railway Company, [1921] 2 K.B. 426;
Glynn and Others v. Margetson & Co. and Others, [1893] A.C. 351;
Gunyon v. South Eastern and Chatham Railway Companies' Managing Committee, [1915] 2 K.B. 370;
Hain Steamship Company, Ltd. v. Tate and Lyle, Ltd., (1936) 41 Com. Cas. 350; (1936) 55 Ll.L.Rep. 159;
Hardwick Game Farm v. S.A.P.P.A., Ltd., [1966] 1 Lloyd's Rep. 197;
Hawksley v. Outram, [1892] 3 Ch. 359;
Hongkong Fir Shipping Company, Ltd. v. Kawasaki Kisen Kaisha, Ltd., [1962] 2 Q.B. 26; [1961] 2 Lloyd's Rep. 478;
Inverkip Steamship Company, Ltd. v. Bunge & Co., [1917] 2 K.B. 193;
Karsales (Harrow), Ltd. v. Wallis, [1956] 1 W.L.R. 936; [1956] 2 All E.R. 866;
Leduc & Co. v. Ward and Others, (1888) 20 Q.B.D. 475;
Lilley v. Doubleday, (1881) 7 Q.B.D. 510;
London and North Western Railway Company v. Neilson, [1922] 2 A.C. 263;
Mallet v. Great Eastern Railway Company, [1899] 1 Q.B. 309;
Margaronis Navigation Agency, Ltd. v. Henry W. Peabody & Co., of London, Ltd., [1964] 1 Lloyd's Rep. 173; (C.A.) [1964] 2 Lloyd's Rep. 153;
Morrison & Co., Ltd. v. Shaw, Savill, and Albion Company, Ltd., [1916] 2 K.B. 783;
Pinnock Brothers v. Lewis and Peat, Ltd., [1923] 1 K.B. 690; (1923) 14 Ll.L.Rep. 277;
Pollock & Co. v. Macrae, [1922] S.C. (H.L.) 192;
Scaramanga & Co. v. Stamp and Another, (1880) 5 C.P.D. 295;
Shaw v. Director of Public Prosecutions, [1962] A.C. 220;
Smeaton, Hanscomb & Co., Ltd. v. Sassoon I. Setty, Son & Co., [1953] 2 Lloyd's Rep. 580; [1953] 1 W.L.R. 1468;
Stag Line, Ltd. v. Foscolo, Mango & Co., Ltd., and Others, [1932] A.C. 328; (1931) 41 Ll.L.Rep. 165;
Sze Hai Tong Bank, Ltd. v. Rambler Cycle Company, Ltd., [1959] A.C. 576; [1959] 2 Lloyd's Rep. 114;
Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd., (1936) 55 Ll.L.Rep. 159;
Thorley, Ltd. v. Orchis Steamship Company, Ltd., [1907] 1 K.B. 660;
U.G.S. Finance, Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A., [1964] 1 Lloyd's Rep. 446;
United States Shipping Board v. Bunge y Born, (1925) 23 Ll.L.Rep. 257;
Wallis, Son & Wells v. Pratt & Haynes, [1911] A.C. 394;
Western Steamship Company v. Amaral Sutherland & Co., [1913] 3 K.B. 366;
Yeoman Credit, Ltd. v. Apps, [1962] 2 Q.B. 508.

This was an appeal by the claimants, Suisse Atlantique Société d'Armement Maritime S.A., from an order of the Court of Appeal ([1965] 1 Lloyd's Rep. 533) dismissing their appeal from a decision by Mr. Justice Mocatta ([1965] 1 Lloyd's Rep. 166) on a consultative case stated by arbitrators in a dispute between the claimants, Suisse Atlantique Société d'Armement Maritime S.A., and the respondents, N.V. Rotterdamsche Kolen Centrale, in respect of delays in loading and discharging the motor vessel *General Guisan*, which vessel was by an agreement dated Oct. 8, 1957, and a charter-party dated Dec. 21, 1956, chartered to the respondents by the claimants.

According to the consultative case, the arbitrators found the following facts:

(1) By an agreement in writing dated Oct. 8, 1957, between the claimants and the respondents it was agreed that the motor vessel *General Guisan* (whereof the claimants were at all material times the disponent owners) should thenceforth perform a charter-party dated Dec. 21, 1956.

(2) By that charter-party dated Dec. 21, 1956, a vessel was chartered from the claimants for the carriage of coal for two years' consecutive voyages between Hampton Roads or Baltimore or Philadelphia and one port Belgium, Holland or Germany (North Sea).

(3) The charter-party provided that the motor vessel *Silvretta* would perform thereunder until replaced by the claimants' newbuilding vessel then under construction.

(4) The *General Guisan* (hereinafter called the vessel) performed a total of eight voyages under that agreement.

(5) The times occupied by the vessel at the loading and discharging ports during each of those voyages were as set out in a schedule annexed to the case.

(6) With the exception of loading at Norfolk on the first voyage (when the respondents earned dispatch money) the lay days were exceeded during loading and discharging on each of the eight voyages.

(7) The respondents had paid to the claimants and the claimants had accepted demurrage as and when due in the sum of not less than 149,993.08 dols. in respect of discharging at Rotterdam on the first voyage and loading and discharging on each of the remaining seven voyages.

(8) By reason of the periods spent by the vessel at the loading and discharging ports during the eight voyages in respect whereof the demurrage was paid the vessel was able to perform fewer voyages during the period of the charter-party than would have been possible if the loading and discharging had been completed within the laytime.

The claimants contended (*inter alia*) that

(i) The respondents' failure to load and discharge the vessel within the laytime was a breach of the charter-party.

(ii) The claimants' rights in respect of that breach were not limited to the demurrage due under the charter-party, and extended to a right to damages in respect of any loss which was a reasonably foreseeable consequence of the breach. In the present case such loss included the claimants' alleged loss of profit in respect of voyages which would have been performed if the vessel had been loaded within the laytime.

(iii) It was an implied term of the charter-party and/or of the agreement that the respondents would co-operate with the claimants in doing all things necessary to enable the claimants to perform the maximum number of voyages and earn the maximum amount of freight under the charter-party and/or agreement and/or would not wilfully delay the vessel during loading and discharging.

(iv) The respondents were in breach of the charter-party and/or agreement in that they deliberately failed to load and discharge the vessel with such dispatch as the circumstances permitted and/or within the lay days.

(v) The mere payment and receipt of demurrage did not constitute an accord and satisfaction of the claimants' claims.

The respondents contended (*inter alia*) that

(i) The charter-party rate of demurrage quantified the claimants' rights in respect of delay at the loading and discharging ports, and no additional damages were recoverable in respect of such delay.

(ii) The charter-party was not subject to any implied term as alleged.

(iii) Alternatively, the claimants' rights in respect of any breach of that implied term were limited to the demurrage prescribed by the charter-party.

(iv) The payment of demurrage by the respondents and the receipt thereof by the claimants constituted an accord and satisfaction of the claimants' claims in respect of delay at the loading and discharging ports.

The questions of law for the opinion of the Court were as follows:

Whether upon the facts found and upon the true construction of the charter-party dated Dec. 21, 1956, and the agreement dated Oct. 8, 1957:

(A) (i) The claimants were entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the respondents' having failed to load and discharge the vessel within the lay days whereby the charter-party was (if so proved) rendered less profitable to the claimants by consequent loss of voyages or voyage time.

(ii) Upon the assumption that such loss of profitability resulted from the respondents' having deliberately (i.e., with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel:

(a) With such ordinary dispatch as the circumstances permitted

or

(b) within the lay days

the claimants were entitled to recover any damages suffered by the claimants through the charter-party having been rendered less profitable as above subject to giving credit for the demurrage payments received by them and for any such dispatch money as would have been earned by the respondents.

(B) If the answer to any of the questions under (A) be " Yes ", the payment by the respondents and acceptance by the claimants of demurrage in respect of those periods when the lay days were exceeded precluded the claimants from recovering any damages otherwise recoverable by them in accordance with such answer or answers.

Mr. Justice Mocatta, in giving judgment, held (1) (a) that a consecutive voyage charter was an indivisible contract for the number of voyages to which it applied and was not a series of charters for a separate voyage; (b) that the shipowners' obligation to proceed with dispatch, in

Suisse Atlantique v. N.V. Rotterdamsche                    [1966] Vol. 1

this charter-party, applied to every voyage in ballast and with cargo under the charter; (2) (i) that the charter was for a total of "two years consecutive voyages"; that, each time the vessel tendered for loading during that period the charterers were under an obligation to load and discharge her within the laytime provisions; and that there was no justification for spelling out of those provisions a separate obligation to load and discharge the vessel on a specific number of voyages only ascertainable with difficulty at the end of the two-year period; (ii) that no implications should be made because the shipowners could have protected themselves by insisting on demurrage rates commensurate with charter freight rates; (3) that there was no justification for implying a term that the charterers would not break express terms of the contract; (4) that *Aktieselskabet Reidar v. Arcos, Ltd.*, (1926) 25 Ll.L.Rep. 513, had the special feature that the delay in loading affected the quantity of cargo which could have been carried on the very voyage in which the delay arose; that, in the absence in this case of that special feature, the shipowners were prevented from establishing that their claim was other than one for detention, in that the shipowners' loss was indistinguishable in principle from that suffered by a shipowner under a single voyage charter when his ship was detained beyond her lay days; (5) that the intention of a contract breaker was irrelevant; and that, therefore, Questions A (i) and (ii) would be answered "No".

An appeal by the claimants was dismissed by the Court of Appeal.

The claimant owners appealed to the House of Lords, on the following grounds:

1. Because on the true construction of the charter-party dated Dec. 21, 1956, it was the charterers' obligation to load and discharge cargoes on a number of consecutive voyages not less than the number compatible with the performance by the charterers of their obligations (subject to the operation of exception clauses) to provide a cargo and to load and discharge it on each voyage in the laytime specified by the charter-party.

2. Because on the true construction of the charter-party dated Dec. 21, 1956, the owners were given the right and the duty of performing at the agreed rates of freight a total number of voyages not less than the number which (subject to the operation clauses) the owners could have performed in the charter-party period by the exercise of all possible dispatch if the charterers had provided cargoes and had loaded and discharged them in the laytime specified.

3. Because it was an implied term of the charter-party that the charterers would not by their conduct hinder or prevent the owners from earning freights thereunder.

4. Because in the alternative on the true construction of the charter-party dated Dec. 21, 1956, the number of voyages for the purposes of grounds 1 and 2 above, was not less than the number referred to therein subject only to foreseeable commercial variations in the length of time used by the charterers for loading and discharging the vessel.

5. Because on the true construction of the charter-party dated Dec. 21, 1956, the damages recoverable for breaches of the express laytime provisions of the charter-party were not limited to the amount of demurrage provided for by the charter-party when the damages claimed represented loss of earnings on further voyages under the charter-party which by reason of those breaches could not be performed during the charter-party period.

6. Because on the true construction of the charter-party dated Dec. 21, 1956, the damages recoverable for the charterers' deliberate failure (i.e., a failure originating in their wilful intention of limiting the number of contractual voyages) to load and/or to discharge the vessel during the lay days were not limited to the amount of demurrage provided for by the charter-party.

7. Because the learned Judge and the Court of Appeal were wrong in answering Questions A (i) and (ii) in the consultative case, in the negative.

8. Because Questions A (i) and/or (ii) should be answered in the affirmative and the respondents should be ordered to pay the appellants' taxed costs of the appeal and below.

By their case, the charterers submitted that the order of the Court of Appeal was right and should be affirmed for the following, among other, reasons:

(1) Because the charterers committed no breach of contract other than by failing to load and discharge within the lay days.

(2) Because no loss flowed from the charterers' failure to load and discharge within the lay days other than loss which the parties had agreed should be compensated for by demurrage.

(3) Because it was no longer open to the owners to argue that wilful delay by the charterers, if proved, would entitle the owners to recover damages.

(4) Because the motive of the charterers in failing to load and discharge within the lay days was irrelevant.

(5) Because the reasoning and order of Mr. Justice Mocatta and of the Court of Appeal were right and should be affirmed, and Questions A (i) and (ii) in the consultative case answered in the negative.

Mr. H. V. Brandon, Q.C., Mr. R. A. MacCrindle, Q.C., and Mr. Anthony Evans (instructed by Messrs. Richards, Butler & Co.) appeared for the appellant owners; Mr. John Donaldson, Q.C., and Mr. Christopher Staughton (instructed by Messrs. William A. Crump & Son) represented the charterers.

In his submissions, Mr. MacCrindle, for the owners, sought to argue that there was fundamental breach of contract. That had not been argued in the Courts below, but the question was raised in the appellants' printed case.

Here it was submitted that: "The principle which disentitles a party guilty of a fundamental breach of his contract from relying upon an exemption clause contained therein operates so as to disentitle that party also from relying upon a clause which operates to limit his liability for a damages claim."

The appellants submitted that in the circumstances the respondents were disentitled from relying upon the demurrage provisions in this case in order to limit their liability for damages.

Counsel said that accumulation of delay could amount to a repudiation of the contract. *A fortiori* it was a repudiation if it was deliberate.

Viscount Dilhorne: You are wanting now to argue that if there was a repudiation which was not deliberate you are still entitled to succeed. That is new.

Counsel: Yes, I am wanting to argue, with your Lordships' permission, that where you get an accumulation of delay such as to go to the root of the contract then that delay as such—without any

intention—on the authorities, is certainly enough to enable the shipowners to sail away.

Viscount Dilhorne: You really are saying you want to argue something that was not argued in the Courts below and really does not appear in your case.

Mr. MacCrindle: Yes.

Mr. Donaldson opposed the appellants' being allowed to take this point.

After a short adjournment, Viscount Dilhorne announced that their Lordships considered it would be more satisfactory, to enable them to give full answers to the questions posed, if the appellants were allowed to develop this point.

But as it had not been raised in the Courts below, and had not been considered below, their Lordships thought there would have to be a rehearing of the case before the House.

When the case came on again it was almost inevitable it would have to start again, because the House might be differently constituted.

The appellants would have to pay the costs of the hearing by the House so far, and should file a supplemental case within three weeks, stating their propositions, and adding to their reasons. The respondents would have an opportunity to file a supplemental answer.

By their supplementary case, the appellants submitted that the appeal should alternatively be allowed and a qualified* affirmative given to Question A (i) and (ii) for the following reasons:

(1) Because, whether the clauses of the charter-party providing for the payment of demurrage by the respondents were exceptions clauses or clauses providing for the payment of liquidated damages, they did not govern the measure of damages recoverable by the appellants for detention of the vessel where the detention was such as to be a deviation from, or a repudiation or fundamental breach of, the charter-party.

(2) Because the detention would be such as to be a deviation from, or a repudiation or fundamental breach of, the charter-party, if (as the appellants contended) it was in the aggregate so long as to frustrate the commercial purpose of the charter-party.

---

\* Viz., that it would be for the arbitrators to find the facts material to the question whether the detention was a deviation from, or a repudiation or fundamental breach of, the charter-party.

(3) Because the detention would be such as to be a deviation from, or a repudiation or fundamental breach of, the charter-party, if (as the appellants further contended) it resulted from breaches which, in addition to causing serious delay, were deliberate or wilful.

In their supplementary case, the respondents submitted that the order of the Court of Appeal should be affirmed for the following additional reasons:

(1) Because on the true construction of the charter-party its demurrage provisions applied as much to delay going to the root of the contract as to any other delay.

(2) Because there was no general rule of law under which clauses in a contract might be disregarded although on their true construction they applied to the events that had happened.

(3) Because, alternatively, any such rule did not apply (a) to clauses by which liquidated damages were agreed, nor (b) unless the party not in breach had lost the whole of the benefit which he ought to have received under the contract, nor (c) if he had subsequently affirmed or approbated the contract.

Mr. BRANDON, for the owners, said that the way the appellants sought to put their supplementary case was that the demurrage clauses in the charter-party did not govern the measure of damages recoverable by them for detention of the vessel where the detention was such as to be a deviation from or repudiation or fundamental breach of the charter-party. Counsel said that the detention would be such as to be a deviation from or repudiation or fundamental breach of the charter-party if it was in the aggregate so long as to frustrate the commercial purpose of the charter-party.

