# EXHIBIT 10

May 10, 1950.]   LLOYD'S LIST LAW REPORTS.   [Vol. 83.—385

K.B.]   Chandris v. Isbrandtsen-Moller Company, Incorporated.   [K.B.

not other challenges, one of which was quite reasonably successful, and the other rather dropped out of the picture, but I do not think it is a case of adding up figures and mere arithmetic. The real fight was about this interest; that is what we were all really worried about. I have not worked it out; the interest will come to quite a substantial sum, will it not?

Mr. BOYES: About £4000, I think, my Lord. If the point with regard to the interest had been the only point, my Lord, there would have been no need to have printed the record in this case.

Lord MERRIMAN, P.: The evidence, you mean?

Mr. BOYES: Yes, my Lord.

Lord MERRIMAN, P.: There is that, of course. That is quite true, Mr. Carpmael, is it not?

Mr. CARPMAEL: Yes. We had to print it because the learned Registrar had disallowed a very large part of Item 4, and a large part of the evidence was required with regard to that; we could not pick and choose, in my respectful submission.

Lord MERRIMAN, P.: I see the point. There is a certain amount of extra expense in the printing of the record. You used it for one purpose, on which you have succeeded, but it was also there for other purposes which you abandoned. Would this not be fair, if I say that the printing of the record should be considered separately, and should be half and half: you should only get half the costs of printing the record, but otherwise get the costs of the motion.

Mr. CARPMAEL: If your Lordship pleases.

---

## KING'S BENCH DIVISION.

Feb. 8, 9, 10, 1950.

CHANDRIS v. ISBRANDTSEN-MOLLER COMPANY, INCORPORATED.

Before Mr. Justice DEVLIN.

*Charter-party—Demurrage—Damages for detention — Dangerous cargo —Shipment with consent of master—Ejusdem generis rule — Interest — Plaintiff's steamship chartered by defendants to load in New York/Jacksonville range a full and complete cargo for discharge at Liverpool—"Cargo to consist of lawful general merchandise, excluding acids, explosives, arms, ammunition or other dangerous cargo . . ."—Incorporation of United States Carriage of Goods by Sea Act, 1936—Cargo shipped including 1546 tons of turpentine—Freight accepted by shipowner at charter-party rate—Arrival at Liverpool dock—Ship ordered by authorities to discharge overside in river owing to dangerous nature of turpentine—Extra expenses incurred by ship—Additional time taken in discharging—Claim by shipowner—Measure of damage where dangerous cargo shipped in breach of charter-party — Whether turpentine "other dangerous cargo"—Interpretation of ejusdem generis rule—Purpose of rule—Turpentine shipped with consent of master—Liability of shipper under U.S. Act where cargo of a "dangerous nature" shipped with consent of master—Whether liability of charterers in respect of additional time taken in discharging dangerous (or "non-contract") cargo limited by provisions of demurrage clause or assessable as damages at large—Applicability of demurrage clause assuming shipment of turpentine was in breach of fundamental obligation under charter-party —Shipowner's option where "non-contract" cargo tendered—Affirmation by shipowner — Effect — Arbitration— Award including damages for detention in respect of additional discharging time taken—Jurisdiction of arbitrator to award interest—Case stated—United States Carriage of Goods by Sea Act, 1936, Sect. 4 (6).*

Case 1:07-cv-07469-JGK   Document 19-11   Filed 10/25/2007   Page 3 of 16

386—Vol. 83.]     LLOYD'S LIST LAW REPORTS.     [May 10, 1950.

K.B.]     Chandris v. Isbrandtsen-Moller Company, Incorporated.     [K.B.

————*Held*, (*1*) *that general words were* prima facie *to be considered as having their natural and larger meaning and not to be restricted to things* ejusdem generis *with those previously enumerated, unless there was something to show an intention so to restrict them; that in this case there was nothing in the " cargo " clause which indicated an intention that " other dangerous cargo " was restricted to cargo in the nature of " acids, explosives, arms, ammunition "; and that therefore the charterers were in breach in shipping turpentine, which was a dangerous cargo.*

————*Anderson v. Anderson*, [*1895*] *1 Q.B. 749, applied.*

————*Held*, (*2*) *that the shipment of cargo of a " dangerous nature " with the consent of the master (Sect. 4 (6) of the U.S. Act) did not preclude a claim by the shipowner against the shipper for damages.*

————*Held*, (*3*) *that although the charterers were in breach in shipping dangerous or " non-contract " cargo, the shipowner in accepting such cargo without complaint must be treated as having accepted it as coming within the contract description and subject to their right to damages within the contract terms.*

————*Held*, (*4*) *that the damages recoverable for the delay were limited by the demurrage clause even if the charterers' failure to provide " contract " cargo was a breach of a fundamental obligation.*

————*Inverkip Steamship Company, Ltd. v. Bunge & Co.*, [*1917*] *2 K.B. 193, followed.*

————*Held*, (*5*) *that the arbitrator had no jurisdiction to award interest.*

————*Podar Trading Company, Ltd. v. Francois Tagher*, [*1949*] *2 K.B. 277; 82 Ll.L.Rep. 705, followed.*

————*Alternative award limiting shipowner to recovery under demurrage clause upheld.*

This was an award in the form of a special case stated by Sir Robert Aske, K.C., as arbitrator, in a dispute in which Evgenia J. Chandris, administratrix of the estate of J. D. Chandris, owner of the Greek steamship *Evgenia Chandris*, claimed damages for breach of charter-party against the charterers of the ship, Isbrandtsen-Moller Company, Inc. The questions for decision concerned the right of the charterers to load turpentine under the charter-party, and the measure of damages for detention of the ship if such cargo was shipped in breach of the charter-party terms.

By the charter-party, which was dated Nov. 22, 1940, it was agreed that the steamer should load in the New York/Jacksonville range a full and complete cargo of wheat and/or maize, and/or other lawful merchandise, including deckload at shipper's risk, and therewith proceed to Liverpool and deliver the same.

The charter-party further provided (*inter alia*):

14. Lay days at port or ports of loading are . . . to commence on the day following receipt by charterers' agents of captain's written notice of readiness whether in berth or not . . .

15. If the steamer be not sooner dispatched, a total of fourteen (14) weather working [days] (Sundays and holidays excepted) shall be allowed the charterers for loading and discharging. Should the cargo not be delivered to vessel at loading ports and/or discharged at port of destination within the specified time, for each and every day over and above said lay days, charterers are to pay, day by day, the sum of £100 British sterling per day demurrage . . . .

26. Cargo to consist of lawful general merchandise, excluding acids, explosives, arms, ammunition or other dangerous cargo, also livestock.

The charter-party also incorporated the United States Carriage of Goods by Sea Act, 1936.

According to the award, the steamer proceeded to Jacksonville as her first port of loading under the charter-party and notice of readiness was given on Mar. 13, 1941. She completed loading cargo there on Mar. 19, and loaded further cargo at Norfolk and Newport News between Mar. 24 and Apr. 4, 1941. The cargo included 1546 tons of turpentine in steel drums shipped at Jacksonville.

The steamer proceeded via Halifax to Liverpool, where she arrived on May 25, 1941, and began discharging in dock on May 27. Such discharge continued until

May 10, 1950.]    LLOYD'S LIST LAW REPORTS.    [Vol. 83.—387

K.B.]    Chandris v. Isbrandtsen-Moller Company, Incorporated.    [K.B.