COUNSEL also contended that the detention would be a deviation from or repudiation or fundamental breach of the charter-party if it resulted from breaches which, in addition to causing serious delay, were deliberate or wilful.

COUNSEL said that the demurrage clauses did not apply to the damage suffered because on the true construction of the contract it was not intended so to apply. The breaches of the contract that the parties contemplated as being breaches to which the demurrage clauses would apply were "non-fundamental breaches."

In considering whether his submissions on the law were right or wrong, it was necessary to assume certain facts; it would be for the arbitrators to find the facts material to the question of whether the detention of the vessel was a deviation from or repudiation or fundamental breach of the charter-party.

COUNSEL submitted that a breach of contract going to the root of that contract or conflicting with its main purpose was a deviation from or repudiation or fundamental breach of the contract, and exceptions clauses did not apply to such breaches. He also submitted that on the facts, which it would be open to the arbitrators to determine later, the detention of the vessel was, in the aggregate, so long that it frustrated the commercial purpose of the charter-party, and the delay was brought about deliberately or wilfully.

COUNSEL cited *Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd.,* (H.L.) (1936) 55 Ll.L.Rep. 159, which he described as an extremely important landmark. Counsel said the importance of that case was not so much because it overruled or dissented from earlier cases but because it brought the doctrine of deviation as previously established into line with the general contract law.

It killed any notion that there was something peculiar about deviation in maritime contracts and equated it with fundamental breach and with repudiation in any contract. It also threw a great deal of light on the question of election to affirm a contract and on how election must be considered in cases of this kind.

COUNSEL referred their Lordships to the case of *Sze Hai Tong Bank, Ltd. v. Rambler Cycle Company, Ltd.,* [1959] 2 Lloyd's Rep. 114.

COUNSEL said he would be inviting their Lordships to overrule decisions on delay that indicated that motive was irrelevant.

COUNSEL said that it was a question of fact as to when the fundamental breach of contract occurred, and commercial arbitrators ought perhaps to be able to answer that question more easily than lawyers. If he were dealing with it before arbitrators he would submit that there was a repudiation when accumulated delay deprived the owners of one complete voyage or, alternatively, when the accumulation of delay deprived them of a substantial number of voyages.

Lord REID observed that there would seem to be nothing absurd in giving the demurrage clause in the charter-party its full meaning, and applying it was not inconsistent with the main object of the contract. All it did was to give the owners less money than they would otherwise get.

COUNSEL submitted that it was absurd if the charterers could keep the ship in port at a price of only 1000 dols. a day demurrage, when she could have earned some 3000 dols. a day. It was a question of degree as to when the situation became absurd and Counsel suggested it could not be found that there was no limit to the time the vessel could be kept in port on payment of demurrage only.

COUNSEL submitted that breaches of contract fell into two categories—those that went to the root of the contract and those that did not. The only remedy for the latter was damages, and general exceptions clauses would apply only if the words were in their ordinary meaning wide enough.

Two remedies were available to the other party for a breach that went to the root of the contract. He could treat the contract as at an end or treat it as remaining and sue for damages; exceptions clauses generally speaking would not apply to breaches of that character.

COUNSEL cited authority in relation to his proposition that liquidated damages provisions did not apply to breaches that were deviations from, or repudiations or fundamental breaches of, the contract.

COUNSEL reminded their Lordships that the broad question was whether there was any limit to the delay that the charterers could impose at the cost of paying demurrage only. Counsel contended there were two limits: frustrating delay whether deliberate or not; and deliberate delay whether frustrating or not.

Both were questions of construction of the charter-party.

COUNSEL contended that the demurrage clauses could not be construed as covering frustrating or deliberate delay.

Mr. DONALDSON, for the charterers, said that the background to the case was that English law permitted parties to agree in advance what the measure of damage should be in the event of any breach of contract and unless the agreed measure constituted a penalty the Courts would apply that measure. English law in general also permitted parties to limit their liability in damages for breach of contract. Those two types of agreement were essentially different, Counsel said. Under the agreed measure of damage all that the plaintiff need prove was that there had been a breach; he need not prove he had suffered any damage. In the case of a limited measure of damage he must prove every penny of his damage up to the limit.

It was difficult for either party to predict precisely the loss that might be suffered by the shipowner. COUNSEL submitted that was a classic example of circumstances justifying the adoption of a liquidated damages clause. He said that a demurrage clause was a clause agreeing a measure of liquidated damage for detention and not a clause limiting the damages.

If the rate were too low then there was a limiting element in the operation of the clause but conversely the rate might be too high and then the damages recoverable, if it was a liquidated damages clause, were the reverse of limited.

In the present case, there was no evidence that the rate was too low, although it was true that an astronomical claim had been put forward.

COUNSEL contended that all delays were covered by the demurrage clauses in the charter-party. If there was a further implied obligation on the charterers it must be such that it was of necessity to be implied in order to give business efficacy to the contract and must be one that the law presumed the parties to have accepted.

In the present case there was no business necessity because if the demurrage rate was correctly calculated it would cover the daily rate of profit the vessel could make and the cost of keeping her in port. On that basis it was entirely immaterial to the ship-owner whether the vessel was in port or at sea.

The parties could have provided that the number of days on demurrage should be limited but they did not choose to do so. Alternatively they could have

Suisse Atlantique v. N.V. Rotterdamsche    [1966] Vol. 1

defined the number of voyages that were to be performed but this also was not done.

Counsel added that the implied term contended for by the appellants would have odd consequences and said that it was impossible to formulate the term with accuracy and simplicity.

Turning to the appellants' proposition, Counsel said that Mr. Brandon had now abandoned the contention that exceptions clauses did not apply to fundamental breaches of contract. There was authority to support the contention, but Counsel submitted that Mr. Brandon's concession was rightly made. In fact there was no category of breach of contract known as a fundamental breach.

Asked by Lord Reid whether the phrase "fundamental breach," as used in the authorities that had been cited, amounted to anything other than a repudiatory breach, Counsel replied that the users clearly either meant something other than repudiatory breach or they had got the rules as to repudiatory breach wrong.

Lord Reid observed that they seemed to have invented a new rule for repudiatory breaches.

Counsel accepted that if there was a repudiatory breach of contract the shipowners had the option of sailing away. If they did so the common-law measure of damages would apply but Counsel contended that if the breach was not accepted as putting an end to the charter, then the demurrage clause applied. In the present case there was clearly no acceptance and therefore the deliberateness of the breach was totally irrelevant on the facts.

On the question of whether periods of delays could be aggregated, Counsel said that could not be done where there were successive periods of loading lay time and discharging lay time separated by voyages and where each period of discharging or loading had its own special committed time. In each case one did not exceed what one was permitted in the aggregate but what was permitted in that special case.

On the question whether it was open to the arbitrators to find that the delay was serious or frustrating, Counsel said that he must concede it would be possible for them to find that the delays were serious because "serious" was an imprecise term. But they could not find that the delays were frustrating, bearing in mind that the total days of demurrage were 154 out of 511.

If they purported to find that that was a frustrating delay their Lordships would have no difficulty in saying there was no evidence for this, or alternatively that it was a mixed question of fact and law and that the arbitrators were wrong in law. Counsel said that this was, in effect, a time charter and so far as he was aware, a two-year time charter had never been frustrated on the basis of one-third delay.

Counsel said that the arbitrators had asked whether the claimants were, on particular facts, entitled to recover anything more than demurrage, and if the answer was that they were not on those facts, but might be on other facts, then the answer to the question was "No." Mr. Brandon, Counsel submitted, had tried to reconstruct the question so that it read: "Whether upon the facts found and upon the assumption that there was a deviation from or repudiation or fundamental breach of the charter . . . ".

In reply, Mr. Brandon said it was implicit in Mr. Donaldson's case that his clients were entitled to detain the ship for an unlimited period at any stage of the charter-party on payment of demurrage only and that if they did so the appellants would not be entitled either to treat the contract as at an end, or claim compensation on the true basis for the loss they had suffered.

If their Lordships accepted there was absolutely no limit to the possible delay, that was an end to the case. But if it was found that there was some limit, it would be necessary to decide that limit and the legal basis for it.

Counsel said the argument that the parties could have expressed a term defining the numbers of voyages to be performed could be applied to every term that had ever been implied. It must be implicit in the intentions of the parties in this case that a certain number of voyages would be performed.

Counsel said that breaches of the lay day provisions could be repudiatory if they went to the root of the contract —whether one called them serious, radical breaches or fundamental breaches.

COUNSEL said that prolonged delay could alter the nature of the contract, even as an aggregate of separate successive delays, and deliberate breaches were repudiatory if they produced more than trivial consequences. Each case had to be considered on its facts, and Counsel submitted that their Lordships could say that the question whether there had been repudiatory delay in the present case was to be determined not only on the facts already found by the arbitrators but on all the facts.

Judgment was reserved.

———————

Thursday, Mar. 31, 1966

———————

## JUDGMENT

Viscount DILHORNE: My Lords, this appeal is from a decision of the Court of Appeal (Lord Justice Sellers, Lord Justice Harman and Lord Justice Diplock) ([1965] 1 Lloyd's Rep. 533) dismissing an appeal by the appellants from a decision by Mr. Justice Mocatta ([1965] 1 Lloyd's Rep. 166) on a consultative case in relation to a dispute between the parties which has arisen in connection with the charter of a vessel from the appellants.

On Dec. 21, 1956, the respondents agreed to charter a vessel from the appellants for the carriage of coal from the United States to Europe. That charter was to remain in force "for a total of two years consecutive voyages" (Clause 23 of the charter-party). The vessel had "with all possible dispatch" to "sail and proceed" to a port in the United States and there load on each voyage a cargo of coal "and being so loaded, shall therewith proceed, with all possible dispatch," to a port in Europe (Clause 1). She had to be loaded at a specified rate per running day and, if she was detained beyond the loading time, the charterers were to pay 1000 dols. a day demurrage. In computing the loading time, detention of the vessel in consequence of the happening of certain events was to be disregarded (Clause 3). Similarly, if she was detained longer than was required to unload her at the stipulated rate per day and that was not due to strikes, etc., or other causes beyond the control of the charterers, the charterers who were to discharge the cargo were to pay demurrage at the rate of 1000 dols. a day.

On Sept. 16, 1957, the appellants regarded themselves as entitled to treat the charter-party as repudiated by reason of the respondents' delays in loading and discharging the vessel. This was not accepted by the respondents, and on Oct. 8, 1957, it was agreed, without prejudice to this dispute, that from thenceforward the charter-party would be carried out.

Between Oct. 16, 1957, and the end of the charter the vessel made eight round voyages. The appellants contended that she ought reasonably to have completed each round voyage in 30 or 37 days, including loading and unloading. On this basis eight voyages would have taken 240 or 296 days. In fact, they took 511, and the difference, the appellants alleged, was due to delays in loading and unloading, for which respondents were responsible. The result was, so the appellants alleged, that the vessel did not make as many voyages as she should have done, with the result that they were deprived of the freights they would have earned on nine or alternatively six voyages. On this basis, after giving credit for the demurrage payments received by them, they claimed 772,866.92 dols. and alternatively 476,490.92 dols. from the respondents.

This claim went to arbitration and, at the request of the appellants, the arbitrators stated the following questions in the form of a consultative case:

Whether . . .

(A) (i) The Claimants are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the Respondents' having failed to load and discharge the Vessel within the laydays whereby the Charterparty was (if so proved) rendered less profitable to the Claimants by consequent loss of voyages or voyage time.

(ii) Upon the assumption that such loss of profitability resulted from the Respondents having deliberately (i.e. with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel:

(a) With such ordinary despatch as the circumstances permitted

or

(b) within the laydays

the Claimants are entitled to recover any damages suffered by the Claimants through the Charterparty having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the Respondents.

(B) If the answer to any of the questions under ("A") be "Yes", the payment by the Respondents and acceptance by the Claimants of demurrage in respect of those periods when the laydays were exceeded preclude the Claimants from recovering any damages otherwise recoverable by them in accordance with such answer or answers.

Before Mr. Justice Mocatta it was agreed that he should confine his decision to answering Questions A (i) and (ii) and that the words " or voyage time " at the end of A (i) added nothing.

Mr. MacCrindle, for the appellants, submitted to your Lordships, as he had in the Courts below, that the appellants had under the charter-party a contractual right to the number of voyages which would be performed if parties complied with their obligations; and, secondly, that the appellants' claim for the loss of freight on the voyages which should have been performed was not limited to the demurrage payments.

In my opinion, no such contractual right is to be implied either on the construction of the charter-party or by operation of law. The charter-party might have provided that not less than a certain number of voyages should be accomplished. It did not do so.

In support of their second contention, the appellants relied on *Aktieselskabet Reidar v. Arcos, Ltd.,* [1927] 1 K.B. 352; (1926) 25 Ll.L.Rep. 513 (C.A.), and, in particular, on the judgment of Lord Justice Bankes. Although he came to the same conclusion as Lord Justice Atkin and Lord Justice Sargant, he did so on somewhat different grounds. I do not consider that this decision affords any basis for the contention that, where demurrage provisions apply, it is possible to obtain more than the demurrage payments for the detention of a vessel.

On these issues I agree with, and do not think that it is necessary to add to, the judgments of the Court of Appeal and Mr. Justice Mocatta.

If in this case the appellants had been able to establish a breach of the charter-party other than by the detention of the vessel, then *Reidar v. Arcos, sup.,* is authority for saying that the damages obtainable would not be limited to the demurrage payments. In my opinion, they have not done so.

Towards the conclusion of his argument, Mr. MacCrindle sought to put forward a new argument, not advanced in the Courts below nor in the appellants' case, to the effect that if the delays for which the respondents were responsible were such as to entitle the appellants to treat the charter-party as repudiated, the demurrage provisions did not apply and they were entitled to recover the full loss they had suffered.

While ordinarily this would not be permitted, as the result of refusing to allow it in the present case might be that the question would come before the Courts on another consultative case, involving delay and expense, their Lordships decided to allow the argument to be advanced on condition that supplemental cases should be filed, the hearing adjourned and on the appellants undertaking to pay the costs involved.

At the resumed hearing Mr. Brandon sought to sustain this contention. He cited a large number of cases in which it had been held that where there had been deviation of a vessel, the owners of the ship were not entitled to rely on provisions in a charter-party or bill of lading protecting them from liability or limiting their liability for the loss of the kind that had occurred. It is not, I think, necessary to refer to all the cases cited. The principle is well established.

In *Hain Steamship Company, Ltd. v. Tate and Lyle, Ltd.,* (1936) 41 Com. Cas. 350,[1] Lord Atkin, with whose opinions Lord Thankerton and Lord Macmillan agreed, said (*ibid.,* at p. 354[2])

    . . . the effect of a deviation upon a contract of carriage by sea has been stated in a variety of cases but not in uniform language. . . . Occasionally language has been used which suggests that the occurrence of a deviation automatically displaces the contract, as by the now accepted doctrine does an event which " frustrates " a contract. In

---
[1] *Sub nom. Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd.,* (1936) 55 Ll.L.Rep. 159.
[2] *Ibid.,* at p. 173.

other cases where the effect of deviation upon the exceptions in the contract had to be considered language is used which . . . shows that the sole effect is, as it were, to expunge the exceptions clause, as no longer applying to a voyage which from the beginning of the deviation has ceased to be the contract voyage. I venture to think that the true view is that the departure from the voyage contracted to be made is a breach by the shipowner of his contract, a breach of such a serious character that, however slight the deviation, the other party to the contract is entitled to treat it as going to the root of the contract, and to declare himself as no longer bound by any of the contract terms. . . .

At p. 355[3] he said:

. . . If this view be correct, then the breach by deviation does not automatically cancel the express contract, otherwise the shipowner by his own wrong can get rid of his own contract. Nor does it affect merely the exceptions clauses. This would make those clauses alone subject to a condition of no deviation, a construction for which I can find no justification. It is quite inconsistent with the cases which have treated deviation as precluding enforcement of demurrage provisions. The event falls within the ordinary law of contract. The party who is affected by the breach has the right to say, "I am not now bound by the contract whether it is expressed in charterparty, bill of lading, or otherwise." . . . I am satisfied that once he elects to treat the contract as at an end he is not bound by the promise to pay the agreed freight any more than by his other promises. But, on the other hand, as he can elect to treat the contract as ended, so he can elect to treat the contract as subsisting; and if he does this with knowledge of his rights he must in accordance with the general law of contract be held bound. . . .