May 29, when the steamer was on the orders of the Port Emergency Committee moved into the River Mersey in order there to discharge the rest of her cargo. Discharge into barges in the river was carried out and was completed on June 18, 1941.

The claimant claimed that the shipment of the turpentine was in breach of the charter-party and that she had thereby suffered damage, and further that the cargo was not loaded and discharged within the lay days specified and that demurrage became payable. She also claimed damages for breach of an oral warranty.

The claimant contended that turpentine was dangerous cargo, and as such was outside the terms of the charter-party, and the learned arbitrator found on the evidence that the 1546 tons of turpentine in steel drums were dangerous cargo.

The respondent charterers contended that if the turpentine was dangerous, it was not such cargo as was excluded by Clause 26 of the charter-party; that the *ejusdem generis* principle applied; and that the test was whether turpentine was like any of the other excluded goods specified in the clause. The claimant contended that that principle did not apply to Clause 26; that in any case the test was whether turpentine was within a *genus* comprising all the specified goods; and that, if it was possible to frame a *genus* in this case, it would be sufficiently wide to include turpentine.

On the question whether turpentine was "like" any of the goods specified, the arbitrator found that turpentine was a volatile inflammable liquid. Its flash point was 90 deg. to 95 deg. F., at which it gave off a vapour which, with air in certain proportions, formed an inflammable and explosive mixture. Generally, the risk in the carriage of turpentine was inflammability rather than explosion; but in a confined space, if the temperature was sufficiently high, an explosion involving considerable concussion might result. The chief danger in the carriage of acids was corrosion, though tainting of certain types of other cargo might also result. Turpentine did not cause corrosion, but could taint certain types of cargo. In the arbitrator's view, turpentine was not an explosive or an acid in the common acceptation or commercial understanding of those terms, and was not "like" any of the excluded goods specified.

The charterers also contended that, if the shipment of turpentine was a breach of the charter-party, such breach was waived, in that the master and the agents of the owner at Jacksonville orally on or about Mar. 13, 1941, or impliedly by conduct consented to the shipment with knowledge of the nature and character of turpentine. The claimant denied the alleged waiver, and further contended that the master and agents had no authority from the owner to vary any of the terms of the charter-party or to waive the alleged or any breach of its terms or to consent to any shipment of turpentine.

On these questions the arbitrator found that on about Mar. 13, the master heard from the foreman stevedore that turpentine, resin, pitch and timber were to be shipped. The master went to the offices of the ship's agents, Messrs. McGiffin & Co., and there met J. A. Kaufmann, who was in the service of the charterers' agents. The master stated to Kaufmann that he thought that the cargo he was getting was dangerous. Kaufmann replied that it was not dangerous, and that all ships loaded it under the same charter-party. The manager of Messrs. McGiffin & Co. was present at the interview. The master stated in evidence that he did not remember whether the manager took any part in the conversation, but that he (the manager) might have agreed that turpentine was common cargo from Jacksonville. The arbitrator inferred that he did so agree, because the master stated that he had to "trust his agents that turpentine was not dangerous and that all ships were carrying it." The master raised no objection to the turpentine being shipped after this conversation, and he knew of the nature and character of turpentine, and consented to the shipment with knowledge of its nature and character. The arbitrator said that there was no evidence that the ship's agents objected to the shipment of the turpentine, but he could not find that they consented thereto. Further, in his view, neither the master nor the ship's agents waived or agreed or intended to waive any of the rights or remedies of the owner in respect of such shipment or any breach of the charter-party or to vary any of the terms of the charter-party, and neither the master nor the ship's agents had any authority of the owner, express or implied, so to do.

The claimant also sought to recover all damages and expenses directly or indirectly arising out of or resulting from the shipment under the terms of Sect. 4 (6) of the United States Carriage of Goods by Sea Act, 1936; but in the arbitrator's view it

388—Vol. 83.]     LLOYD'S LIST LAW REPORTS.     [May 10, 1950.

K.B.]     **Chandris v. Isbrandtsen-Moller Company, Incorporated.**     [K.B.

was not established that the master had not consented to the shipment of the turpentine. On the contrary, he found that the master did consent to its shipment with knowledge of its nature and character.

No claim was advanced before the arbitrator in respect of any common law liability of the charterers in respect of the shipment of turpentine, but it was alleged that Kaufmann expressly warranted to the master that the turpentine was not dangerous, and that in reliance thereon the master permitted it to be shipped. The charterers denied the alleged warranty, and further contended that Kaufmann had no authority from them to give any such warranty.

The arbitrator found that Kaufmann did not give any warranty, nor did he intend to give any warranty. The arbitrator further said that he was not satisfied that the master permitted the shipment in reliance upon the statements made by Kaufmann, or that he regarded such statements as a warranty; nor was it established that Kaufmann had any authority, express or implied, to give the alleged or any warranty on behalf of the charterers.

Under the head of damages, the claimant alleged that the vessel was detained from Apr. 6 to 12 at Newport News and from Apr. 16 to May 6 at Halifax by the refusal of the crew to sail and desertions owing to the dangerous nature of the turpentine, and by the consequent necessity of the master having to engage fresh hands and to persuade them and the remaining members of the crew to sail, and that the claimant had thereby suffered loss and incurred expense.

On this question the arbitrator found that at Newport News and Halifax, the vessel was short of her complement. The reason was that four men were discharged, no reason being stated; 11 officers and men were discharged in order to enter hospital; two men refused to work, no reason being stated; one man was discharged as a deserter; and six men were discharged by mutual agreement, the reason they gave being the nature of the cargo. On Apr. 6, 12 officers and men of the original crew refused to continue their service, stating the nature of the cargo as their reason, but they continued to serve after the master agreed to pay them a bonus for so doing. There was no evidence as to the date when the master agreed to pay the bonus, but in any case this defection on the part of the men caused no detention of the vessel, as she was far short of her complement as above mentioned. The master had had no previous trouble with these men, and they had crossed the Atlantic three times under his command. They made no complaint regarding the turpentine while it was being loaded. The loading was completed on Mar. 19. They made some complaint on Mar. 23, but continued to serve. The next time they complained was on Apr. 6. No evidence was given as to the terms of the crew's engagement.

The arbitrator said that he could not find that the shipment of turpentine made their service fundamentally different from their contract service, or that they were entitled to be discharged because of it or to be paid any extra wages. The discharge of the six men by mutual agreement was purely a voluntary act by the master; and it was that act, and not the nature of the cargo, which caused that shortage in the crew. But in any case, that particular shortage did not result in any detention of the vessel, as she was otherwise considerably short of her complement.

Evidence was given that parcels of turpentine were very frequently shipped from Jacksonville and Savannah, but it was not suggested that any bonus or increased wages were usually or indeed ever paid because of such cargo being on board. There was considerable difficulty in obtaining seamen to cross the Atlantic at the time, possibly because of war risks during the voyage, and other masters were experiencing the same difficulties. It was obviously a temptation to serving men to try to get free from their articles in order to obtain more remunerative or safer work on other ships. The arbitrator said that his inference from a survey of all the circumstances was that the men on this vessel used the shipment of the turpentine as an excuse in order to exploit the difficulties with which the master would be confronted in obtaining other men, and that he paid the bonuses, not because he considered the men were entitled to them, but because of the difficulty he would experience in obtaining substitutes. The master claimed a bonus of £200 for himself in his accounts, and the owner allowed it; but in his evidence the master did not convey the impression that he had been apprehensive about undertaking the voyage, and in a telegram to the owner on Mar. 26 referring to crew trouble he made no suggestion that he regarded the trouble as referable to the cargo shipped. No claim

May 10, 1950.]　　LLOYD'S LIST LAW REPORTS.　　[Vol. 83.—389

K.B.]　　Chandris v. Isbrandtsen-Moller Company, Incorporated.　　[K.B.

was in fact made against the charterers in respect of detention of the vessel through inability to keep or obtain a crew because of the cargo or in respect of consequent expenses incurred until the year 1947.