Lord Wright, M.R., in the same case said (*ibid.*, at p. 362[4]):

. . . An unjustified deviation is a fundamental breach of a contract of affreightment. . . .

and at p. 363[5]:

But, however fundamental is the condition, it may still be waived by the goods owner. For this purpose the case is like any other breach of a fundamental condition, which constitutes the repudiation of a contract by one party; the other party may elect not to treat the repudiation as being final, but to treat the contract as subsisting, and to that extent may waive the breach, any right to damages being reserved. . . .

See also *Chandris v. Isbrandtsen-Moller Company, Inc.,* [1951] 1 K.B. 240, per Mr. Justice Devlin at pp. 248 and 249.[6]

This House thus treated the deviation cases as coming within the ordinary law of contract.

Mr. Brandon also cited *Mallet v. Great Eastern Railway Company,* [1899] 1 Q.B. 309, where goods were sent by a different route from that contracted for and a clause relieving the company of liability was consequently held not to apply; *Gunyon v. South Eastern and Chatham Railway Companies' Managing Committee,* [1915] 2 K.B. 370, where fruit was carried by goods train when the contract was for it to go by passenger train and so an exemption clause was held not to apply; and *Lilley v. Doubleday,* (1881) 7 Q.B.D. 510, where goods were destroyed by fire in a warehouse other than that contracted for and an exemption clause was held not to apply.

These are all cases which illustrate the principle that where there has been a fundamental breach—and deviation is a fundamental breach—or a breach of a fundamental term, the party guilty of the breach cannot successfully rely on provisions in the contract designed for his protection in the performance of the contract.

In a number of cases (e.g., *Smeaton Hanscomb & Co., Ltd. v. Sassoon I. Setty, Son & Co. (No. 1),* [1953] 1 W.L.R. 1468;[7] *Karsales (Harrow), Ltd. v. Wallis,* [1956] 1 W.L.R. 936; *Yeoman Credit, Ltd. v. Apps,* [1962] 2 Q.B. 508; *Astley Industrial Trust, Ltd. v. Grimley,* [1963] 1 W.L.R. 584; *Charterhouse Credit Company, Ltd. v. Tolly,* [1963] 2 Q.B. 683, and *U.G.S. Finance, Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A.,* [1964] 1 Lloyd's Rep. 446) there are judicial

---

[3] *Ibid.*, at p. 174.
[4] *Ibid.*, at p. 177.

[5] *Ibid.*, at p. 178.
[6] (1950) 83 Ll.L.Rep. 385, at pp. 394 and 395.
[7] [1953] 2 Lloyd's Rep. 580.

observations to the effect that exempting clauses, no matter how widely they are drawn, only avail a party when he is carrying out the contract in its essential respects. In my view, it is not right to say that the law prohibits and nullifies a clause exempting or limiting liability for a fundamental breach or breach of a fundamental term. Such a rule of law would involve a restriction on freedom of contract, and in the older cases I can find no trace of it.

In each case not only have the terms and scope of the exempting clause to be considered, but also the contract as a whole. In the cases I have cited above, I think that, on construction of the contract as a whole, it is apparent that the exempting clauses were not intended to give exemption from the consequences of the fundamental breach. Any provision that does so must be expressed in clear and unambiguous terms (see *Cunard Steamship Company, Ltd. v. Buerger*, [1927] A.C. 1, per Lord Parmoor at p. 13,[8] and *London and North Western Railway Company v. Neilson*, [1922] 2 A.C. 263, per Lord Dunedin at p. 272). It must be apparent that such is its purpose and intention. In *Glynn and Others v. Margetson & Co. and Others*, [1893] A.C. 351, the contract was for the carriage of oranges from Malaga to Liverpool and the charter-party contained a provision giving the vessel liberty to go to any port not on the route from Malaga to Liverpool. As a result of the vessel going to a port not on the route from Malaga to Liverpool the oranges were damaged. In that case Lord Herschell, L.C., said (*ibid.*, at p. 355) that the main object and intent of the charter-party was the voyage so agreed on and

. . . it would be to defeat what is the manifest object and intention of such a contract to hold that it was entered into with a power to the ship-owner to proceed anywhere . . .

I think that the legal position was most clearly and accurately stated by Lord Justice Pearson (as he then was) in *U.G.S. Finance, Ltd. v. National Mortgage Bank of Greece, sup.* He said ([1964] 1 Lloyd's Rep., at p. 453):

As to the question of " fundamental breach ", I think there is a rule of construction that normally an exception or exclusion clause or similar provision in a contract should be

construed as not applying to a situation created by a fundamental breach of the contract. This is not an independent rule of law imposed by the Court on the parties willy-nilly in disregard of their contractual intention. On the contrary it is a rule of construction based on the presumed intention of the contracting parties. It involves the implication of a term to give to the contract that business efficacy which the parties as reasonable men must have intended it to have. This rule of construction is not new in principle but it has become prominent in recent years in consequence of the tendency to have standard forms of contract containing exceptions clauses drawn in extravagantly wide terms, which would produce absurd results if applied literally. . . .

Although the terms are sometimes used as if their meaning was the same, a fundamental breach differs from a breach of a fundamental term. In *Smeaton Hanscomb & Co., Ltd. v. Sassoon I. Setty, Son & Co. (No. 1)*, [1953] 1 W.L.R., at p. 1470,[9] Mr. Justice Devlin said that he thought a fundamental term was

. . . something which underlies the whole contract so that, if it is not complied with, the performance becomes something totally different from that which the contract contemplates. . . .

In relation to a fundamental breach, one has to have regard to the character of the breach and determine whether in consequence of it the performance of the contract becomes something totally different from that which the contract contemplates.

The provisions as to demurrage in the charter-party indicate that it was appreciated that the respondents might be in breach of the charter-party by detaining the vessel beyond the lay days and yet carry out the charter-party. I do not think that breach of the charter-party by detention beyond the lay days can be regarded as a breach of a fundamental term.

Delay in the performance of a charter-party may amount to deviation and so to a fundamental breach. In *The Cap Palos*, [1921] P. 458, where the contract was for the towage of a vessel, Lord Justice Atkin said (*ibid.*, at p. 470):

---

[8] *Sub nom. Buerger v. Cunard Steamship Company, Ltd.*, (1926) 25 Ll.L.Rep. 215, at pp. 219 and 220.

[9] [1953] 2 Lloyd's Rep., at p. 584.

[1966] Vol. 1]          Suisse Atlantique v. N.V. Rotterdamsche          [Viscount DILHORNE

. . , The [towage] figures appear to me to indicate such delay as to make the purported performance something quite different from that contracted for, a form of deviation quite familiar in marine adventures.

In *Brandt and Another v. Liverpool, Brazil and River Plate Steam Navigation Company, Ltd.*, [1924] 1 K.B. 575,[10] delay by the owners of a vessel in dealing with bags of zinc was held by Lord Justice Scrutton and Lord Justice Atkin (*ibid.*, at pp. 597 and 601[11]) to amount to a deviation.

Breach of a charter-party by the detention of the vessel beyond the lay days by the charterers may, in my view, take on the character of a fundamental breach. If, for instance, there was a delay of many weeks in the loading of the vessel the consequence would be that the voyages, though in fact consecutive, would be totally different from those contemplated by the contract. Further, if it was established that a breach, though of itself not of sufficient duration as to lead to the conclusion that the performance of the contract became totally different from that contemplated, was committed deliberately and wilfully with the object of reducing the number of voyages accomplished, the breach might, in my opinion, take on the character of a fundamental breach. It is only in this connection, in determining whether there has been repudiatory conduct, that, in my opinion, the wilfulness of the breach has any relevance.

In this case the appellants contend that the totality of the delays in loading and unloading constituted a fundamental breach entitling them to treat the contract as repudiated and the demurrage provisions as not applying. They do not suggest that at any particular time between Oct. 16, 1957, and the end of the charter the delays were such as to constitute a fundamental breach.

If there was a time after Oct. 16, 1957, and before the end of the charter-party when they could have said that it had been repudiated by the respondents, they did not do so. They had full knowledge of the delays as they occurred, and if there was a time when they could have elected to treat the charter-party as at an end they must, in my view, be taken to have elected to waive the repudiation and to have affirmed the charter-party.

If they affirmed the charter-party, then they were bound by its provisions in respect of events occurring after the affirmation, but waiver of the breach does not mean waiver of the right to damages for that breach (*Hain Steamship Company v. Tate and Lyle, Ltd., sup.*; *Chandris v. Isbrandtsen-Moller Company, Inc.*, [1951] 1 K.B. 240, per Mr. Justice Devlin, at p. 248[12]). In this connection there are, I think, certain passages in *Charterhouse v. Tolly, sup.*, which require reconsideration.

If the appellants were entitled to treat the charter-party as repudiated, the demurrage provisions could only be held not to apply if they were provisions limiting the respondents' liability and, on construction of the contract as a whole, they were held not to apply in relation to the fundamental breach.

In my view, the demurrage provisions are not to be regarded as limiting the respondents' liability. In the circumstances of this case it may be that the amount of the demurrage payments bears little relation to the loss the appellants claim to have suffered. In *Chandris v. Isbrandtsen-Moller, sup.*, Mr. Justice Devlin, at p. 249,[13] said that the sum produced by demurrage " is generally less than damages for detention " and that a demurrage clause is merely a clause providing for liquidated damages for a certain type of breach. While it may be that a demurrage clause in a particular case is so drawn that on its proper construction it is to be treated as imposing a limitation on liability, in this case the demurrage provisions are, in my opinion, clearly provisions for the payment of agreed damages. If the clauses imposed a limit on liability, then the appellants would have to prove the actual loss they sustained, and if it was less than the amount stated they would only recover the loss they proved. Here the parties agreed that demurrage at a daily rate should be paid in respect of the detention of the vessel and, on proof of breach of the charter-party by detention, the appellants are entitled to the demurrage payments without having to prove the loss they suffered in consequence.

In my view, the appellants cannot avoid the operation of these provisions and cannot recover more than the agreed damages for the detention of their vessel.

(See *Cellulose Acetate Silk Company, Ltd. v. Widnes Foundry (1925), Ltd.,* [1933] A.C. 20.)

For these reasons the further contention advanced by the appellants, in my view, fails, and, in my opinion, this appeal should be dismissed.

**Lord REID:** My Lords, I am satisfied that for the reasons given by your Lordships this appeal could not succeed on any of the grounds submitted to the Court of Appeal and to your Lordships at the first hearing of this appeal. But at the end of his opening address Counsel for the appellants put forward a new contention based on there having been a fundamental breach of contract by the respondents. Normally this House would not permit a new question of that character to be argued. But this is a consultative case stated by arbitrators, and the appellants could still raise such a new question before the arbitrators. So in order to avoid delay and expense your Lordships adjourned the hearing on terms as to costs and ordered the parties to lodge supplementary cases dealing with this new contention. I only intend to deal with the new question argued at the second hearing.

The case arises out of a charter-party for two years' consecutive voyages made on Dec. 21, 1956, between the appellants, the owners, and the respondents, the charterers. After a dispute the parties made a further agreement on Oct. 8, 1957, to perform the charter-party for the remainder of the two-year period. The purpose of the charter-party was that on each voyage the vessel should proceed in ballast to an Atlantic port in the United States and there load coal to be carried to a port in the Netherlands. During this remaining part of the two years the vessel only made eight voyages and she spent some 380 days in ports of loading or discharge. There was provision for payment of demurrage with wide exceptions of causes of delay beyond the control of the charterers. But the respondents have admitted liability to pay demurrage for some 150 days. The complaint of the appellants is that by reason of the failure of the respondents to perform their contractual obligations to load and discharge within the lay days the appellants have been deprived of the freight which would have been earned on the additional voyages which would have been performed had there not been this delay for which the respondents are responsible. They claim that six or nine more voyages would have been performed within the period if the respondents had fulfilled their obligations, and they estimate their loss from that cause at 875,000 dols. or alternatively 580,000 dols. The respondents' answer is that the appellants are only entitled to demurrage at the agreed rate of 1000 dols. per day, and they have paid some 150,000 dols. as demurrage.

The new contention submitted by the appellants is that the breaches of contract which caused these delays amounted to fundamental breach or breach going to the root of the contract so that at some time during the currency of the agreement the appellants would have been entitled to treat the breaches as a repudiation, to terminate or rescind the contract and to claim damages at common law. It is, I think, clear that if they did have that right they must be held to have elected not to treat the breaches as repudiatory. But they argue that nevertheless the fact that there was a fundamental breach prevents the respondents from relying on the demurrage clause as limiting their responsibility.

So the first question must be whether these delays can be regarded as involving fundamental breach. If so, it is for the arbitrators, at least in the first instance, to decide whether there was fundamental breach. The respondents deny that these breaches are capable of being regarded as amounting to fundamental breach. General use of the term "fundamental breach" is of recent origin and I can find nothing to indicate that it means either more or less than the well-known type of breach which entitles the innocent party to treat it as repudiatory and to rescind the contract. The appellants allege that the respondents caused these delays deliberately (i.e., with the wilful intention of limiting the number of contractual voyages). They do not allege fraud or bad faith. This allegation would appear to cover a case where the charterers decided that it would pay them better to delay loading and discharge and pay the resulting demurrage at the relatively low agreed rate, rather than load and discharge more speedily and then have to buy more coal and pay the relatively high agreed freight on the additional voyages which would then be possible. If facts of that kind could be proved I think

that it would be open to the arbitrators to find that the respondents had committed a fundamental or repudiatory breach. One way of looking at the matter would be to ask whether the party in breach has by his breach produced a situation fundamentally different from anything which the parties could as reasonable men have contemplated when the contract was made. Then one would have to ask not only what had already happened but also what was likely to happen in future. And there the fact that the breach was deliberate might be of great importance.

If fundamental breach is established, the next question is what effect, if any, that has on the applicability of other terms of the contract. This question has often arisen with regard to clauses excluding liability, in whole or in part, of the party in breach. I do not think that there is generally much difficulty where the innocent party has elected to treat the breach as a repudiation, bring the contract to an end and sue for damages. Then the whole contract has ceased to exist, including the exclusion clause, and I do not see how that clause can then be used to exclude an action for loss which will be suffered by the innocent party after it has ceased to exist, such as loss of the profit which would have accrued if the contract had run its full term. But that is not the situation in the present case, where, in my view, the appellants elected that the contract should continue in force.

Where the contract has been affirmed by the innocent party, at first sight the position is simple. You must either affirm the whole contract or rescind the whole contract: you cannot approbate and reprobate by affirming part of it and disaffirming the rest—that would be making a new contract. So the clause excluding liability must continue to apply. But that is too simple, and there is authority for two quite different ways of holding that, in spite of affirmation of the contract as a whole by the innocent party, the guilty party may not be entitled to rely on a clause in it. One way depends on construction of the clause. The other way depends on the existence of a rule of substantive law.

As a matter of construction it may appear that the terms of the exclusion clause are not wide enough to cover the kind of breach which has been committed. Such clauses must be construed strictly and if ambiguous the narrower meaning will be taken. Or it may appear that the terms of the clause are so wide that they cannot be applied literally: that may be because this would lead to an absurdity or because it would defeat the main object of the contract or perhaps for other reasons. And where some limit must be read into the clause it is generally reasonable to draw the line at fundamental breaches. There is no reason why a contract should not make a provision for events which the parties do not have in contemplation or even which are unforeseeable, if sufficiently clear words are used. But if some limitation has to be read in it seems reasonable to suppose that neither party had in contemplation a breach which goes to the root of the contract. Then the true analysis seems to me to be that the whole contract, including the clause excluding liability, does survive after election to affirm it, but that that does not avail the party in breach. The exclusion clause does not change its meaning: as a matter of construction it never did apply and does not after election apply to this type of breach, and therefore is no answer to an action brought in respect of this type of breach.

But applying a strict construction to these clauses is not sufficient to exclude them in all cases of fundamental breach. It cannot be said as a matter of law that the resources of the English language are so limited that it is impossible to devise an exclusion clause which will apply to at least some cases of fundamental breach without being so widely drawn that it can be cut down on any ground by applying ordinary principles of construction. So, if there is to be a universal rule that, no matter how the exclusion clause is expressed, it will not apply to protect a party in fundamental breach, any such rule must be a substantive rule of law nullifying any agreement to the contrary and to that extent restricting the general principle of English law that parties are free to contract as they may see fit.