The arbitrator found that the vessel was detained at Newport News for seven days and at Halifax for 16 days through deficiency of crew, and that such detention caused a loss to the owner of £10,805, including war insurance. He also found that the owner was obliged to pay to certain members of the crew bonuses amounting to £350 to induce them to continue the voyage; £55 1s. 7d. as special bonuses to engineers and firemen for the voyage from Newport News to Halifax with a short crew; and £41 extra expenses of the master in connection with obtaining crew. But in the arbitrator's view it was not established that the refusal of the crew to sail or any deficiency of crew was attributable directly or indirectly to the shipment of turpentine, or that any detention of the vessel at Newport News or Halifax or any of the payments above mentioned were caused or occasioned by the shipment.

The claimant also alleged that at Liverpool the steamer was, because of the dangerous nature of the turpentine, prevented from discharging in dock, and had to move into the river and discharge there, and that she was thereby detained and the claimant was put to extra expenses. The charterers did not dispute that they were liable to pay demurrage for any time occupied in discharge beyond the stipulated lay days, but they denied that they were liable for damages for detention.

On this question the arbitrator found that the steamer arrived at Liverpool on May 25, 1941, and was duly ordered to discharge in dock, and she commenced discharging there on May 27. Such discharge continued until May 29, when the Port Emergency Committee ordered the steamer to move from the dock into the river to complete her discharge. The orders to move were given solely because of the dangerous nature of the turpentine. In fact, the port authorities would not allow any turpentine to be landed on the quay because of its dangerous nature. The discharge in the river was made into craft, and was completed on June 18. If completion of discharge had been permitted to take place in dock, it would have been effected there, and would have been completed by June 2. Further, the discharge occupied 16 days more than the discharge of a cargo which conformed to the contract would have in fact taken. The steamer was therefore detained for 16 days.

If and in so far as it was a question of fact, the arbitrator found that the direct and effective cause of such detention was the shipment of the turpentine. For the period of such detention, the owner was deprived of the use of the vessel, and thereby suffered loss amounting to £6833. The owner was also put to extra expenses amounting to £79 5s. by reason of discharge taking place in the river instead of in dock.

The claimant also claimed demurrage. It was agreed that the time occupied in loading and discharging exceeded the stipulated lay days by 22½ days; and that, if the claim for detention at Liverpool was disallowed, the claimant was entitled to 22½ days' demurrage; and that, if such claim for detention was allowed, the claimant was entitled to 6½ days' demurrage and damages for detention for 16 days.

The arbitrator held that demurrage clauses, like freight and exception clauses, were designed to apply only where cargo of the kind (if any) specified in the contract of affreightment was shipped; and that in Clause 15 of the charter-party in question the words "the cargo" refer to contract cargo and not to cargo the shipment of which was prohibited by the contract. If the charter-party had permitted or provided for carriage of dangerous cargo, the number of lay days and the demurrage rate agreed upon might have been quite different. The basis of all the contractual provisions was that dangerous cargo should not be loaded.

Subject to the decision of the Court on the questions stated below, the arbitrator awarded (by par. 14) that the claimant was entitled to recover against the charterers (a) the sum of £617 10s., being £650 less the 5 per cent. brokerage mentioned in Clause 24, in respect of 6½ days' demurrage; (b) the sum of £6833 damages in respect of 16 days' detention; and (c) the sum of £79 5s., being extra expenses incurred by the owner by reason of discharge having to be made in the river, making a total of £7529 15s. He also awarded that the charterers should pay the cost of the award and also the costs of the reference to be taxed.

The questions for the decision of the Court were whether (a) the charterers were liable to pay damages by reason of the shipment of turpentine in the *Evgenia*

390—Vol. 83.]    LLOYD'S LIST LAW REPORTS.    [May 10, 1950.

K.B.]    Chandris v. Isbrandtsen-Moller Company, Incorporated.    [K.B.

*Chandris*; (b) the charterers were liable to pay damages for detention of the steamer at Liverpool; (c) the charterers were liable to pay damages in respect of the detention of the steamer at Newport News and Halifax or in respect of the amounts paid by the owner in order to retain the crew or in obtaining men.

If the Court answered questions (a) and (b) in the affirmative and question (c) in the negative, then the award should stand.

By par. 17 of his award the arbitrator said that if the Court answered question (a) in the affirmative and questions (b) and (c) in the negative, then he awarded that the charterers do pay to the claimant the sum of £2137 10s. as 22½ days' demurrage, and the sum of £79 5s. extra expenses, making a total of £2216 15s. Further, the charterers should pay the cost of the award and the costs of the reference to be taxed.

The claimant also claimed interest, and a further question for the decision of the Court was whether the arbitrator had jurisdiction to award interest. If he had, then he awarded that the charterers should pay to the claimant the sum of £170 as interest on £2137 10s., which amount was admittedly owing to her, and that £170 be added to the sum which the Court decided was payable by the charterers under the prior provisions of this award.

Mr. A. A. Mocatta and Mr. M. Holman (instructed by Messrs. Holman, Fenwick & Willan) appeared for the claimant; Mr. A. J. Hodgson and Mr. G. N. W. Boyes (instructed by Messrs. Lightbounds, Jones & Co.) represented the charterers.

Judgment was reserved.

---

The following cases are cited in the judgment below:

Aktieselskabet Frank v. Namaqua Copper Company, 2 Ll.L.Rep. 618; 25 Com. Cas. 212;
Aktieselskabet Reidar v. Arcos, Ltd., [1926] 2 K.B. 83; 25 Ll.L.Rep. 30; [1927] 1 K.B. 352; 25 Ll.L.Rep. 513;
Anderson v. Anderson, [1895] 1 Q.B. 749;
Ardan Steamship Company, Ltd. v. Andrew Weir & Co., [1905] A.C. 501;
Beaumont-Thomas v. Blue Star Line, Ltd., 64 Ll.L.Rep. 159;
Burrell & Sons v. F. Green & Co., [1914] 1 K.B. 293;
Glynn v. Margetson & Co., [1893] A.C. 351;
Grant & Co. v. Coverdale, Todd & Co., 9 App. Cas. 470;
Inverkip Steamship Company, Ltd. v. Bunge & Co., [1917] 1 K.B. 31; (C.A.) [1917] 2 K.B. 193;
Jackson v. Union Marine Insurance Company, Ltd., L.R. 10 C.P. 125;
Knutsford, Ltd. v. Tillmanns & Co., (C.A.) [1908] 2 K.B. 385; (H.L.) [1908] A.C. 406;
Larsen v. Sylvester & Co., [1908] A.C. 295;
*Magnhild* (Owners) v. McIntyre Brothers & Co., [1920] 3 K.B. 321; 4 Ll.L.Rep. 130;
Metropolitan Water Board v. Dick, Kerr & Co., [1918] A.C. 119;
Naylor, Benzon & Co., Ltd. v. Krainische Industrie Gesellschaft, [1918] 1 K.B. 331;
Parkinson (Sir Lindsay) & Co., Ltd. v. Commissioners of Works and Public Buildings, [1950] 1 All E.R. 208;
Podar Trading Company, Ltd. v. Francois Tagher, [1949] 2 K.B. 277; 82 Ll.L.Rep. 705;
Schloss Brothers v. Stevens, [1906] 2 K.B. 665;
Steven v. Bromley & Son, [1919] 2 K.B. 722;
Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd., 55 Ll.L.Rep. 159; 41 Com. Cas. 350;
Thames and Mersey Marine Insurance Company, Ltd. v. Hamilton, Fraser & Co., 12 App. Cas. 484;
Thorman v. Dowgate Steamship Company, Ltd., [1910] 1 K.B. 410;
Tillmanns & Co. v. s.s. Knutsford, Ltd., (C.A.) [1908] 2 K.B. 385; (H.L.) [1908] A.C. 406;
Wallis, Son & Wells v. Pratt & Haynes, (C.A.) [1910] 2 K.B. 1003; (H.L.) [1911] A.C. 394.