There is recent authority for the existence of such a rule of law, but I cannot find support for it in the older authorities. Most of them arose out of deviation from the contractual voyage or similar breaches of contracts of carriage by land. Any deviation has always been regarded as a breach going to the root of the contract, and it was held in these

earlier cases that, if the consignor's goods were lost after there had been a deviation, the shipowner could not rely on clauses excluding or limiting his liability. The reasons given for this varied, but I do not think that it is useful now to examine them in detail because it was made clear in the speeches in this House in *Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd.,* (1936) 55 Ll.L.Rep. 159, that there is no special rule applicable to deviation cases: the ordinary principles of the law of contract must be applied. The special feature of these cases is that the consignor's goods were lost before he knew of the deviation and therefore before he had any opportunity to elect whether or not to treat it as bringing the contract to an end. When he learns of the deviation and of the subsequent loss of his goods there is hardly room for any election, but the fact that he sues for their value could be treated as an election to terminate the contract by reason of and immediately after the deviation.

Among the reasons given in the earlier cases I do not find any reliance on any rule of law that a party guilty of a breach going to the root of the contract can never rely on clauses excluding his liability. And I do not think that the decision in *Tate & Lyle's case, sup.,* assists us. There the owners of the goods had known of the deviation and had elected to waive it before the goods were lost. The breach was not a continuing breach and it did not cause the loss of the goods. In this case the breach, if it was a fundamental breach, was a continuing breach and it did cause the loss of which the appellants complain.

I think that *Smeaton Hanscomb & Co., Ltd. v. Sassoon I. Setty, Son & Co. (No. 1),* [1953] 1 W.L.R. 1468,[14] can be regarded as the first of the series of recent cases dealing with fundamental breach. There the question was whether a claim by the buyer was barred by a clause in the contract "Any claim must be made within 14 days from the final discharge of the goods". Mr. Justice Devlin said (*ibid.,* at p. 1470[15]):

   . . . It is no doubt a principle of construction that exceptions are to be construed as not being applicable for the protection of those for whose benefit they are inserted if the beneficiary has

[14] [1953] 2 Lloyd's Rep. 580.
[15] *Ibid.,* at pp. 583 and 584.

committed a breach of a fundamental term of the contract; and that a clause requiring the claim to be brought within a specified period is to be regarded as an exception for this purpose . . . I do not think that what is a fundamental term has ever been closely defined. It must be something, I think, narrower than a condition of the contract, for it would be limiting the exceptions too much to say that they applied only to breaches of warranty. It is, I think, something which underlies the whole contract so that, if it is not complied with, the performance becomes something totally different from that which the contract contemplates. . . .

It is true that Lord Devlin says that he is applying a principle of construction, but I think that he is really applying a substantive rule of law. He does not reach his conclusion by construing the clause in its context: there is no statement of any reason why the apparently general terms of this particular clause must be cut down or limited so as to make it only applicable to claims in respect of breaches which do not go to the root of the contract or which are not breaches of fundamental terms. And it does not appear to me to be obvious that some canon of construction would require a limitation of the apparently general terms of this clause.

The next case is *Karsales (Harrow), Ltd. v. Wallis,* [1956] 1 W.L.R. 936. There the contract provided that

   . . . "No condition or warranty that the vehicle is roadworthy, or as to its age, condition or fitness for any purpose is given by the owner or implied herein." . . .

Lord Denning said (*ibid.,* at p. 940):

   . . . Notwithstanding earlier cases which might suggest the contrary, it is now settled that exempting clauses of this kind, no matter how widely they are expressed, only avail the party when he is carrying out his contract in its essential respects. He is not allowed to use them as a cover for misconduct or indifference or to enable him to turn a blind eye to his obligations. They do not avail him when he is guilty of a breach which goes to the root of the contract. . . .

And Lord Parker said (*ibid.*, at p. 943):

> But, in my judgment, however extensive the exception clause may be, it has no application if there has been a breach of a fundamental term. . . .

This is a clear statement of a rule of law. If it is right, it would be irrelevant that on its true construction an exempting clause must be held to be intended to apply to the breach in question, and that it is not so wide in its terms that as a matter of construction in its context its applicability must be limited. It must mean that the law does not permit contracting out of common-law liability for a fundamental breach. I think that I should go on to examine the rest of the series of recent cases, but, under the present practice of the Court of Appeal with regard to the binding character of any of its own decisions, it was hardly to be expected that this statement of the law would not be followed. I should add that I cannot deduce from the authorities cited in *Karsales (Harrow), Ltd. v. Wallis, sup.*, that the proposition stated in the judgments could be regarded as in any way settled law.

In *Sze Hai Tong Bank, Ltd. v. Rambler Cycle Company, Ltd.*, [1959] A.C. 576,[16] I think that the ground of decision was that " the clause must therefore be limited and modified to the extent necessary to enable effect to be given to the main object and intent of the contract ", applying *Glynn and Others v. Margetson & Co. and Others*, [1893] A.C. 351. But, in delivering the judgment of the Board, Lord Denning made some observations about deliberate breach. At p. 587[17] he said:

> . . . And they deliberately disregarded one of the prime obligations of the contract. No court can allow so fundamental a breach to pass unnoticed under the cloak of a general exemption clause . . .

and at p. 588:[18]

> The self-same distinction runs through all the cases where a fundamental breach has disentitled a party from relying on an exemption clause. In each of them there will be found a breach which evinces a deliberate disregard of his bounden obligations. . . .

[16] [1959] 2 Lloyd's Rep. 114, at p. 121.
[17] *Ibid.*, at p. 121.
[18] *Ibid.*, at p. 121.

Then he cited *Bontex Knitting Works, Ltd. v. St. John's Garage*, (1943) 60 T.L.R. 44; *Alexander v. Railway Executive*, [1951] 2 K.B. 882, and *Karsales (Harrow), Ltd. v. Wallis*, [1956] 1 W.L.R. 936, and added:

> . . . In each of those cases it could reasonably be inferred that the servant or agent deliberately disregarded one of the prime obligations of the contract. He was entrusted by the principal with the performance of the contract on his behalf: and his action could properly be treated as the action of his principal. In each case it was held that the principal could not take advantage of the exemption clause. It might have been different if the servant or agent had been merely negligent or inadvertent . . .

In this connection I may refer to *The Cap Palos*, [1921] P. 458, where Lord Justice Atkin referred to the importance of a breach being deliberate.

*Yeoman Credit, Ltd. v. Apps*, [1962] 2 Q.B. 508, was another case of hire purchase of a car with an exemption clause similar to that in *Karsales, sup*. Lord Justice Holroyd Pearce quoted the passages from the judgments in *Karsales, sup.*, to which I have referred, and on p. 520 referred to

> . . . such a non-performance or repudiation or breach going to the root of the contract as disentitles the owners to take refuge behind an exception clause intended only to give protection to those breaches which are not inconsistent with and not destructive of the whole essence of the contract. . . .

*Charterhouse Credit Company, Ltd. v. Tolly*, [1963] 2 Q.B. 683, was a similar case but with more complicated facts. It had been argued that the exemption clause was not sufficiently clear to be given effect. Lord Justice Donovan said at p. 703:

> I do not find it necessary to determine the true construction of this clause, for even if it bears the construction contended for by the finance company, I am of opinion that it is of no avail to it in this case. As has been often said in recent years, a fundamental breach of contract, that is, one which goes to its very root, disentitles the party in breach from relying on the provisions of an exempting clause . . .

and he gives *Karsales, sup.*, as his authority.

Lord REID]                Suisse Atlantique v. N.V. Rotterdamsche                [1966] VOL. 1

There was a finding that the hirer had elected to treat the contract as still on foot and it was argued that therefore he must be as much bound by the exemption clause as by any other clause. On this matter Lord Donovan said, *sup.*, at p. 704:

The point is, apparently, free from direct authority, but, on principle, the election by the hirer of one remedy . . . ought, as I see it, to make no difference to the ineffectiveness of an exempting clause in face of such a breach. However this may be, two decisions of the House of Lords exist where one party to a contract elected to treat it as still subsisting despite a fundamental breach by the other, and succeeded in obtaining damages for such breach despite the existence in the contract of an exempting clause similar to clause 5 here. One is *Pollock & Co. v. Macrae*, [1922] S.C. (H.L.) 192 and the other *Wallis, Son & Wells v. Pratt & Haynes*, [1911] A.C. 394. The contention I am now considering was not specifically raised in either case, but it is impossible to think that, if valid, it would have been overlooked not only by the parties sued, but by all the Courts before which the two cases came. . . .

Lord Justice Upjohn said (*ibid.*, at p. 709):

. . . The authorities establish that where there is a breach of a fundamental term the person in breach cannot rely on clauses of exclusion to protect him as against the other party. But the company said with some force that that is so, no doubt, when the innocent party treats the contract as repudiated, but that if he elects to affirm the contract, then he must take the benefit of the contract subject to all its provisions, including a clause of exclusion, and he can no longer plead that the finance company, though in breach of a fundamental term, cannot rely on a clause of exclusion. That is not, I think, an easy question, and there appears to be no authority where the matter has been expressly decided. If I am right in the analysis of this fundamental term, that it really stems from the fact that the finance company must lend that which it contracts to lend and not something which is essentially different, it seems to me that the principle must apply whether it is a case of repudiation accepted by the hirer or whether he affirms the contract and sues for damages. . . .

This was substantially repeated by him in *Astley Industrial Trust, Ltd. v. Grimley*, [1963] 1 W.L.R. 584, at p. 598. My noble and learned friend gave the example of a contract for delivery of a tractor and delivery instead of Suffolk Punch horses. I would be inclined to think that that was not delivery under the contract at all, but that it was an offer of a new contract on terms to be implied.

I do not think that either of the two cases to which Lord Donovan referred is of assistance in this connection. In each it was held that on a true construction the exempting clause was not wide enough to apply to the breach. In *W. & S. Pollock & Co. v. Macrae*, [1922] S.C. (H.L.) 192, Lord Dunedin said:

. . . Such conditions to be effectual must be most clearly and unambiguously expressed, as is always necessary . . . where a well-known common law liability is sought to be avoided . . .

Then he referred to *London and North Western Railway Company v. Neilson*, [1922] 2 A.C. 263, and continued:

. . . Reading the clauses in this light, I am of opinion that, although they excuse from damage flowing from the insufficiency of a part or parts of the machinery, they have no application to damage arising when there has been total breach of contract by failing to supply the article truly contracted for.

In *Wallis, Son & Wells v. Pratt & Haynes*, [1911] A.C. 394, an inferior variety of seed was delivered, but the buyer did not discover this until it was too late to reject the goods; so he sued for damages, The contract included the clause "sellers give no warranty expressed or implied", but it was held that this was not wide enough in its terms to apply to breach of a condition. In neither case was there any question of cutting down or limiting the application of a clause apparently wide enough to apply to the breach. Both really turned on pure construction.

In *U.G.S. Finance, Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A.*, [1964] 1 Lloyd's Rep. 446, the question related to a condition to the effect that interest coupons were forfeited if not presented within six years. Lord Denning, M.R., repeated in substance what he had said in *Karsales* and added (*ibid.*, at p. 450):

LLOYD'S LIST LAW REPORTS    [H.L.

[1966] VOL. 1]    Suisse Atlantique v. N.V. Rotterdamsche    [Lord REID

The doctrine does not depend on the customer electing to disaffirm the contract. Usually he has no option open to him. The contract has been broken irretrievably before he gets to know of it, and the only course for him is to sue for the breach. So the point does not very often arise. But even if he does get to know of it, in time to affirm or disaffirm, he can still treat the contract as in being, and sue for the breach (without being defeated by the exemption clause) provided always that the breach itself is continuing to operate and cause damage to him. . . .
A different view was expressed by Lord Justice Pearson (*ibid.*, at p. 453):

As to the question of " fundamental breach ", I think there is a rule of construction that normally an exception or exclusion clause or similar provision in a contract should be construed as not applying to a situation created by a fundamental breach of the contract. This is not an independent rule of law imposed by the Court on the parties willy-nilly in disregard of their contractual intention. On the contrary it is a rule of construction based on the presumed intention of the contracting parties. It involves the implication of a term to give to the contract that business efficacy which the parties as reasonable men must have intended it to have. This rule of construction is not new in principle but it has become prominent in recent years in consequence of the tendency to have standard forms of contract containing exceptions clauses drawn in extravagantly wide terms, which would produce absurd results if applied literally. . . .

If this new rule of law is to be adopted, how far does it go? In its simplest form it would be that a party is not permitted to contract out of common-law liability for a fundamental breach. If that were right then a demurrage clause could not stand as limiting liability for loss resulting from a fundamental breach: and the same would apply to any clause providing for liquidated damages. I do not suppose that anyone has intended that this rule should go quite so far as that. But I would find it difficult to say just where the line would have to be drawn.

In my view, no such rule of law ought to be adopted. I do not take that view merely because any such rule is new or because it goes beyond what can be done

by developing or adapting existing principles. Courts have often introduced new rules when, in their view, they were required by public policy. In former times when Parliament seldom amended the common law, that could hardly have been avoided. And there are recent examples although, for reasons which I gave in *Shaw* v. *Director of Public Prosecutions,* [1962] A.C. 220, I think that this power ought now to be used sparingly. But my main reason is that this rule would not be a satisfactory solution of the problem which undoubtedly exists.

Exemption clauses differ greatly in many respects. Probably the most objectionable are found in the complex standard conditions which are now so common. In the ordinary way the customer has no time to read them, and if he did read them he would probably not understand them. And if he did understand and object to any of them, he would generally be told he could take it or leave it. And if he then went to another supplier the result would be the same. Freedom to contract must surely imply some choice or room for bargaining.

At the other extreme is the case where parties are bargaining on terms of equality and a stringent exemption clause is accepted for a *quid pro quo* or other good reason. But this rule appears to treat all cases alike. There is no indication in the recent cases that the Courts are to consider whether the exemption is fair in all the circumstances or is harsh and unconscionable or whether it was freely agreed by the customer. And it does not seem to me to be satisfactory that the decision must always go one way if, e.g., defects in a car or other goods are just sufficient to make the breach of contract a fundamental breach, but must always go the other way if the defects fall just short of that. This is a complex problem which intimately affects millions of people, and it appears to me that its solution should be left to Parliament. If your Lordships reject this new rule there will certainly be a need for urgent legislative action, but that is not beyond reasonable expectation.

I have no doubt that exemption clauses should be construed strictly and I think that this case must be decided by considering whether there is any ground for adopting any but the natural meaning of the demurrage clause. Having provided for the calculation of the lay days and

for extension of the lay days when delays are caused by various events for which the charterer is not responsible, Clause 3 of the charter-party continues:

> . . . If longer detained, Charterer to pay $1000 U.S. Currency Payable in the same manner as the freight. per running day (or pro rata for part thereof) demurrage. If sooner despatched, Vessel to pay Charterer or his Agents $500 U.S. Currency per day (or pro rata for part thereof) dispatch money for lay time saved. . . .

It is impossible to hold that these words are not wide enough to apply to the circumstances of the present case, whether or not there was fundamental breach. So the only question is whether there is any reason for limiting their scope. The authorities are against the appellants, but, even putting them aside, I can find no such reason. The appellants chose to agree to what they now say was an inadequate sum for demurrage, but that does not appear to me to affect the construction of this clause. Even if one assumes that the 1000 dols. per day was inadequate and was known to both parties to be inadequate when the contract was made, I do not think that it can be said that giving to the clause its natural meaning could lead to an absurdity or could defeat the main object of the contract or could for any other reason justify cutting down its scope. If there was a fundamental breach the appellants elected that the contract should continue and they did so in the knowledge that this clause would continue. On the whole matter I am of opinion that this appeal fails and that the questions should be answered as my noble and learned friend proposes.