---

Monday, Mar. 6, 1950.

### JUDGMENT.

**Mr. Justice DEVLIN:** The matter before me is an award stated in the form of a special case; and the facts found by the arbitrator, so far as they are material to the questions that I have to answer, are these. In March, 1941, the *Evgenia Chandris* under a voyage charter loaded at Jacksonville, Fla., a general cargo which included 1546 tons of turpentine. Turpentine is a dangerous cargo. The master consented to its shipment with knowledge of its nature and character; but did not thereby waive any of the rights or remedies of the owner in respect of the shipment, nor had he any authority from the owner so to do. The vessel arrived at Liverpool, which was the port of discharge, on May 25, 1941, and

May 10, 1950.]          LLOYD'S LIST LAW REPORTS.          [Vol. 83.—391
K.B.]          Chandris v. Isbrandtsen-Moller Company, Incorporated.          [K.B.

began discharging on May 27 in dock. On May 29, because of the dangerous nature of the turpentine, she was ordered to move out of the dock and to discharge in the river into craft, with the result that the discharge took 16 days longer than it would otherwise have done.

The first question which I have to consider is whether turpentine is a dangerous cargo within the meaning of Clause 26 of the charter-party. The second is whether, having regard to the fact that the charter-party incorporates the United States of America Carriage of Goods by Sea Act, 1936, the shipment of the turpentine with the knowledge and consent of the master was a breach of the charter-party. If these questions are answered affirmatively, as the arbitrator has answered them, the owner is entitled to the sum of £79 5s., as extra expenses incurred by reason of the discharge having to be made in the river; and is entitled to a further sum in respect of the 16 additional days. Is the further sum to be demurrage at the rate fixed by Clause 15 of the charter-party, or is it to be damages for detention? This is the third question. The arbitrator has decided that it is to be damages which he has assessed at £6833, a much larger figure than the corresponding figure for demurrage. The fourth question is whether the arbitrator has jurisdiction to award interest. He held that he had and has awarded the sum of £170.

I can get rid of this last question at once. In Podar Trading Company, Ltd. v. Francois Tagher, [1949] 2 K.B. 277; 82 Ll.L.Rep. 705, the Divisional Court answered the same question in the negative. Whether or not I am technically bound by a decision of the Divisional Court, I propose to follow this one as a recent and authoritative pronouncement on the law, and I have not therefore invited argument upon it.

The first question depends upon the construction of Clause 26 of the charter-party, which provides:

> Cargo to consist of lawful general merchandise, excluding acids, explosives, arms, ammunition or other dangerous cargo . . .

The question is whether "other dangerous cargo" is to be construed *ejusdem generis* with what goes before. Mr. Hodgson, who says that it is, says that the question turns upon whether or not the rule is correctly stated in the following passage in Scrutton on Charter-parties, 15th Ed., p. 239:

> It must be remembered that the question is whether a particular thing is within the *genus* that comprises the specified things. It is not a question (though the point is often so put in argument), whether the particular thing is like one or other of the specified things.

This paragraph was quoted with approval by Mr. Justice McCardie in *Magnhild* (Owners) v. McIntyre Brothers & Co., [1920] 3 K.B. 321, at p. 332; 4 Ll.L.Rep. 130, at p. 134. The alternative view which the paragraph condemns is the one for which Mr. Hodgson contends, and he can cite in support of it the *dictum* of Mr. Justice Greer (as he then was) in Aktieselskabet Frank v. Namaqua Copper Company, Ltd., 2 Ll.L.Rep. 618; 25 Com. Cas. 212. If the former view is right, Mr. Hodgson cannot suggest a *genus* which would not include turpentine, and so he would fail. If the latter view is right, it is not suggested that turpentine is like any of the specified things, and so Mr. Hodgson would succeed.

Initially, Mr. Hodgson presented his argument as if the choice lay between these two interpretations of the rule and as if there was no question but that the rule in one or other form applied. But I think this is the first question that I have to determine, and indeed, without examining the nature and scope of the rule, I should not be able to find a satisfactory answer on the point propounded.

Anderson v. Anderson, [1895] 1 Q.B. 749, is a decision of the Court of Appeal in relation to a post-nuptial settlement in which all three Lords Justices clearly laid it down that general words were *prima facie* to be considered as having their natural and larger meaning and not to be restricted to things *ejusdem generis* with those previously enumerated, unless there was something in the deed to show an intention so to restrict them. In Tillmanns & Co. v. s.s. Knutsford, Ltd., [1908] 2 K.B. 385, Lord Justice Vaughan Williams, without impeaching the authority of Anderson v. Anderson, *sup.*, sets out other authorities to the opposite effect designed to show that it is the restricted meaning that primarily attaches to the general words. It is perhaps important that this case concerns a charter-party. In Thorman v. Dowgate Steamship Company, Ltd., [1910] 1 K.B. 410, Mr. Justice Hamilton, also dealing with a charter-party, thought it unnecessary to

392—Vol. 83.]　　　LLOYD'S LIST LAW REPORTS.　　　[May 10, 1950.

K.B.]　　　Chandris v. Isbrandtsen-Moller Company, Incorporated.　　　[K.B.

embark upon this discussion. Anderson v. Anderson, *sup.*, is a decision which, unless distinguishable on the ground that I am dealing with a commercial document rather than a settlement, is binding upon me. Apart from its authority, if I may respectfully say so, I entirely agree with it. A rule of construction cannot be more than a guide to enable the Court to arrive at the true meaning of the parties. The *ejusdem generis* rule means that there is implied into the language the parties have used words of restriction that are not there. It cannot be right to approach a document with the presumption that there should be such an implication. To apply the rule automatically in that way would be to make it the master and not the servant of the purpose for which it was designed, namely, to ascertain the meaning of the parties from the words they have used. Of course, the first approach will often show quite plainly that the words are used far more widely than the parties could have intended, as for example "all other perils" in the Lloyd's policy which formed the subject of the well-known decision of Thames and Mersey Marine Insurance Company, Ltd. v. Hamilton, Fraser & Co., 12 App. Cas. 484. The so-called rule is, in short, really only a recognition of the fact that parties with their minds concerned with the particular objects about which they are contracting are apt to use words, phrases or clauses which, taken literally, are wider than they intend. Under the description of *ejusdem generis* the principle is applied to words only. But it is not different from the principle which restricts the meaning of clauses if literally they are inconsistent with the main object of the contract, as in Glynn v. Margetson & Co., [1893] A.C. 351. The same principle is put to work when it is sought to apply such clauses to events not contemplated by the contract, as in Metropolitan Water Board v. Dick, Kerr & Co., Ltd., [1918] A.C. 119, and other similar cases in which frustrating events, though literally covered by the wide language of suspension clauses, have been held not to be within them.