Lord HODSON: My Lords, I agree with the judgments given already in the Court of Appeal and at first instance that this contract cannot be held to contain an implied obligation involving payment for the greatest number of voyages which could have been made if no delays had been experienced. Further, I do not find that the appellants can find support from the decision in the case of *Aktieselskabet Reidar v. Arcos, Ltd.*, [1927] 1 K.B. 352; (1926) 25 Ll.L.Rep. 513. The trial Judge, Mr. Justice Greer, and two of the Lords Justices, Lord Justice Atkin and Lord Justice Bankes, were agreed that damages were payable as for dead freight beyond the sum due for demurrage. There

a chartered vessel had been sent to Archangel, a White Sea port, to load a cargo of timber. She went there in plenty of time within the lay days to load a full and complete cargo according to the summer marks and summer carrying capacity of the vessel. Delay took place in loading and the number of lay days was exceeded in order to load the quantity which was loaded. She sailed with 306 standards short of the 850 standards of timber which she could have loaded because by the time the vessel sailed she could only load in order to comply with the law down to her winter marks. There was a breach separate from although arising from the same circumstances as the delay, and it was in these circumstances that damages were awarded.

The charter-party now under consideration provided for the carriage of coal from the United States (East Coast) to Europe and to return in ballast between each trip and remained in force " for a total of two years consecutive voyages ". (Clause 23.) Fixed periods of laytime were provided within which the respondents were obliged respectively to load and discharge the vessel on each voyage. During the relevant part of the two-year period the vessel performed eight voyages, whereas the appellants contend that a further six voyages could have been performed if the loading and discharging had been completed within the laytime or a further nine voyages if the respondents had loaded and discharged the vessel with reasonable dispatch.

The detention beyond the agreed laytime is admittedly a breach of the charter-party, and the only question is whether in circumstances such as those which have arisen here the appellants are entitled to any further sum from the respondents over and above their demurrage for which the appellants give credit in their claim.

The matter for your Lordships to decide arises on a consultative case stated by arbitrators. The only relevant question is:

> Whether upon the facts found and upon the true construction of the Charterparty dated the 21st December 1956 and the agreement dated the 8th October 1957:—

> (A) (i) The Claimants are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the Respondents' having failed to

550

LLOYD'S LIST LAW REPORTS

[H.L.

[1966] VOL. 1]

Suisse Atlantique v. N.V. Rotterdamsche

[Lord HODSON

load and discharge the Vessel within the laydays whereby the Charterparty was (if so proved) rendered less profitable to the Claimants by consequent loss of voyages or voyage time.

(ii) Upon the assumption that such loss of profitability resulted from the Respondents having deliberately (i.e. with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel:

(a) With such ordinary despatch as the circumstances permitted

or

(b) within the laydays

the Claimants are entitled to recover any damages suffered by the Claimants through the Charterparty having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the Respondents.

It is emphasized on behalf of the appellants that since their obligation throughout was to perform all parts of the agreed voyages "with all possible despatch" subject only to the operation of excepted perils, the respondents as charterers should likewise as a matter of construction of the clauses of the charterparty be held to be bound to load and discharge the vessel on a specific number of voyages only ascertainable and then with some difficulty at the end of the two-year period.

This argument was, I think, rightly rejected, but before your Lordships the argument was carried further in that it was said that, although the demurrage rate here would be the measure of compensation in the ordinary case for delay of the vessel yet where the detention is so long as to frustrate the contract the words of the charter-party "If longer detained" whether or not the detention is deliberate, i.e., with the wilful intention of limiting the number of contractual voyages, no longer govern the measure of compensation payable to the owners. Detention cannot, it is said, cover delay by the charterers of such a kind as to amount to repudiatory breach of the contract. Often expressions have been used in various cases such as fundamental breach or breach going to the root of a contract to describe those situations which may

be brought about through the fault of one party which have a frustrating effect and make the contract in its original form at any rate impossible of performance. Sometimes it is said that to hold the parties to the original contract after the breach would be to make a new contract for them not to insist on performance of the old. The argument is quite general in its scope and not confined to cases involving the carriage of goods by sea or by land. Before considering the argument further it is pertinent to remember that your Lordships are not concerned with a case where the appellants have accepted a repudiation of the contract or purported to do so and sailed away. The appellants continued to perform the contract and seek damages for delay over and above the demurrage rate. Thus, if they were to succeed in this appeal they would be faced with the difficulty of establishing when if at all the accumulated delay was such as would entitle them to sue for damages at large for the loss they have suffered.

As has been recognized at the Bar on both sides, the expression "fundamental breach" is of comparatively recent origin and has seemed to have attained some mystical meaning in the law of contract. For my part, I doubt whether anything is to be gained by analysing the various expressions which have been used to describe breaches of contract so serious as to justify the injured party in throwing up the contract if he so chooses. Sometimes it has been declared that where a fundamental breach of contract had occurred an exceptions clause could not as a matter of law be relied upon, but the better view on the authorities, and that accepted by both sides before your Lordships, is that as a matter of construction normally an exception or exclusive clause or similar provision in a contract should be construed as not applying to a situation created by a fundamental breach of contract.

I have here quoted the language used by Lord Justice Pearson in U.G.S. Finance, Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A., [1964] 1 Lloyd's Rep. 446, which is contained in the passage cited by my noble and learned friend, Lord Reid—see also the judgment of Lord Justice Diplock in Hardwick Game Farm v. S.A.P.P.A., Ltd., [1966] 1 Lloyd's Rep. 197, in which

judgment was delivered on Dec. 20, 1965 —a recent example of the acceptance of the opinion of Lord Justice Pearson.

So long as one remembers that one is construing a document and not applying some rule of law superimposed upon the law of contract so as to limit the freedom of the parties to enter into any agreement they like within the limits which the law prescribes one can apply one's mind to each contract as it comes up for consideration. I would adopt the language of Lord Justice Atkin in *The Cap Palos*, [1921] P. 458, at pp. 471 and 472:

> I am far from saying that a contractor may not make a valid contract that he is not to be liable for any failure to perform his contract, including even wilful default; but he must use very clear words to express that purpose . . .

This passage has the support of Lord Parmoor in *Cunard Steamship Company, Ltd. v. Buerger*, [1927] A.C. 1, at p. 13,[19] I think it is unnecessary to refer in detail to those cases where the doctrine of fundamental breach has been stated as if it went further than a matter to be dealt with on construction. By way of example, in an unreported case, Privy Council Appeal No. 51 of 1959, *Philip Boshali v. Allied Commercial Exporters, Ltd.*, the Board stated unequivocally that a breach which goes to the root of a contract disentitles a party from relying on an exemption clause (*Karsales (Harrow), Ltd. v. Wallis*, [1956] 2 All E.R. 866, Lord Justice Denning, at p. 869). It is to be noticed, however, that Lord Denning himself delivering a judgment of the Board in the year 1959 in *Sze Hai Tong Bank, Ltd. v. Rambler Cycle Company, Ltd.*, [1959] A.C. 576,[20] treated the same matter as one of construction. As in this case, Counsel there conceded that finally the question was one of construction, and in the judgment of the Board this phrase appears (*ibid.*, at p. 587)[21]:

> . . . as a matter of construction, their Lordships decline to attribute to it [—viz. the clause—] the unreasonable effect contended for.

Thus, even if the accumulated delays of the chartered ship were such as to justify the finding that the respondents

[19] *Sub nom. Buerger v. Cunard Steamship Company, Ltd.*, (1926) 25 Ll.L.Rep. 215, at pp. 219 and 220.
[20] [1959] 2 Lloyd's Rep. 114.
[21] *Ibid.*, at p. 120.

are guilty of a fundamental breach of contract, nevertheless it would not follow as a matter of law that the demurrage clause entitling the amount of compensation for detention would not apply.

Even if one were to describe the demurrage clause as an exemption or exclusive clause, which I do not think it is, this result would not follow for the contract must still be construed. Moreover, if one drives the argument that " fundamental breach " of contract introduces a rule of law that exemption clauses cannot be relied on far enough it would no doubt be sufficient to destroy the effect of a clause by which " demurrage " (that is agreed damages for detention) should be calculated. No case has ever gone so far.

It is convenient to remember that a great number of marine cases have been heard over the years in which " deviation " has been in question, and deviation has always been regarded as a serious matter. As Lord Atkin said in *Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd.*, (1936) 55 Ll.L.Rep. 159, at p. 173:

> . . . I venture to think that the true view is that the departure from the voyage contracted to be made is a breach by the shipowner of his contract, but a breach of such a serious character that however slight the deviation the other party to the contract is entitled to treat it as going to the root of the contract and to declare himself as no longer bound by any of its terms.

Later he said:

> . . . No doubt the extreme gravity attached to a deviation in contracts of carriage is justified by the fact that the insured cargo-owner when the ship has deviated has become uninsured. . . .

Deviation cases are convenient examples for consideration because they involve breaches of a fundamental term of the contract and there is usually no difficulty in ascertaining whether that term has been breached. If it has been the breach will be fundamental. The case is more difficult as a rule where, as here, the term involved can hardly be described as fundamental yet breaches of it may be said in the aggregate to be fundamental. I doubt whether it is helpful to analyse or to sub-divide the cases which are concerned with these serious breaches or to try to give special names to individual clauses

of such cases. The leading case of *Glynn and Others v. Margetson & Co. and Others*, [1893] A.C. 351, is a striking example of a breach of a deviation clause in a contract which has been described as an application of the " main purpose " rule. This was a case of deviation where the main purpose of the contract was the delivery of oranges from Malaga to Liverpool. The ship made in the opposite direction, viz., to Burriana, going farther away from Liverpool than she was at Malaga and the oranges were damaged owing to the delay on the voyage. The shipowner relied on a clause which gave him liberty to proceed to and stay at any port or ports within wide limits, staying there as long as he liked for any purpose. Both Lord Herschell, L.C., and Lord Halsbury, with whom the other members of the House agreed, treated the matter as one of construction of the contract and on that basis limited the liberty to ports in the course of the voyage.

Other expressions have been used, e.g., " the four corners rule ". Thus, under a contract of carriage or bailment if the carrier or bailee uses a place other than that agreed on for storing the goods, or otherwise exposes the goods to risks quite different from those contemplated by the contract, he cannot rely on clauses in the contract designed to protect him against liability within the four corners of the contract, and has only such protection as is afforded by the common law. *Lilley v. Doubleday*, (1881) 7 Q.B.D. 510, and *Gibaud v. Great Eastern Railway Company*, [1921] 2 K.B. 426, are examples of such cases all of which depend on the construction of the contract.

Sometimes a position of absurdity is reached by the tacking on to formal words in a printed contract designed for a variety of purposes a specific bargain which cannot be performed if the printed words are to apply. Such a case was *Glynn and Others v. Margetson & Co. and Others, sup.* Lord Herschell, L.C., said (*sup.*, at p. 355):

. . . Where general words are used in a printed form which are obviously intended to apply, so far as they are applicable, to the circumstances of a particular contract, which particular contract is to be embodied in or introduced into that printed form, I think you are justified in looking at the main object and intent of the contract and in limiting the general words used, having in view that object and intent. . . .

Treating the matter as one of construction, the case is not affected by the affirmation of the contract. In this case the appellants, the owners of the ship, did not sail away; they continued to perform the contract to the bitter end, and accordingly are bound by such of the terms of the contract as are applicable notwithstanding the breach of contract by the respondents, the charterers. I see no reason why the agreement as to the demurrage rate should not apply so long as the contract is being performed whether the breach is treated as fundamental or not.

I think the decision of this House in *W. & S. Pollock & Co. v. Macrae*, [1922] S.C. (H.L.) 192, is of some assistance. There a contract for the building and installation of a set of motor marine engines which bound the sellers to replace any parts faulty through bad material or workmanship contained a clause providing that all goods were supplied on the condition that the builders should not be liable for direct or consequential damages arising from the defective material or workmanship. It was held that this clause, while it protected the builders where a part or parts of the engines were defective, was of no avail where there had been a complete breach of contract owing to a series of defects in the engines which rendered them practically unserviceable. The buyer then had ineffectively elected to reject the goods and treat the contract as repudiated, but was allowed to fall back on his alternative remedy for damages. Lord Dunedin said (*ibid.*, at p. 200):

. . . Now, when there is such a congeries of defects as to destroy the workable character of the machine, I think this amounts to a total breach of contract, and that each defect cannot be taken by itself separately so as to apply the provisions of the conditions of guarantee and make it impossible to claim damages. . . .

The case turned on pure construction, but it was decided on the basis that the whole of the contract had to be construed. I think the same applies to the case of *Wallis, Son & Wells v. Pratt & Haynes*, [1911] A.C. 394, another case of breach of contract of a repudiatory quality followed by affirmation.

On the construction of this contract I am of opinion that the parties have agreed to limit the damages payable for detention at the agreed demurrage rate and that there is no reason for not so

limiting them whether or not there was an intention on the part of the respondents wilfully to limit the number of voyages. As has been stated in Scrutton on Charter-parties and as Mr. Justice Mocatta pointed out: demurrage in its strict meaning is a sum agreed by the charterer to be paid as liquidated damages for delay beyond a stipulated or reasonable time for loading or unloading. As a rule some deliberate or negligent conduct on the part of the charterer is involved for he is protected by a number of exceptions against any risks outside his control. No English authority was cited which assists the appellants. The researches of Counsel only discovered one case which raises the point of deliberate delay consisting of detention so long as it suits the charterers' convenience. This was *Ethel Radcliffe Steamship Company, Ltd. v. W. & R. Barnett, Ltd.*, (1926) 24 Ll.L.Rep. 277. Damages at large at common law were awarded by an arbitrator, but the award was varied by Mr. Justice Rowlatt, and the Court of Appeal rejected the submission which had at first succeeded.

There the clause to be construed was as follows:

Orders as to port of discharge are to be given to the master within 24 hours after receipt by consignees of master's telegraphic report to consignees . . . of his arrival at the port of call, and for any detention waiting for orders after the aforesaid 24 hours, the charterers or their agents shall pay to the steamer 30s. sterling per hour. . . .

The Court treated the 24 hours as equivalent to lay days and the 30s. per hour as demurrage and applied to the situation the passage at p. 348 of the 12th ed. (1925) of Scrutton on Charter-parties, Art. 128:

Stipulations for demurrage may be

(1) Exhaustive: as "10 days for loading and demurrage at £20 per diem afterwards," which covers all delay. On such a provision the shipowner cannot say that the provision for £20 a day demurrage only applies to a reasonable time, after the lapse of which he can claim damages for detention. After the lapse of a reasonable time he may take his ship away, but if he allows her to stay on he can only claim the agreed rate of demurrage.

In the current (17th (1964)) edition of this work the last sentence has been rewritten so as to read:

. . . If the contract be not repudiated or frustrated, he can only claim the agreed rate of demurrage.

Thus, the question of a frustrating delay is left open, but the general proposition stated in the paragraph is supported by the case of *Inverkip Steamship Company, Ltd. v. Bunge & Co.*, [1917] 2 K.B. 193, as Lord Justice Atkin pointed out ((1926) 24 Ll.L.Rep., at p. 281).

An American case which was relied upon by the appellants should be noticed as the language of the judgment lends some support to their submission. This was *Empresa Maritime de Transportes, S.A. v. A. T. Massey Coal Company, et al.*, [1965] A.M.C. 517, tried in the United States District Court, Eastern District of Virginia, Norfolk Division, in 1963. In that case damages were claimed for wrongful detention of the motor vessel *Blue Star* within the lay days, the allegation being that the defendant coal supplier conspired with the charterer of the vessel intentionally to delay the *Blue Star* at loading by arranging that the coal would not be loaded on the vessel until laytime was about to expire so as to diminish the number of consecutive voyages the vessel could perform under a two years' consecutive voyage time charter agreement. The charter was also written on an Americanized Welsh Coal Charter Form.

The claim succeeded on the construction of the charter-party but the facts were special and in any case, as the editors of the report point out in a note, there is authority in the Courts of this country for the proposition that when a charter-party prescribes a fixed time to load there is no basis for implying an obligation on the part of the voyage charterer to load within a lesser time. See *Margaronis Navigation Agency, Ltd. v. Henry W. Peabody & Co., of London, Ltd.*, [1964] 1 Lloyd's Rep. 173, affirmed by the Court of Appeal [1964] 2 Lloyd's Rep. 153.

For myself, I see no reason to hold that attributing to the respondents a wilful intention of limiting the number of contractual voyages affects the sums otherwise payable by way of demurrage so as to open the way to a claim for damages at large. I would accordingly agree with the learned Judge that the Question A in the consultative case be answered in the negative and dismiss the appeal.