The latter principle has been recently applied in Sir Lindsay Parkinson & Co., Ltd. v. Commissioners of Works and Public Buildings, [1950] 1 All E.R. 208, in which Lord Justice Asquith, at p. 228, referred to the process as

a restriction imposed on the literal scope of the language actually used by the parties, by implication from what they must have contemplated.

And Lord Justice Cohen, at p. 223, applied the principle enunciated by Mr. Justice McCardie in Naylor, Benzon & Co., Ltd. v. Krainische Industrie Gesellschaft, [1918] 1 K.B. 331, at p. 335, that "words, even though general, must be limited to circumstances within the contemplation of the parties." I do not think that the presence of a *genus* or of a series of items alters the nature of the principle or gives it any special significance.

I cannot think that Lord Magnaghten in his rather cryptic observation in Knutsford, Ltd. v. Tillmanns & Co., [1908] A.C. 406, at p. 409, or Mr. Justice Hamilton in Thorman v. Dowgate Steamship Company, Ltd., *sup.*, were intending to say that the rule should be applied more stringently in the case of commercial documents than in the case of settlements. If that is what these two great lawyers had in mind, it would be impossible for me to differ from them. But I find that hard to credit. Legal draftsmen are all familiar with the existence of the rule, and familiar, too, with the proper signals to hoist if they do not want it to apply. Phrases such as "whether or not similar to the foregoing" and "without prejudice to the generality of the foregoing" are often employed in legal draftsmanship; and if the draftsman has read the report of Larsen v. Sylvester & Co., [1908] A.C. 295, he will know that the addition of "what kind soever" generally serves the same purpose. Commercial draftsmen are not usually taught these rules. Moreover, the main argument of construction that justifies the application of the rule does not apply in commercial documents. It is that if the general words have an unrestricted meaning the enumerated items are surplusage. The presumption against surplusage is of little value in ascertaining the intention of the parties to commercial documents, as many great commercial Judges have recognized. In Burrell & Sons v. F. Green & Co., [1914] 1 K.B. 293, Mr. Justice Bailhache, at p. 303, said that he was unimpressed by the argument of redundancy, "because charter-parties often contain many redundant words." In Schloss Brothers v. Stevens, [1906] 2 K.B. 665, Mr. Justice Walton, at p. 673, said:

It was said for the defendant that, if all risks were covered, why refer specially to risks of robbery with or without

May 10, 1950.]    LLOYD'S LIST LAW REPORTS.    [Vol. 83.—393

K.B.]    Chandris v. Isbrandtsen-Moller Company, Incorporated.    [K.B.

violence, negligence, etc? On the other hand, it is very common to find in such contracts, although perfectly general words are made use of, including practically all risks, special reference to particular perils to which it is desired to draw special attention.

Lord Justice Scott in Beaumont-Thomas v. Blue Star Line, Ltd., 64 Ll.L.Rep. 159, at p. 164, referred to the same habit, but less kindlily, as

> the common and pernicious practice of cramming a contract with particular illustrations of some general stipulation —which in a legal sense are wholly unnecessary, and just because they are unnecessary often afford a pretext for limiting general words in a way that was never intended.

Draftsmen of charter-parties—whether of the printed form or of the typewritten clause, but perhaps especially of the latter —are probably not consciously familiar even with the idea of *ejusdem generis*. This charter-party refers, for example, to "a full and complete cargo of wheat and/or maize and/or other lawful merchandise." Nobody has ever, I think, suggested that the merchandise has to be similar to wheat or maize; although the first question which would occur to a lawyer would be to ask himself why the parties bothered to refer to wheat or maize if they meant that the cargo might be anything from chalk to cheese, including turpentine.

I apply the principle laid down in Anderson v. Anderson, *sup.*, and so inquire whether there is anything in the text of this charter-party or in the circumstances in which it was made which would lead me to suppose that the parties intended "other dangerous cargo" to have some limited meaning. I can find no such indication. It seems to me that the only reason why the owner is objecting to acids, explosives, arms or ammunition is because they are dangerous; and that being so he may be presumed to have the same objection to all other dangerous cargo. On this ground, therefore, I think that Mr. Hodgson's contention fails.

This makes it unnecessary for me to deal with the other point. But since it was fully argued and is a point much in dispute, I may permit myself to express shortly my view of it. If the *ejusdem generis* principle is a rule of automatic application, it becomes of the first importance to determine exactly what the rule is. If it is merely, as I think, an aid to ascertaining the intention of the parties, no point of controversy need arise at all. If there is something to show that the literal meaning of the words is too wide, then they will be given such other meaning as seems best to consort with the intention of the parties. In some cases it may be that they will seem to indicate a *genus*; in others that they perform the simpler office of expanding the meaning of each enumerated item. If a *genus* cannot be found, doubtless that is one factor indicating that the parties did not intend to restrict the meaning of the words. But I do not take it to be universally true that whenever a *genus* cannot be found the words must have been intended to have their literal meaning, whatever other indications there may be to the contrary. I see no reason why, if it accords with the apparent intention of the parties, the words should not be treated, as suggested by Lord Macnaghten in Thames and Mersey Marine Insurance Company, Ltd. v. Hamilton, Fraser & Co., *sup.*, at p. 501, as " being inserted in order to , prevent disputes founded on nice distinctions " and " to cover in terms whatever may be within the spirit of the cases previously enumerated."

The next question is the effect of Sect. 4 (6) of the United States Carriage of Goods by Sea Act, 1936. This sub-section, which is in identical terms with the corresponding rule (Art. IV, r. 6) made under the Carriage of Goods by Sea Act, 1924, is in two parts. The first part deals with dangerous goods to the shipment whereof the master has not consented; and the second part deals with such goods to the shipment whereof he has consented. With regard to the first class, the rule provides that the goods may be landed or destroyed without compensation and that the shipper shall be liable for damages resulting from the shipment. With regard to the second class the rule provides only that the goods, if they become a danger to ship or cargo, may be landed or destroyed: and this is subject to the carrier's liability for general average, if any. This second part says nothing at all about liability for damage. Mr. Hodgson argues that since the first part expressly makes the shipper liable for damages and the second part is silent, there must be implied into the second part a provision in contrast to the first that the shipper is not liable for damages.

If this reading of the rule is right, Mr. Hodgson next contends that the charter-party, construed as a whole, does not pro-

394—Vol. 83.]    LLOYD'S LIST LAW REPORTS.    [May 10, 1950.

K.B.]    Chandris v. Isbrandtsen-Moller Company, Incorporated.    [K.B.

hibit absolutely the shipment of all dangerous cargo, but only of dangerous cargo to the shipment whereof the master has not consented. I need not explore the merits of this further contention, for I can see no ground for making the implication in the rule which Mr. Hodgson requires. If it was clear that the Act was intended to provide a complete code in relation to the matters with which it deals, it might be argued that it could not have deliberately remained silent in respect of cargo of the second class, and therefore that some implication must be made. But the Act is not intended as a code. It is not meant altogether to supplant the contract of carriage, but only to control upon certain topics the freedom of contract which the parties would otherwise have. I see no reason why it should not be silent upon such topics as the consequences of shipping cargo with the consent of the master, leaving the matter to be regulated by the parties themselves. On the contrary, I see good reason why silence might be thought desirable, for the consequences might well depend on the terms in which the consent was given or the circumstances in which it was given.