**Lord UPJOHN :** My Lords, in this appeal your Lordships are concerned with the rights and obligations of the contracting parties to a consecutive voyage charter-party dated Dec. 21, 1956, made between the appellants, owners of the ship, and the respondents, the charterers. It provided for the carriage of coal for two years' consecutive voyages terminating in March, 1959, between Hampton Roads, Baltimore or Philadelphia on one side of the Atlantic and one safe port, Belgium, Holland or Germany on the other side, returning in ballast to the U.S.A. for a further cargo. Clause 3 of the charter-party provided for loading at an agreed rate with a widely drawn provision excluding from loading time (or lay days as they are usually called) time lost from a variety of events and causes immaterial to the matters in issue before your Lordships. The clause provided

. . . If longer detained, Charterer to pay $1000 U.S. Currency . . . per running day (or pro rata for part thereof) demurrage. . . .

There was a similar provision for demurrage if the time for the agreed rate of discharge was exceeded.

Whether because of the fall in freight rates after the re-opening of the Suez Canal in April of 1957 or for some other reason the ship greatly exceeded the permitted laytime in port and your Lordships were told that at one time the owners sailed the ship away treating the contract as repudiated by the charterers and accepting that repudiation. This led to an arbitration between the parties, not yet determined, and without prejudice to that arbitration the parties on Oct. 8, 1957, agreed to perform the charter-party for the remainder of the stipulated term. Thereafter, save for the first voyage, the ship always greatly exceeded the lay days in port both loading and unloading and in fact during the term of the charter-party the ship performed only eight voyages. The charterers do not dispute their liability to pay demurrage for these lost days which amounts to the substantial sum of approximately 150,000 dols. The owners, however, allege that but for the days lost in port the ship could have performed some six to nine additional profitable voyages during that time and upon that footing they claim large additional damages for loss of profit which the ship could have earned by reason of these additional voyages.

This dispute was referred to arbitration and has reached this House upon consultative case by the arbitrators.

When the matter first came before your Lordships it was opened, as in the Courts below, upon the footing that though the delays (beyond the lay days) in port were considerable such delays did not amount to repudiatory conduct on the part of the charterers.

It is not in doubt that every time the charterers exceeded the lay days in port they committed a breach of contract; a breach, however, for which the parties have agreed damages at the rate of 1000 dols. a day. But the owners argue that as this is not a single voyage charter but one contract for the performance of a number of consecutive voyages, damages are no to be determined solely by the length of detention of the ship in excess of the lay days in port as it was admitted they would have been in a single voyage charter, but that there was a further obligation upon the charterers to load and discharge within the laytime provided by the charter-party so that the ship might perform such a number of consecutive voyages each of a duration not exceeding the sea passage plus the permitted laytimes in port, as proved to be capable of performance within the term of the charter. In other words, in a consecutive voyage charter there is a larger obligation upon the charterers to load and discharge the cargo within the lay days so that the owners may benefit from the profitable employment of their ship contemplated by the charter-party for the period of the charter. This obligation was said to arise either as a matter of construction of the charter-party regarded as a whole or from an implied term that the charterers would co-operate or concur in doing all things necessary to enable the owners to perform the maximum possible number of voyages and to earn the maximum possible amount of freight, which could in the ordinary course of events be performed or earned during the term of the charter.

My Lords, the charter-party in my opinion does not bear this construction. It is clear that the charterers have broken no express clause of the charter-party except the provision for detention in the ports of loading or discharge in excess of the lay days. The voyages have been in fact consecutive and I, for my part, can find nothing in the contract which imposes

upon the charterers as a matter of construction or as a matter of necessary implication an obligation to undertake any additional requirement of loading within the lay days for breach of which they will be liable in damages beyond the rate of demurrage specified in the contract for exceeding those days. As both Mr. Justice Mocatta and the Court of Appeal held, there was only one breach by the charterers, namely, a breach of the obligation to load and discharge at an agreed rate and the detention of the ship in a port beyond that date was a breach of contract for which the parties had agreed damages. The owners, however, placed much reliance upon the case of *Aktieselskabet Reidar v. Arcos, Ltd.*, [1927] 1 K.B. 352; (1926) 25 Ll.L.Rep. 513, but with all respect to the argument that was a very different case. In the view of Mr. Justice Greer at first instance and the majority of the Court of Appeal there were in that case breaches of two quite independent obligations; one was demurrage for detention (as here) the other was a failure to load a full and complete cargo, which had become impossible owing to the onset of winter conditions and, therefore, entirely different considerations applied to that case. It is true that Lord Justice Bankes reached the same result by a different route on the particular facts of that case, but as Mr. Justice Mocatta and the Court of Appeal, with whose judgments I am in full agreement, pointed out his *ratio decidendi* does not assist the owners in this quite a different case. Accordingly, in my opinion that case does not help your Lordships.

My Lords, I have dwelt upon this case at a little length because in the end I believe that the considerations which I have already mentioned are very material in deciding this appeal.

At the conclusion of his main argument Counsel for the owners endeavoured to take a new point not raised in the Courts below, namely, that the charterers had committed a fundamental breach of the contract which amounted to a repudiation and upon that footing it was urged that the owners were entitled to general damages for lack of profitability and were not confined to demurrage.

Your Lordships, in the special circumstances of this case, permitted the appeal to be re-argued *de novo* after supplemental cases had been lodged by each side. The owners' basic argument on this new case is that after the first voyage there were

such delays beyond the lay days each time that the ship entered port for loading or discharge that the delays, each admittedly a breach of the charter-party, amounted cumulatively to a repudiation of the contract which entitled the respondents at their option to accept and to treat the contract as at an end and sail away. This appeal comes before your Lordships on a consultative case by the arbitrators and the relevant facts have not yet been found on this point so for the purposes of this point it is necessary to make the double assumption in favour of the owners first that it is open to the arbitrators on the facts to find that there has been a breach of contract by the charterers which goes to its root and entitled the owners to treat the contract as at an end and secondly that in fact they will so find. It was submitted by the charterers that upon the facts of this case, as a matter of law it was not open to the arbitrators to find in favour of the owners for it was said that out of 511 days which was the term of the charter after the agreement of October, 1957, only 154 days were demurrage days. I cannot agree with this submission. It is a proper matter of fact for the arbitrators to consider. Accordingly, for the purpose solely of dealing with the argument I am prepared to make the assumptions desired by the owners.

But what seems to me quite clear, making these assumptions, is that there has been no acceptance by the owners of the repudiation which brought the contract to an end. On the contrary, it seems to me clear that by their conduct the owners expressly affirmed the contract. The relevant facts were known at all material times to them for they must have been made currently aware of the excessive delays in port; they had already sailed away once—I say nothing about that for it is still *sub judice*—but it was for the owners, knowing of the delays, to make up their minds whether to sail away again. They did not do so and with full knowledge of all the facts elected to treat the contract as on foot until the expiry of the charter-party by effluxion of time. It is this feature which gives rise to the whole difficulty in this interesting case. For it is common ground that had the owners accepted the assumed repudiation and sailed away, thereby terminating the contract, none of its terms survived, and damages for breach of contract would have

LLOYD'S LIST LAW REPORTS                [H.L.

[1966] VOL. 1]        **Suisse Atlantique v. N.V. Rotterdamsche**        [Lord UPJOHN

been at large including damages for loss of profitable employment of the ship for the term of the charter-party.

In general it cannot be disputed that where a party having an option to treat a contract as at an end nevertheless affirms it, that contract and all its terms must remain in full force and effect for the benefit of both parties during the remainder of the period of performance, for it is not possible even for the innocent party to make a new contract between the parties without the concurrence of the other. As Lord Atkin in *Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd.*, (1936) 55 Ll.L.Rep. 159, said (*ibid.*, at p. 174):

> . . . he can elect to treat the contract as subsisting, and if he does this with knowledge of his rights he must in accordance with the general law of contract be held bound. . . .

and as Lord Wright said even more clearly (*ibid.*, at p. 178):

> . . . In the present case the charterers elected to waive the breach, with the result that the charter-party was not abrogated, but remained in force. The appellants were thus entitled to the benefit of the contract conditions and in particular to rely on the exception of perils of the sea . . .

and see *Chandris v. Isbrandtsen-Moller Company, Inc.*, [1951] 1 K.B. 240, per Mr. Justice Devlin at the foot of p. 248:[23] That is this case. Now it is, in my opinion, quite clear that as a matter of construction of the charter-party the demurrage clause both as to loading and discharging is expressed without limitation of time and therefore applies throughout the term of the contract. If authority be wanted for this self-evident proposition it is to be found in *Western Steamship Company v. Amaral Sutherland & Co.*, [1913] 3 K.B. 366; *Inverkip Steamship Company, Ltd. v. Bunge & Co.*, [1917] 2 K.B. 193; *Ethel Radcliffe Steamship Company, Ltd. v. W. & R. Barnett, Ltd.*, (1926) 24 Ll.L.Rep. 277; (1926) 31 Com. Cas. 222. Therefore, to succeed in this appeal the owner must displace the demurrage clause. He seeks to do so in reliance on the well-known doctrine that in certain circumstances a party to a contract cannot rely on an exception or limitation clause inserted solely for his benefit. But before examining this doctrine the first question which logically must be asked is, surely, whether this demurrage clause is a provision of

exception or limitation. Whatever the ultimate ambit of the doctrine may be found to be it is, in my opinion, confined to clauses which are truly clauses of exception or limitation, that is to say clauses essentially inserted for the purpose only of protecting one contracting party from the legal consequences of other express terms of the contract or from terms which would otherwise be implied by law or from the terms of the contract regarded as a whole; just as a party may waive a clause which is inserted for solely his own benefit (see *Hawksley v. Outram*, [1892] 3 Ch. 359) so *per contra* there are occasions when a party cannot be permitted to rely on such a clause. But if it is inserted for the benefit of both I know of no authority —and none has been cited—which entitles one party unilaterally to disregard its provisions. In my opinion, the demurrage clause with which we are concerned is a clause providing for agreed damages and is different from a clause excluding or limiting liability for damage by breach of contract by one party. An agreed damage clause is for the benefit of both; the party establishing breach by the other need prove no damage in fact; the other must pay that, no less but no more. But where liability for damage is limited by a clause then the person seeking to claim damages must prove them at least up to the limit laid down by the clause; the other party, whatever may be the damage in fact, can refuse to pay more if he can rely on the clause. As Mr. Justice Greer said in relation to a demurrage clause in *Aktieselskabet Reidar v. Arcos Ltd.*, [1926] 2 K.B. 83, at p. 86:[23]

> . . . "This clause was put in for my benefit as well as yours; it measures the damages I have to pay". . . .

Counsel for the owners sought to say that the agreed damages of 1000 dols. a day were much too low to be an estimate of damage and that it might be open to the arbitrators to hold that in truth this was in the nature of a penalty clause or a limitation clause limiting liability. I do not think it is open now to the owners to make this submission. It is quite clear on the authorities that the parties need not agree on a true estimate of damage. They are perfectly entitled to agree on a low rate. See *Cellulose Acetate Silk Company, Ltd. v. Widnes Foundry (1925), Ltd.*, [1933] A.C. 20; and the *Chandris case, sup.*, at p. 240.[24]

---

[23] (1950) 83 Ll.L.Rep. 385, at p. 394.

[23] (1926) 25 Ll.L.Rep. 30, at p. 31.
[24] (1950) 83 Ll.L.Rep., at p. 394.

Accordingly, in my opinion the demurrage clause is a clause which, the contract being affirmed, remains an agreed damages clause for the benefit of both parties and it is not a clause of exception or limitation inserted for the benefit of one party only to which the doctrine under consideration can properly be applied. That is sufficient to dispose of this appeal.

But in view of the arguments that have been addressed to your Lordships I think it is right that I should express my views thereon upon the footing that the demurrage clause in this case is indeed a clause of exception or limitation of liability inserted solely for the benefit of the charterer, and that it is therefore a clause to which in certain circumstances the doctrine relied upon by the appellants applies. That the doctrine exists is not in doubt, but it is necessary to examine the authorities to understand the principle upon which it is based.

There was much discussion during the argument upon the phrases " fundamental breach " and " breach of a fundamental term " and I think it is true that in some of the cases these terms have been used interchangeably; but in fact they are quite different. I believe that all of your Lordships are agreed and, indeed, it has not seriously been disputed before us that there is no magic in the words " fundamental breach "; this expression is no more than a convenient shorthand expression for saying that a particular breach or breaches of contract by one party is or are such as to go to the root of the contract which entitles the other party to treat such breach or breaches as a repudiation of the whole contract. Whether such breach or breaches do constitute a fundamental breach depends on the construction of the contract and on all the facts and circumstances of the case. The innocent party may accept that breach or those breaches as a repudiation and treat the whole contract at an end and sue for damages generally or he may at his option prefer to affirm the contract and treat it as continuing on foot in which case he can sue only for damages for breach or breaches of the particular stipulation or stipulations in the contract which has or have been broken.

But the expression " fundamental term " has a different meaning. A fundamental term of a contract is a stipulation which the parties have agreed either expressly or by necessary implication or which the general law regards as a condition which

goes to the root of the contract so that *any* breach of that term may at once and without further reference to the facts and circumstances be regarded by the innocent party as a fundamental breach and thus is conferred on him the alternative remedies at his option that I have just mentioned. I discussed this matter in the Court of Appeal in *Hongkong Fir Shipping Company, Ltd. v. Kawasaki Kisen Kaisha, Ltd.,* [1962] 2 Q.B. 26, at p. 63.[25]

With these preliminary observations I must now examine some of the cases that were cited to your Lordships as examples of the principle that in some circumstances a party to the contract cannot rely on clauses inserted for his benefit. The earlier cases were nearly all cases of carriage of goods by sea or by land or concerned with the warehousing of goods. The principles on which these cases, mainly in the last century, were decided were not expressed by the Judges to be related to repudiatory conduct on the part of one party thereto nor to any principle of frustration, for these conceptions were not so fully developed as they are now. Thus, in cases of carriage of goods by sea, an unreasonable deviation from the usual and customary course is and has always been considered as precluding the shipowner from relying on any clauses inserted for his protection—see for example *Davis v. Garrett*, (1830) 6 Bing. 716, and *Scaramanga & Co. v. Stamp*, (1880) 5 C.P.D. 295. So strict is this rule that although the deviation has not been the cause of any loss to the plaintiff's goods and was, so to speak, a mere incident in the voyage, nevertheless having taken place the owner is no longer entitled to rely on clauses of exception contained in the relevant contract, unless it can be shown that the loss would have happened in any event (see *United States Shipping Board v. Bunge y Born*, (1925) 23 Ll.L.Rep. 257; *James Morrison & Co., Ltd. v. Shaw, Savill, and Albion Company, Ltd.,* [1916] 2 K.B. 783). It was not, however, until this century that deviation was finally established as a fundamental breach. This was first suggested, rather tentatively, by Lord Esher, M.R., in *Balian and Sons v. Joly, Victoria & Co., Ltd.,* (1890) 6 T.L.R. 345, but was accepted as the basis of his decision by the Court of Appeal in *Joseph Thorley, Ltd. v. Orchis Steamship Company, Ltd.,* [1907] 1 K.B. 660. Sir Richard Henn Collins, M.R., pointed out that the deviation goes to the

―――――――――――
25 [1961] 2 Lloyd's Rep. 478, at p. 490.

root of the contract and its performance is a condition precedent to the right of a shipowner to put the bill of lading in suit.

Finally, this House in *Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd.*, (1936) 55 Ll.L.Rep. 159, established the proposition in relation to carriage of goods by sea in the words of Lord Atkin at p. 173 (with which the other Lords agreed):

> . . . I venture to think that the true view is that the departure from the voyage . . . is a breach by the shipowner . . . of such a serious character that however slight the deviation the other party to the contract is entitled to treat it as going to the root of the contract and to declare himself no longer bound by any of its terms.