Accordingly, I decide both these two questions against the charterers, and I agree with the arbitrator's conclusion that there has been a breach of the charter-party.

I have next to determine whether the damages for the detention are at large or are governed by the demurrage clause, Clause 15. This clause provides:

Should the cargo not be delivered to vessel at loading ports and/or discharged at port of destination within the specified time, for each and every day over and above said lay days, charterers are to pay, day by day, the sum of £100 British sterling per day demurrage . . .

The discharge took 22½ days over and above the lay days. The owner has claimed and has been awarded demurrage in respect of 6½ of those days; and the fact that the nature of the cargo was responsible for increasing the discharging time from 6½ days to 22½ days, at first sight, appears to be irrelevant, since the clause seems wide enough to apply to delay in discharging, however caused. In holding that the clause does not apply, the arbitrator expressed his view in par. 13 of the award in the following terms:

I hold that demurrage clauses, like freight and exceptions clauses, are designed to apply only where cargo of the kind (if any) specified in the contract of affreightment is shipped; and that in Clause 15 of the charter-party in question the words "the cargo" refer to contract cargo and not to cargo shipment of which is prohibited by the contract. If the charter-party had permitted or provided for carriage of dangerous cargo, the number of lay days and the demurrage rate agreed upon might have been quite different. The basis of all the contractual provisions was that dangerous cargo should not be loaded.

Coming as it does from an arbitrator of great learning and experience, this view is entitled to deep respect.

It was at one time thought that if the owner or charterer committed a breach of some fundamental or basic condition of the contract, such as is involved, for example, in a deviation from the contract voyage, the exceptions clauses in the contract were displaced and the contract could be enforced by the aggrieved party without granting to the other the benefit of any of the exceptions which might otherwise have protected him. The law on this matter was settled by the House of Lords in Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd., 55 Ll.L.Rep. 159; 41 Com. Cas. 350, where it was held that it was governed by the ordinary law of contract. Deviation is a fundamental breach going to the root of the contract, and the aggrieved party is entitled either to rescind or to affirm; if he affirms, he retains his right to damages for the breach, but the contract with all its terms and conditions remains alive for the benefit of the wrongdoer as well as of himself. In the case of the shipment of cargo outside the contract, the owner has in effect a similar right of election, as is instanced by Steven and Another v. Bromley & Son, [1919] 2 K.B. 722. He can treat the shipment as a request to carry the cargo at a reasonable remuneration; and, if he accepts it, the freight clause in the contract will not apply to the non-contractual cargo. Here again no principle is involved peculiar to contracts of carriage and freight clauses, but only the ordinary law.

In Sir Lindsay Parkinson & Co., Ltd. v. Commissioners of Works and Public Buildings, sup., the Court of Appeal held that the payment clause in a building contract was not applicable to work which was not contemplated by the contract, and that the contractor was entitled to recover for it upon an implied contract to pay a reasonable remuneration.

May 10, 1950.]   LLOYD'S LIST LAW REPORTS.   [Vol. 83.—395

K.B.]   Chandris v. Isbrandtsen-Moller Company, Incorporated.   [K.B.

In all these cases the old contract is not displaced unless there is either a rescission of it or evidence from which a new contract can be implied. Mr. Mocatta does not contend that either event has taken place in this case, and neither is alleged in the pleadings in the arbitration which are attached to the award. The owner had previously taken freight in respect of the dangerous cargo at the charter-party rate; and he claimed in the arbitration, as I have said, under the demurrage clause in respect of 6½ days. What Mr. Mocatta contends is that the demurrage clause, while it remains generally effective, is not of its nature applicable to the consequences of the shipment of dangerous cargo. If I understood his argument rightly, it can be considered in two aspects: the clause is inapplicable, first, because the cargo was outside the contractual description, and, secondly, because there was a breach of a fundamental or basic provision of the contract.

A demurrage clause is merely a clause providing for liquidated damages for a certain type of breach. It is presumably the parties' estimate of the loss of prospective freight which the owner is likely to suffer if his ship is detained beyond the lay days. The demurrage rate in this case appears to have been a good deal lower than the freight market rate; and I suppose I need not shut my eyes to the fact that a sum produced by demurrage is generally less than damages for detention, which are presumably assessed by reference to the market rate of freight at the time of the breach. To this extent a demurrage clause may be in practice a concession to the charterer. But I am not, and I do not think I could be, invited to consider it as different in its nature from an ordinary liquidated damage clause.

At first sight it would appear that a demurrage rate should be as applicable to dangerous cargo as to any other sort of cargo. If the discharge of the dangerous cargo takes longer, the demurrage will be larger. Mr. Mocatta has argued, however, that the shipment of dangerous cargo often results in the necessity for paying danger money or some other sort of bonus to officers and crew; and so, if the contract had covered dangerous cargo, a higher rate of freight and of demurrage might well have been demanded. The arbitrator thought so, too; so let it be accepted. It seems to me that it is just because it may well be that neither the demurrage clause nor any other clause of the contract was originally intended to apply to the new situation created by a wrongdoer, that the aggrieved party is given his choice whether he desires them to apply or not. If he thinks that the freight and demurrage rates provided by the contract are insufficient to compensate him, he can rescind and sue upon an implied contract for an adequate remuneration.

A further consideration reinforces this view. It is not contended by Mr. Mocatta that the owner has any option in the matter of applying the demurrage clause. His argument is that it does not apply at all, whether the owner wants it or not. The result is that if the demurrage rate were higher than the market rate of freight at the time of the detention—and even though the former may be designed to be lower, there is always the possibility of a slump in freight rates—the owner would be bound to take the lower rate and the wrongdoer would thus profit from his own wrong.

A similar consideration assisted Lord Atkin in Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd., sup., at pp. 174 and 355 of the respective reports, and Lord Wright, at pp. 178 and 363 of the respective reports, to reject the argument that deviation automatically cancelled the contract, and to prefer the view that it gave the aggrieved party the option of rescinding or affirming. But it is plain that after an election to affirm the whole there cannot be a further option to rescind in part. So Mr. Mocatta is driven to argue that the impact of the new situation ipso facto robs the clause of applicability. That might be so if it had been due to no wrongdoing. The principle laid down in Jackson v. Union Marine Insurance Company, Ltd., L.R. 10 C.P. 125, and applied in Sir Lindsay Parkinson & Co., Ltd. v. Commissioners of Works and Public Buildings, sup., requires that the contract should become inapplicable without any default of either party. Where there is default, the offended party has the advantage of making his choice.

It does not appear to me that the argument, the general nature of which I have considered, is rendered any more attractive by being put as a matter of construction of the demurrage clause and reading "the cargo" in that clause as referring to contract cargo. If this is true of the demurrage clause, it must be true of every other clause. It must follow, therefore, that, notwithstanding that the contract as a whole is affirmed, no clause in it which

396—Vol. 83.]    LLOYD'S LIST LAW REPORTS.    [May 10, 1950.

K.B.]    Chandris v. Isbrandtsen-Moller Company, Incorporated.    [K.B.

refers expressly to "the cargo" can be applicable to the dangerous cargo. A glance at Clauses 7, 9, 10 and 17 of the charter-party shows the devastating effect that this would have. But, of course, all the clauses expressly or impliedly refer to "the cargo," and whether the words are expressly used or not is often a mere accident of draftsmanship. The argument seems to me to lead logically to the conclusion that no part of the affirmed contract can apply. I think the true view is that the party who affirms the contract in circumstances such as this treats the dangerous cargo, subject to his right to damages, as coming within the contract description; and that the term "the cargo" is to be construed accordingly.