So the law is now quite clearly established that unless the parties otherwise agree the usual and customary course on any voyage described in a charter-party is a fundamental term and therefore *any* breach of it (however for practical purposes irrelevant) is a fundamental breach. See this stated explicitly by Lord Wright in the *Tate & Lyle case, sup.*, at the foot of p. 177 and top of p. 178. Moreover, Lord Atkin made it clear that the rule that the owner cannot rely on an exception clause in such a case is not because of anything special about such a clause but it is the result of the application of the ordinary law of contract. He said (*ibid.*, at p. 174):

> If this view be correct, then the breach by deviation does not automatically cancel the express contract, otherwise the shipowner by his own wrong can get rid of his own contract. Nor does it affect merely the exceptions clauses. This would make those clauses alone subject to a condition of no deviation, a construction for which I can find no justification. It is quite inconsistent with the cases which have treated deviation as precluding enforcement of demurrage provisions. The event falls within the ordinary law of contract. The party who is affected by the breach has the right to say, "I am not now bound by the contract whether it is expressed in charter-party, bill of lading or otherwise." . . .

Lord Atkin then went on to point out that equally the innocent party electing to treat the contract as at an end is not bound by his promise to pay the agreed freight any more than by his other promises.

The warehouse cases and cases of carriage by land have developed on parallel lines. The principle on which these cases proceeded originally is well stated by Lord Justice Scrutton in *Gibaud v. Great Eastern Railway Company*, [1921] 2 K.B. 426, at p. 435, where he said:

> . . . The principle is well known and perhaps *Lilley v. Doubleday* ((1881) 7 Q.B.D. 510) is the best illustration, that if you undertake to do a thing in a certain way, or to keep a thing in a certain place, with certain conditions protecting it, and have broken the contract by not doing the thing contracted for in the way contracted for, or not keeping the article in the place in which you have contracted to keep it, you cannot rely on the conditions which were only intended to protect you if you carried out the contract in the way in which you had contracted to do it. . . .

These observations have subsequently been approved in your Lordships' House in *London and North Western Railway Company v. Neilson*, [1922] 2 A.C. 263. Thus, to give one or two examples from the cases to illustrate the general proposition, in *Lilley v. Doubleday*, (1881) 7 Q.B.D. 510, itself, the warehouseman contracted to store his goods at A but in fact he stored them at B. It was held that he could not rely on a clause of exception excusing him from loss without negligence though he could have relied on the clause if they had been warehoused at A. Again, in *Mallet v. Great Eastern Railway Company*, [1899] 1 Q.B. 309, a consignment of fish contracted to be sent to Jersey by the Weymouth route was sent by the consignor by mistake via the Southampton route and although the steamers were due to arrive at Jersey at about the same time the Southampton steamer, being on a longer sea route, was delayed by bad weather and it was held that the consignor could not rely on the clause of exception for he had done something wholly at variance with the contract. So, too, in *Gunyon v. South Eastern and Chatham Railway Companies' Managing Committee*, [1915] 2 K.B. 370, the goods were by mistake transferred from a passenger train by which means the consignor had contracted to send them on to a goods train, and it was held that the consignor could not rely on a clause of exception against liability for loss.

Just as in the case of deviation in sea voyages, it is a fundamental term of the relevant contract that ships shall proceed

by the ordinary and customary route and that any deviation changes the adventure and is at once a fundamental breach, regardless of the consequences, so in the other cases to which Lord Justice Scrutton referred in *Gibaud's case, sup.,* the true *ratio decidendi* in my view is that the law treats the stipulation that the goods shall be housed in a particular place or that they shall be consigned by a particular route or on a particular type of train as a fundamental term, breach of which at once entitles the other side to accept, if he so desires, as a fundamental breach. In forming this view I am fortified by the observations of Lord Dunedin in *London and North Western Railway Company v. Neilson, sup.,* at p. 272, where he treats these observations of Lord Justice Scrutton as being illustrative of or comparable to a deviation in a shipping contract. I can see no justification for applying some special rule to those classes of case any more than in the deviation cases. Both are governed by and *only* by the general law relating to contracts.

If I am right in drawing this conclusion then the necessary result, in my opinion, is that the principle upon which one party to a contract cannot rely on the clauses of exception or limitation of liability inserted for his sole protection, is not because they are regarded as subject to any special rule of law applicable to such clauses as being in general opposed to the policy of the law or for some other reason but, just as in the deviation cases, it is the consequence of the application of the ordinary rules applicable to all contracts, that if there is a fundamental breach accepted by the innocent party the contract is at an end; the guilty party cannot rely on any special terms in the contract. If not so accepted the clauses of exception or limitation remain in force like all the other clauses of the contract.

Thus, for my part if in *Karsales (Harrow), Ltd. v. Wallis,* [1956] 1 W.L.R. 936, Lord Denning at p. 940 or Lord Parker at p. 943, in passages which have already been quoted in the speech of Lord Reid and which therefore I shall not repeat, were intending to lay down some special rule of law applicable to exclusion or limitation clauses, I find myself unable to agree. I prefer the view of Lord Justice Pearson (as he then was) in *U.G.S. Finance, Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A.,* [1964] 1 Lloyd's Rep. 446, that the matter is one

of the true construction of the contract. But before considering this question of construction one matter remains to be stated. In very many of the cases which were cited to your Lordships there was no question of any election by the innocent party either to affirm or disaffirm the contract when the other party had committed a fundamental breach. This is because in so many cases, as Lord Denning, M.R., pointed out in the *U.G.S. case, sup.,* the voyage or journey or warehousing contract has been completed before the innocent party gets to know of any breaches of it, and the only course open to him is to sue for breach, and he does so upon the footing that he is entitled to treat the whole contract as at an end, for the law is clear that where there has been a fundamental breach he can only be taken to affirm the contract if he knows his full rights. Thus, in the *Bunge y Born case, sup.,* the whole argument in your Lordships' House turned upon the question whether there had been a deviation or not, and it was assumed that if deviation was proved the charterer could thereupon at the conclusion of the voyage sue as for a fundamental breach.

Therefore, my Lords, as in my opinion the owners have expressly affirmed the contract they cannot escape from the consequences of the demurrage clause, unless as a matter of construction of that clause they can show that it has no application to the events of this case; this they cannot do for the reasons I have already given. Accordingly, upon the footing that the demurrage clause is a clause of exclusion or limitation this does not avail the owners in this case.

But, my Lords, again having regard to the arguments addressed to your Lordships I think I ought to make one or two observations upon the question of construction of exclusion or limitation clauses.

It cannot be doubted that even while the contract continues in force (that is there has been no fundamental breach but only some lesser breach) exclusion clauses are strictly construed. Why this should be so is largely a matter of history and I think probably stems from the fact that in so many cases exceptions clauses are to be found in rather small print sometimes on the back of the main terms of the contract and that the doctrine of *contra proferentes* has been applied. But whatever the reason, that they are strictly construed against the

contracting party seeking protection even during the currency of the contract cannot be doubted.

I refer only to two examples: the first is to be found in the judgment of Lord Sterndale, M.R., in *The Cap Palos*, [1921] P. 458, at p. 465, where he expressly put his decision upon a strict construction of the exclusion clause relied on, and treated the contract as continuing. With all respect to the judgment of Lord Justice Atkin in that case, I think the reasoning of Lord Sterndale, M.R., is to be preferred. A second example is to be found in the observations of Lord Sumner in *London and North Western Railway Company v. Neilson, sup.*, at p. 278, where he (in contrast to the other Lords), expressly put his decision upon the footing that the contract remained on foot, but he gave a very strict construction to the words " in transit " and held that it did not apply to goods not actually in transit which had wrongly been delivered to a railway cloakroom.

But where there is a breach of a fundamental term the law has taken an even firmer line for there is a strong, though rebuttable, presumption that in inserting a clause of exclusion or limitation in their contract the parties are not contemplating breaches of fundamental terms and such clauses do not apply to relieve a party from the consequences of such a breach even where the contract continues in force. This result has been achieved by a robust use of a well-known canon of construction, that wide words which taken in isolation would bear one meaning must be so construed as to give business efficacy to the contract and the presumed intention of the parties, upon the footing that both parties are intending to carry out the contract fundamentally. Thus, in *Leduc & Co. v. Ward and Others*, (1888) 20 Q.B.D. 475, where the charter-party was for a voyage from Fiume to Dunkirk " with liberty to call at any ports in any order " it was construed by Lord Esher, M.R., to mean any ports which would be substantially ports which in the course of the voyage would be passed on the named voyage, so that a call at Glasgow was held to be a deviation and, therefore, a breach of the fundamental term, notwithstanding the wide words of the exception. Again, in your Lordships' House in *Glynn and Others v. Margetson & Co. and Others*, [1893] A.C. 351: under a bill of lading the ship was to carry oranges from Malaga to Liverpool, but the words of exclusion permitted the ship to visit almost any ports in Europe or Africa. The voyage from Malaga to Liverpool was treated by Lord Herschell, L.C. (*ibid.*, at p. 355) as the main object and intent of the contract (that is, parenthetically, a fundamental term) and the wide words permitting calls at almost any port must be cut down so as not to defeat that object and intent. Lord Halsbury said (*ibid.*, at p. 357):

> . . . Looking at the whole of the instrument, and seeing what one must regard, for a reason which I will give in a moment, as its main purpose, one must reject words, indeed whole provisions, if they are inconsistent with what one assumes to be the main purpose of the contract. . . .

The cases of *Cunard Steamship Company, Ltd. v. Buerger*, [1927] A.C. 1,[26] and the *Neilson case, sup.*, support the same view. In the former case Lord Parmoor (*sup.*, at p. 13[27]) said of an exception clause:

> . . . [they] do not apply when such loss or damage has occurred outside the route or voyage contemplated by the parties . . . unless the intention that such limitations should apply is expressed in clear and unambiguous language. . . .

In the latter case Lord Dunedin said ([1922] 2 A.C. 263, at p. 272):

> . . . a broad principle of great importance in all contracts of carriage that when a carrier protects himself by exceptions, *unless they are very clearly worded*, they only apply to his carrying out of the contract and do not apply if he is doing something which he has not contracted to do. . . .[28]

Both noble Lords were dealing with what we now call fundamental terms and illustrate both the presumption and its rebuttable character.

The appellants relied strongly on the case of *Charterhouse Credit Company, Ltd. v. Tolly*, [1963] 2 Q.B. 683. That case affords no help to them for it was dealing with breach of a fundamental term and there is no suggestion of such a breach in this case. That case is open to review by your Lordships and having had the advantage of much fuller argument than was afforded to us in the Court of Appeal

---

[26] *Sub. nom. Buerger v. Cunard Steamship Company, Ltd.*, (1926) 25 Ll.L.Rep. 215.
[27] *Ibid.*, at p. 220.
[28] Emphasis supplied by Lord Upjohn.

in that case it is possible that the true justification of that decision lies in the application of the presumption I have mentioned to the relevant clause of exclusion in that case.

My Lords, in view of the introduction in the questions posed by the arbitrator of the impact of a presumed wilful default for my part I think it is only necessary to say that it seems to me as a matter of general principle that wilful default in connection with the matters we are now considering is relevant and relevant only to one matter, that is to say, whether in fact the owners can establish a fundamental breach. In cases such as this, where there has been no breach of any fundamental term, the question as to whether there has been a fundamental breach must be a question of fact and degree in all the circumstances of the case but one of the elements in reaching a conclusion upon that matter is necessarily the question as to whether there has been a wilful breach, for as a practical matter it cannot be doubted that it is easier to find as a fact, for such it primarily is, that the charterers are evincing an intention no longer to be bound by the terms of the contract and are therefore guilty of repudiatory conduct if it can be established that the breaches have been wilful and not innocent. I say no more upon that.

My Lords, I would dismiss this appeal.

**Lord WILBERFORCE:** My Lords, I agree that the present appeal, in so far as it is based upon the reasons advanced in the original case lodged by the appellants, must fail and I do not find it necessary to add to the reasons for so finding given by Mr. Justice Mocatta and the Court of Appeal. It is only upon the submissions contained in the appellants' supplementary case that I desire to add some observations, since these involve some issues of general importance in the law of contract.

The nature of the appellants' contentions can most conveniently be seen from the answer which they suggest should be given to the questions stated in the consultative case.   To the first question (which is whether the owners can recover damages suffered by reason of the respondents having failed to load and discharge the vessels within the lay days whereby the charter-party was rendered less profitable to the owners by consequent loss of voyages or voyage time) the appellants suggest the qualified answer

" Yes, if the detention of the vessel was a deviation from or repudiation or fundamental breach of, the charter-party. Otherwise, no."   And they suggest that the same answer should be given to the second question, which is based upon the assumption that such loss of profitability resulted from the respondents' having deliberately (i.e. with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel within the lay days.

In amplification of this, the appellants submit that the qualification appearing in the suggested answer would apply first, if the detention of the vessel caused by the respondents' breaches of contract was in the aggregate so long as to frustrate the commercial purpose of the charter-party, or, secondly, if that detention was deliberate, in the special sense used in the consultative case.  Whether either of these situations existed would be for the arbitrators to find.   I am prepared to deal with the submissions of law so made upon the assumption that it is open to the arbitrators so to find that they might do so.

The appellants' main argument in law is formulated as follows: First, they say that a breach of contract which goes to the root of the contract or which conflicts with its main purpose is a deviation from or a repudiation or fundamental breach of such contract.   Secondly, they contend that exceptions clauses do not apply to breaches which are deviations from or repudiations or fundamental breaches of the contract.  These propositions contain in themselves implicitly or explicitly several distinct lines of argument.   It is necessary to separate the strands before attempting to examine them.

It is convenient first to segregate the reference to what is sometimes (and conveniently) described as the main purpose rule.   This is a rule of construction, a classic statement of which is found in Lord Halsbury's speech in *Glynn and Others v. Margetson & Co. and Others*, [1893] A.C. 351: it can be summed up in his words (*ibid.*, at p. 357):

    . . . Looking at the whole of the instrument, and seeing what one must regard . . . as its main purpose, one must reject words, indeed whole provisions, if they are inconsistent with what one assumes to be the main purpose of the contract. . . .

[1966] VOL. 1]        Suisse Atlantique v. N.V. Rotterdamsche        [Lord WILBERFORCE

The decision in that case was that printed words in a document intended to be used in a variety of contracts of affreightment between a variety of ports ought to be restricted so as to be consistent with the purpose of the particular charter-party which was for a voyage from Malaga to Liverpool. There is no difficulty as to this, and I shall consider in due course whether it has any application to the relevant clause (i.e. the demurrage clause) in the contract.

Next for consideration is the argument based on "fundamental breach" or, which is presumably the same thing, a breach going "to the root of the contract". These expressions are used in the cases to denote two quite different things, namely, (i) a performance totally different from that which the contract contemplates, (ii) a breach of contract more serious than one which would entitle the other party merely to damages and which (at least) would entitle him to refuse performance or further performance under the contract.

Both of these situations have long been familiar in the English law of contract; and it will have to be considered whether the conception of "fundamental breach" extends beyond them. What is certain is that to use the expression without distinguishing to which of these, or to what other, situations it refers is to invite confusion.

The importance of the difference between these meanings lies in this, that they relate to two separate questions which may arise in relation to any contract. These are (as to (i)) whether an "exceptions" clause contained in the contract applies as regards a particular breach and (as to (ii)) whether one party is entitled to elect to refuse further performance.

The appellants, in their submission that exceptions clauses do not apply to "fundamental breaches" or "repudiations" confuse these two questions. There is in fact no necessary coincidence between the two kinds of (so-called fundamental) breach. For, though it may be true generally, if the contract contains a wide exceptions clause, that a breach sufficiently serious to take the case outside that clause, will also give the other party the right to refuse further performance, it is not the case, necessarily, that a breach of the latter character has the former consequence. An act which, apart from the exceptions clause, might be a breach sufficiently serious to justify refusal of further performance, may be reduced in effect, or made not a breach at all, by the terms of the clause.

The present case is concerned with the application · f what may be said (with what justice will be later considered) to be an exceptions clause to a possible type of "fundamental breach". I treat the words "exceptions clause" as covering broadly such clauses in a contract as profess to exclude or limit, either quantatively or as to the time within which action must be taken, the right of the injured party to bring an action for damages. Such a clause must, *ex hypothesi*, reflect the contemplation of the parties that a breach of contract, or what apart from the clause would be a breach of contract, may be committed, otherwise the clause would not be there; but the question remains open in any case whether there is a limit to the type of breach which they have in mind. One may safely say that the parties cannot, in a contract, have contemplated that the clause should have so wide an ambit as in effect to deprive one party's stipulations of all contractual force: to do so would be to reduce the contract to a mere declaration of intent. To this extent it may be correct to say that there is a rule of law against the application of an exceptions clause to a particular type of breach. But short of this it must be a question of contractual intention whether a particular breach is covered or not and the Courts are entitled to insist, as they do, that the more radical the breach the clearer must the language be if it is to be covered. As Lord Parmoor said in *Cunard Steamship Company, Ltd. v. Buerger,* [1927] A.C., at p. 13,[29] in relation to exception clauses :

. . . [they] do not apply when such loss or damage has occurred outside the route or voyage contemplated by the parties . . . unless the intention that such limitations should apply is expressed in clear and unambiguous language. . . .