I turn now to consider the second aspect of this argument whereunder Mr. Mocatta distinguishes between the breach of a fundamental obligation and the breach of an ordinary term, contending that the demurrage clause does not apply to the former. There is an express obligation on the charterers under this charter-party to furnish a full and complete cargo of lawful merchandise. They have broken that obligation, and it is not disputed that thereby they broke a fundamental obligation, by which I understand to be meant a condition going to the root of the contract the breach of which entitled the owner to rescind. No doubt in the circumstances of this case as they were explored in the arbitration, that was a proper view to take. The turpentine consisted of 1546 tons, though what proportion of the cargo it formed I do not know. Mr. Mocatta says that unless it was *de minimis* there is a breach entitling the owner to rescind, just as he would be able to reject in a contract for the sale of goods. If this is so, the question of the master's implied authority to consent to shipment may require some consideration. If it be the law that an owner who at the end of a voyage discovers that a small portion of cargo (enough to be above *de minimis*) outside the contract description has been shipped, albeit with the knowledge of the master, can tear up the whole contract, it may result in some practical inconvenience. No such question arises for my consideration here, since the owner himself chose to affirm.

The result of the affirmation is that the breach of condition is to be treated as if it were a breach of warranty. In Wallis, Son & Wells v. Pratt & Haynes, [1911] A.C. 394, Lord Loreburn, L.C., at p. 395, puts the position in this way:

> He may treat the breach of the condition as if it was a breach of warranty, that is to say, he may have the remedies applicable to a breach of warranty. That does not mean that it was really a breach of warranty or that what was a condition in reality had come to be degraded or converted into a warranty. It does not become degraded into a warranty *ab initio*, but the injured party may treat it as if it had become so, and he becomes entitled to the remedies which attach to a breach of warranty.

In the same case in the Court of Appeal, [1910] 2 K.B. 1003, Lord Justice Fletcher Moulton, at p. 1013, treats the remedy of damages as being common to all terms of the contract; in the case of a breach of condition, the injured party has the option of another and higher remedy, but if he does not avail himself of it, he will have to be content with his right to damages. I can see nothing in principle to suggest that the damages for the breach of a warranty *ex post facto*, as it is sometimes called, should be any different from those for the breach of a warranty *ab initio*, nor can I see any reason in principle why a liquidated damage clause should not apply with equal efficacy to both.

Mr. Mocatta does not argue that, if the obligation not to load a dangerous cargo had not been in its original form a fundamental obligation, the demurrage clause would not have applied; he would be precluded from doing so by authority. It is useful to review the state of the authorities on this point, because I think that by so doing I can be led to the right conclusion on the merits of Mr. Mocatta's distinction.

It is well settled that in relation to the cargo a charterer has two distinct obligations. The first is to furnish a full and complete cargo which complies with the charter-party; the second is to load and discharge it within the lay days. This distinction first became of practical importance when a charterer, who had failed to get his cargo down to the loading place, contended that he was excused by virtue of an exceptions clause applying to events which prevented loading. In Grant & Co. v. Coverdale, Todd & Co., 9 App. Cas. 470, the House of Lords held that he was not. The Earl of Selborne, L.C., at p. 475, said:

> It would appear to me to be unreasonable to suppose, unless the words make

May 10, 1950.]  LLOYD'S LIST LAW REPORTS.  [Vol. 83.—397

K.B.] Chandris v. Isbrandtsen-Moller Company, Incorporated. [K.B.

it perfectly clear, that the shipowner has contracted that his ship may be detained for an unlimited time on account of impediments, whatever their nature may be, to those things with which he has nothing whatever to do, which precede altogether the whole operation of loading, which are no part whatever of it, but which belong to that which is exclusively the charterer's business. He has to contract for the cargo, he has to buy the cargo, he has to convey the cargo to the place of loading and have it ready there to be put on board; and it is only when he has done those things that the duty and obligation of the shipowner in respect of the loading arises.

A similar point was discussed in Ardan Steamship Company, Ltd. v. Andrew Weir & Co., [1905] A.C. 501. The Lord Ordinary, at p. 502, said:

> The delay was caused, not by the exceptional congestion of shipping, but by the failure of the defenders to perform their primary duty of providing a cargo, and that the principle upon which a reasonable time is allowed to the charterers for loading does not apply to such a case.

The reference to "primary duty" was adopted by the Earl of Halsbury, L.C., in the House of Lords, *sup.*, at p. 510. This appears to be the first place in which the term, which recurs in later cases, was used. Unless it has a special significance in Scots law, I think that the Lord Ordinary was using it merely as a convenient term to describe the nature of the charterer's duty as laid down by Lord Chancellor Selborne. The discharge of the duty is preliminary to the obligation to load; in that sense it is primary.

The owner obtained damages for detention in both these cases, but no question of demurrage arose. The point was therefore unsettled whether a demurrage clause would apply not only to a failure to load within the lay days, but also to a breach of the primary obligation. This question was considered in Inverkip Steamship Company, Ltd. v. Bunge & Co., [1917] 2 K.B. 193. This was a decision of the Court of Appeal in which Lords Justices Warrington and Scrutton delivered judgments with which the Master of the Rolls (Lord Cozens-Hardy) concurred. It will suffice to quote two passages. Lord Justice Warrington, at p. 198, said:

> It was contended that on the true construction of the charter-party the clause I have read [that is to say, the demurrage clause] is confined to mere delays in loading and does not extend to cover detention occasioned by failure to provide a cargo. Reliance was placed on the case of Ardan Steamship Company, Ltd. v. Andrew Weir & Co., *sup.*, as establishing that the obligation to load in accordance with the charter-party and the obligation to provide a cargo are separate and distinct obligations, and I accept that view. But I cannot hold that in the present case the provision for demurrage is confined to delay in loading.

Lord Justice Scrutton, at p. 203, said:

> If there was a breach in not having cargo ready on August 25 the only consequence is detention of the ship, and the damages for that, which is the same detention, however it arises, are agreed in the charter and have been paid.

The authority of this case concludes the point I have to determine unless it can be distinguished, as Mr. Mocatta seeks to do, on the ground that in it the delay in providing the cargo was not a breach of a fundamental obligation. It is argued that the furnishing of a cargo contrary to the charter-party is a breach of contract which by itself and forthwith goes to the root of the matter, whereas delay in providing a cargo depends upon the length of the delay. It was not considered necessary in Inverkip Steamship Company, Ltd. v. Bunge & Co., *sup.*, to decide whether the delay was sufficiently long to entitle the owner to rescind if he had so desired. Mr. Justice Sankey (as he then was) in the Court below, [1917] 1 K.B. 31, thought that it was; Lord Justice Warrington, [1917] 2 K.B. at p. 198, expressed no opinion; and Lord Justice Scrutton, at p. 201, thought that it was not, inasmuch as the circumstances showed that the charterer was not repudiating. The case does, however, show that nobody thought it important to determine whether the breach was fundamental or not. To that extent it accords with the view that I have already expressed, and it remains therefore to consider the authority upon which Mr. Mocatta relies as showing that the point is decisive. This is the judgment of Lord Justice Sargant in Aktieselskabet Reidar v. Arcos, Ltd., [1927] 1 K.B. 352; 25 Ll.L.Rep. 513.