And in *The Cap Palos,* [1921] P. 458, at p. 471, Lord Justice Atkin similarly said:

. . . I am far from saying that a contractor may not make a valid contract that he is not to be liable for any failure to perform his contract, including

[29] Sub nom. Buerger v. Cunard Steamship Company, Ltd., (1926) 25 Ll.L.Rep. 215, at p. 220.

even wilful default; but he must use very clear words to express that purpose . . .

In application to more radical breaches of contract, the Courts have sometimes stated the principle as being that a " total breach of the contract " disentitles a party to rely on exceptions clauses. This formulation has its use so long as one understands it to mean that the clause cannot be taken to refer to such a breach but it is not a universal solvent: for it leaves to be decided what is meant by a " total " breach for this purpose—a departure from the contract? but how great a departure?; a delivery of something or a performance different from that promised? but how different? No formula will solve this type of question, and one must look individually at the nature of the contract, the character of the breach and its effect upon future performance and expectation and make a judicial estimation of the final result.

A few illustrations from three groups of decided cases may explain how the Courts have dealt with this problem.

(i) *Supply of a different article*: As long ago as 1838, where the contract provided for the supply of peas, but beans were delivered, Lord Abinger, C.B., explained the difference between this case and a breach of " condition ":

. . . the contract is to sell peas, and if he sends him any thing else in their stead, it is a non-performance of it. . . .

(*Chanter v. Hopkins*, (1838) 4 M. & W. 399, at p. 404.) This was followed (after the Sale of Goods Act, 1893), in *Pinnock Brothers v. Lewis and Peat, Ltd.*, [1923] 1 K.B. 690,[30] (copra cake) and Lord Justice Pearson accepted the principle, while modernizing the illustration (chalk for cheese) in *U.C.S. Finance, Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A.*, [1964] 1 Lloyd's Rep. 446. Since the contracting parties could hardly have been supposed to contemplate such a mis-performance, or to have provided against it without destroying the whole contractual substratum, there is no difficulty here in holding exception clauses to be inapplicable.

(ii) *Hire-purchase cases*: In several recent decisions, the Courts have been able to hold wide exception clauses inapplicable by finding that what was delivered was totally different from that

promised. Such are *Karsales (Harrow), Ltd. v. Wallis*, [1956] 1 W.L.R. 936, and *Charterhouse Credit Company, Ltd. v. Tolly*, [1963] 2 Q.B. 683. These cases, and others, follow the judgment of Mr. Justice Devlin in *Smeaton Hanscomb & Co., Ltd. v. Sassoon I. Setty, Son & Co. (No. 1)*, [1953] 1 W.L.R. 1468; [1953] 2 Lloyd's Rep. 580, where he expressed the test as being whether there was a performance totally different from that contemplated by the contract. In some of these cases difficult questions of fact have arisen in deciding whether there is the total difference, or merely a serious breach of contract, as can be seen by comparing the *Karsales case, sup.*, with *Astley Industrial Trust, Ltd. v. Grimley*, [1963] 1 W.L.R. 584, and some doubt may be felt whether the right result on the facts was reached in *Charterhouse v. Tolly, sup.*; but the principle is well in line with that of the cases mentioned under (i).

(iii) *Marine cases relating to deviation*: There is a long line of authority the commencement of which is usually taken from the judgment of Tindal, C.J., in *Davis v. Garrett*, (1830) 6 Bing. 716, which shows that a shipowner, who deviates from an agreed voyage, steps out of the contract, so that clauses in the contract (such as exceptions or limitation clauses) which are designed to apply to the contracted voyage are held to have no application to the deviating voyage. The basis for the rule was explained in *Stag Line, Ltd. v. Foscolo, Mango & Co., Ltd., and Others*, [1932] A.C. 328,[31] by Lord Russell of Killowen in these terms (*ibid.*, at p. 347[32]):

. . . It was well settled before the Act [of 1924] that an unjustifiable deviation deprived a ship of the protection of exceptions. They only applied to the contract voyage. . . .

In *The Cap Palos*, [1921] P. 458, at p. 471, Lord Justice Atkin had applied this principle to contracts generally, adopting for this purpose the formulation of Lord Justice Scrutton in *Gibaud v. Great Eastern Railway Company*, [1921] 2 K.B. 426, at p. 435:

. . . The principle is well known, and perhaps *Lilley v. Doubleday* ((1881) 7 Q.B.D. 510) is the best illustration, that

---

[30] (1923) 14 Ll.L.Rep. 277.

[31] *Sub nom. Foscolo, Mango & Co., Ltd., and H. C. Vivian & Co., Ltd. v. Stag Line, Ltd.*, (1931) 41 Ll.L.Rep. 165.

[32] *Ibid.*, at p. 173

if you undertake to do a thing in a certain way, or to keep a thing in a certain place, with certain conditions protecting it, and have broken the contract by not doing the thing contracted for in the way contracted for, or not keeping the article in the place in which you have contracted to keep it, you cannot rely on the conditions which were only intended to protect you if you carried out the contract in the way in which you had contracted to do it. . . .

The words "intended to protect you" show quite clearly that the rule is based on contractual intention.

The conception, therefore, of "fundamental breach" as one which, through ascertainment of the parties' contractual intention, falls outside an exceptions clause is well recognized and comprehensible. Is there any need, or authority, in relation to exceptions clauses, for extension of it beyond this? In my opinion there is not. The principle that the contractual intention is to be ascertained—not just grammatically from words used, but by consideration of those words in relation to commercial purpose (or other purpose according to the type of contract)—is surely flexible enough, and though it may be the case that adhesion contracts give rise to particular difficulties in ascertaining or attributing a contractual intent, which may require a special solution, those difficulties need not be imported into the general law of contract nor be permitted to deform it.

The only new category of "fundamental breach" which in this context I understand to have been suggested is one of "deliberate" breaches. This most clearly appears in the Privy Council case of *Sze Hai Tong Bank, Ltd. v. Rambler Cycle Company, Ltd.,* [1959] A.C. 576; [1959] 2 Lloyd's Rep. 114. The decision itself presents no difficulty and seems to have been based on construction: it was that an exceptions clause referring to "discharge" of the goods did not apply to a discharge wholly outside the contract, a case I would have thought well within the principle of the "deviation" cases. But the appellants rely on one passage in the judgment of the Board which seems to suggest that "deliberate" breaches may, of themselves, form a separate category, citing three previous English decisions. Two of them—*Alexander v. Railway Executive,* [1951] 2 K.B. 882, and *Karsales (Harrow), Ltd. v. Wallis,*

[1956] 1 W.L.R. 936 (on which I have already commented) are straightforward cases of "total departure" from what is contractually contemplated and present no difficulty. The third, *Bontex Knitting Works, Ltd. v. St. John's Garage,* (1943) 60 T.L.R. 44, does not appear to be based on the deliberate character of the breach. The decision may be justified on the basis that there was a breach of contract equivalent to a deviation, but if it goes beyond this I would regard it as of doubtful validity. The "deliberate" character of a breach cannot, in my opinion, of itself give to a breach of contract a "fundamental" character, in either sense of that word. Some deliberate breaches there may be of a minor character which can appropriately be sanctioned by damages: some may be, on construction, within an exceptions clause (for example, a deliberate delay for one day in loading). This is not to say that "deliberateness" may not be a relevant factor: depending on what the party in breach "deliberately" intended to do, it may be possible to say that the parties never contemplated that such a breach would be excused or limited: and a deliberate breach may give rise to a right for the innocent party to refuse further performance because it indicates the other party's attitude towards future performance. All these arguments fit without difficulty into the general principle: to create a special rule for deliberate acts is unnecessary and may lead astray.

I now come to the facts of the present case. First, it is necessary to decide what is the legal nature of the demurrage clause: is it a clause by which damages for breach of the contract are agreed in advance, a liquidated damages clause as such provisions are commonly called, or is it, as the appellants submit, a clause limiting damages? If it is the latter, the appellants are evidently a step nearer the point when they can invoke cases in which clauses of exception, or exemption, do not apply to particular breaches of contract. The appellants' strongest argument here rests upon the discrepancy which they assert to exist between the demurrage rate of 1000 dols. per diem and the freight rate for which the charter-party provides. The extent of the discrepancy is said to be shown by the difference between the appellants' claim for lost freight (which is of the order of 900,000 dols. on one calculation and 600,000 dols. on another) and the amount which they would receive

under the demurrage provision, which is approximately 150,000 dols. So, the argument runs, the 1000 dols. per diem cannot be a pre-estimate of damage: it must be a limit in the charterer's favour.

I am unable to accept this. Leaving aside that the figures quoted for lost freight represent merely the owners' claim, it must be borne in mind that the 1000 dols. a day figure has to cover a number of possible events. There might have been delay for one day or a few days beyond the laytime, in which case the owners might, and probably would, lose nothing in the way of freight and only suffer through increased overheads in port. Even if a case were to arise where freight was lost, over a period of two years circumstances might well change, which would affect adversely the owners' anticipated rate of profit. So I am far from satisfied that any such discrepancy has been shown between the agreed figure and reality as requires the conclusion that the clause is not what on its face it purports to be—particularly when one bears in mind that each side derives an advantage from having the figure fixed and so being assured of payment without the expense and difficulty of proof.

The form of the clause is, of course, not decisive, nor is there any rule of law which requires that demurrage clauses should be construed as clauses of liquidated damages; but it is the fact that the clause is expressed as one agreeing a figure, and not as imposing a limit: and as a matter of commercial opinion and practice demurrage clauses are normally regarded as liquidated damage clauses. (This has the authority of Scrutton on Charter-parties, 10th and following editions, and see *Chandris v. Isbrandtsen-Moller Company, Inc.,* [1951] 1 K.B. 240, at p. 249,[33] per Mr. Justice Devlin.

The clause being, then, one which fixes, by mutual agreement, the amount of damages to be paid to the owners of the vessel if "longer detained" than is permitted by the contract, is there any reason why it should not apply in the present case in either of the assumed alternatives, i.e. either that the aggregated delays add up to a "frustrating" breach of contract, or that the delays were "deliberate" in the special sense? In answering these questions it is necessary to have in mind what happened. It appears that there was an initial dispute between the owners

and the charterers in which the owners claimed that they were entitled to treat the charterers as having repudiated the charter-party. This dispute was resolved by an agreement on Oct. 8, 1957, under which the charterers agreed to pay an agreed sum as demurrage, leaving it to arbitration to decide whether the owners' claim was correct and, if so, what damages they should recover. It was further agreed that the charter-party should be performed for the remainder of the agreed two-year period. The manner in which it was performed is set out in a schedule to the consultative case. There were eight voyages in all, the last terminating on Mar. 7, 1959, three days before the termination date. It is as regards these eight voyages that it is claimed that the delays in question occurred. During the whole of the period, although the periods spent in port on either side of the Atlantic (in fact at Rotterdam and, in every case but the first, Newport News) must have been known to the owners, who must also have been in a position to ascertain the availability of cargo and of loading and discharging facilities, the owners took no steps which would indicate that they regarded the charter-party as repudiated: they did not sail their vessel away but allowed her to continue with further voyages and took demurrage at the agreed rate for the delays. So there is no question here of any termination of the contract having taken place. Is there, then, any basis upon which the owners can escape from their bargain as regards detention of the vessel? In my opinion there is not. The arbitrators can (on the assumptions required) only find that the breach of contract falls within one, or other, or both of the two stated categories, namely, that they "frustrate the commercial purpose of the charter-party," or that the delays were "deliberate" (in the special sense). In either case, why should not the agreed clause operate? Or what reason is there for limiting its application to such delays as fall short of such as "frustrate the commercial purpose" or such as are not "deliberate"? I can see no such reason for limiting a plain contractual provision, nor is there here any such conflict between the demurrage clause and the main purpose of the contract as to bring into play the doctrine of *Glynn v. Margetson, sup.* On a consideration of the nature of this clause, together with the events which took place, and in particular the fact that the owners did not during its currency put an end to

[33] (1950) 83 Ll.L.Rep. 385, at p. 395.

[1966] VOL. 1]    Compania Naviera Termar S.A. v. Tradax Export S.A.

the contract, I reach the conclusion that the owners are clearly bound by it and can recover no more than the appropriate amount of demurrage.

I find support for this conclusion in two decisions of the Court of Appeal. In *Inverkip Steamship Company, Ltd. v. Bunge & Co.*, [1917] 2 K.B. 193, there was a detention of the ship beyond (as was held) a reasonable time for keeping her on demurrage. The demurrage clause was in a similar form to that in the present case: "if detained longer than five days," and was held to be applicable to the whole period of delay. The Court of Appeal did not decide the question whether the delay was such as to amount to a "repudiatory breach," so that the master could have sailed away, but the implication at least of the judgment of Lord Justice Warrington is that the same result would have followed if this had been so. Then in *Ethel Radcliffe Steamship Company, Ltd. v. W. & R. Barnett, Ltd.*, (1926) 24 Ll.L.Rep. 277; (1926) 31 Com. Cas. 222, there was a deliberate detention. The arbitrators' actual finding (which it is relevant to compare with the possible finding here) was that

> The respondents neglected and refused to give such orders until Aug. 29, 1924, and did so deliberately as it suited their business arrangements to keep the steamer at St. Vincent. . . .

It was argued that the charterer had repudiated the contract and that the demurrage clause did not cover wilful detention, but the Court of Appeal held to the contrary. Counsel for the appellants submitted that these cases were wrongly decided but they seem to me to be entirely in accordance with principle, and I respectfully agree with them.

On the whole case, I would dismiss the appeal.

---

## HOUSE OF LORDS

Monday, Mar. 14, 1966

COMPANIA NAVIERA TERMAR S.A. v. TRADAX EXPORT S.A.

Before Viscount SIMONDS, Viscount DILHORNE, Lord HODSON, Lord GUEST and Lord UPJOHN

**Charter-party—Demurrage—"Time used in shifting from . . . anchorage to . . . berth in Hull not to count as laytime"—Whether delay (due to insufficiency of depth of water) for charterers' or shipowners' account—Baltimore Berth Grain Charter Party.**

Motor vessel *Ante Topic* was chartered by owners to charterers for carriage of corn from U.S. port to London or Hull. Charter provided (*inter alia*):

> 17. In the event of the vessel being ordered to Hull and being unable to berth immediately upon arrival on account of congestion, time to count from next working period after vessel's arrival at Spurnhead anchorage but time used in shifting from such anchorage to discharging berth in Hull not to count as laytime.

*Ante Topic* was ordered by charterers to discharge at Hull. Laytime was 4 days 11 hours 15 minutes. *Ante Topic* arrived off Spurn Head on Thursday, Nov. 21, 1963, but no berth was available. *Ante Topic* anchored and notice of readiness was then given and accepted, laytime commencing at 08 00 hours on Nov. 22. Berth became available and *Ante Topic* was given permission by port authority to proceed up river at 21 44 hours on Nov. 22, but *Ante Topic* was unable to proceed up river, owing to insufficiency of depth of water, until 22 40 hours on Nov. 26. *Ante Topic* berthed at Hull at 02 00 hours on Nov. 27, and discharging was completed on Dec. 4. There was a dispute between owners and charterers as to whether demurrage was payable in respect of period *Ante Topic* was delayed at anchorage after berth became available (i.e. 4 days 56 minutes from 21 44 hours on Nov. 22 until 22 40 hours on Nov. 26). In the arbitration umpire awarded in favour of charterers and stated special case. Owners contended that once laytime commenced it continued to run unless the contrary were expressly provided, or an exception clause applied, or owner was in some default; and that "time used in shifting" was not apt to cover time that was not used in shifting. Charterers contended that Clause 17 should not be