That case decided a point up to then left undetermined. Inverkip Steamship Company, Ltd. v. Bunge & Co., *sup.*, had decided that damages for detention for breach of the obligation to provide a cargo

398—Vol. 83.]    LLOYD'S LIST LAW REPORTS.    [May 10, 1950.

K.B.]    Chandris v. Isbrandtsen-Moller Company, Incorporated.    [K.B.

were covered by the demurrage clause. But supposing that the breach of such an obligation gave rise to damages of a different character, not for detention at all. The demurrage clause could not then provide the measure. Ought the clause to be construed as exhaustive, so that no damages which could not be measured by it could be recovered at all, or ought it to be construed merely as applying to damages for detention, leaving damages of any other character to be assessed at large? The Court of Appeal decided the latter.

The facts were that the vessel was chartered to carry a cargo of timber from a White Sea port to an English port. If she reached the English port before Oct. 31, 1923, she could discharge there a cargo of 850 standards; but if she reached there after that date, she could not, by reason of the Merchant Shipping Act, 1906, enter the port with more than 544 standards. That meant that to carry a full and complete cargo her loading must be completed by Oct. 20. In breach of the charter-party it was not completed by that date, with the result that she did not load more than 544 standards, and the owners sued the charterers for dead freight.

This is a problem which might be dealt with in one of two ways. One way is to say that there has been a breach of contract causing dead freight as damage and that dead freight is not excluded by the demurrage clause, which is not exhaustive; on that way of looking at it the question whether the breach was of a primary or fundamental duty is irrelevant. The alternative way is to say that there has been a breach of the primary or fundamental obligation to load a full and complete cargo and therefore that the demurrage clause does not apply; upon that way of putting it the nature of the damage, whether it was dead freight or detention, would be irrelevant. It seems to me plain that the Court of Appeal chose the former way of dealing with it. Lord Justice Bankes in A/S Reidar v. Arcos, Ltd., *sup.*, thought it unnecessary to decide whether there was a breach of the obligation to load a full and complete cargo, and said, at pp. 362 and 516 of the respective reports, that the loss was recoverable simply as damages for the breach of contract to load at the agreed rate. Lord Justice Atkin, at pp. 363 and 516 of the respective reports, said:

If the lay days expire without a full cargo having been loaded the charterer has broken his contract. The provisions as to demurrage quantify the damages, not for the complete breach, but only such damages as arise from the detention of the vessel.

Neither of these Lords Justices refer in terms to any primary or fundamental obligation. Mr. Justice Greer in the Court below, [1926] 2 K.B. 83, at p. 88; 25 Ll.L. Rep. 30, at p. 32, and Lord Justice Sargant, [1927] 1 K.B. at p. 366; 25 Ll.L.Rep. at p. 518, did refer to the breach of a primary obligation; and it is upon the latter judgment particularly that Mr. Mocatta relies. Lord Justice Sargant said:

The loss inflicted on the owners and claimed by them is loss of another character—namely, loss of freight caused by the breach by the charterers of their contract to load a full and complete cargo, as prescribed by Clause 1 of the charter-party. The obligation of Clause 1 is, in my judgment, rightly described by the learned Judge as the primary obligation. The object of the second sentence of Clause 3 is to provide compensation for a detention of the vessel in the course of fulfilling this primary obligation, not to give compensation for the breach of the primary obligation itself.

Neither Mr. Justice Greer nor Lord Justice Sargant, in the passage I have quoted, disregard the fact that the loss caused was dead freight; Lord Justice Sargant particularly refers to it. If they had been intending to decide the case on the ground that the demurrage clause did not apply to the breach of a primary obligation, it would clearly be necessary to distinguish Inverkip Steamship Company, Ltd. v. Bunge & Co., *sup.*, and explain the difference in the character of the obligations in the two cases. In my judgment, the *ratio decidendi* in A/S Reidar v. Arcos, Ltd., is to be found in the judgments of Lords Justices Bankes and Atkin, and the reference by Lord Justice Sargant to a primary obligation is, strictly speaking, irrelevant. I think that the point I have to consider is in principle determined by Inverkip Steamship Company, Ltd. v. Bunge & Co., *sup.*, and is not touched by the reasoning in A/S Reidar v. Arcos, Ltd., *sup.*

In the result I think that the damages are limited by the demurrage clauses. Accordingly, I answer the first question set out in par. 15 in the affirmative, and the second question in the negative. The third question does not arise because Mr. Mocatta

May 10, 1950.]     LLOYD'S LIST LAW REPORTS.     [Vol. 83.—399

K.B.]     Kerr v. Whimster & Co., Ltd.     [K.B.

agrees that it should be answered negatively as the arbitrator has done. The effect of this is that the alternative award in par. 17 for £2216 15s. is upheld; and as I have answered in the negative the question in par. 20, no sum will be added to that by way of interest.

---

After discussion upon costs, Mr. Justice DEVLIN said: I think in this matter Mr. Hodgson's clients have succeeded, temporarily or permanently, and that I ought to give effect to that. They have reduced the award against them from a sum of some £7000 odd to £2000 odd; but, at the same time, as Mr. Mocatta points out, they have lost upon an issue which although in itself only involves the small sum of £79, carries with it the costs of the arbitration and did in fact occupy a certain amount of time in the argument, because the first two questions I had to consider were involved in it. On the whole I think the fair order would be that Mr. Mocatta's client should pay half Mr. Hodgson's costs of the hearing.

Mr. MOCATTA: There is the very minor point about the costs of setting down, my Lord.

Mr. Justice DEVLIN: You incurred them, did you?

Mr. MOCATTA: Yes, my Lord.

Mr. Justice DEVLIN: Then I will leave you to pay them.

---

## KING'S BENCH DIVISION.

Friday, Jan. 27, 1950.

---

KERR v. WHIMSTER & CO., LTD.

Before Mr. Justice HILBERY.

*Negligence—Invitee—Accident on board ship—Obstruction—Duty of occupiers to provide safe premises and safe means of access—Personal injuries sustained by plaintiff coal trimmer in course of his employment in defendants' ship—Hatch covers piled on deck—Alleged necessity for plaintiff, on leaving ship, to step on hatch covers—Collapse of pile, plaintiff being thrown to deck—Claim brought at common law — Whether defendants had failed to provide safe premises and safe means of access—Onus of proof.*

———*Held, that plaintiff had failed to discharge the onus of proof, in that he had not shown that the hatch covers were so placed that it was necessary for him to step on them on leaving ship; that the accident was due to plaintiff's own negligence; and that therefore plaintiff's claim failed.*

In this action, the plaintiff, Mr. Robert Bruce Kerr, a coal trimmer, of Marmadon Road, Plumstead, S.E., sued the defendants, Messrs. Whimster & Co., Ltd., of Renfield Street, Glasgow, claiming damages at common law for injuries sustained in February, 1948, in the course of his employment in defendants' steamship *Reuben Snow*, at Woolwich, London, S.E.

Plaintiff's case was that he was engaged in trimming coal in Nos. 3 and 4 holds, and that in leaving the holds to go ashore for his tea break he was obliged to step on to a pile of hatch covers which had been negligently placed on deck by the defendants. The hatch covers gave way and he was thrown to the deck, injuring his back. He alleged that defendants had failed in their duty to him, as invitee, to provide reasonably safe premises and reasonably safe means of access and egress, or to warn him of any unusual danger of which they knew or ought to have known.

Defendants denied negligence or breach of duty and contended that plaintiff's own negligence caused the accident. Their case was that a clear passage was available for plaintiff to leave the hold.