# EXHIBIT 13

# VOYAGE CHARTERS

BY

JULIAN COOKE
*of Lincoln's Inn, Barrister*

TIMOTHY YOUNG
*of Gray's Inn, One of Her Majesty's Counsel*

ANDREW TAYLOR
*London Solicitor, Richards Butler*

JOHN D. KIMBALL
*New York Attorney, Blank Rome, LLP*

DAVID MARTOWSKI
*New York Arbitrator and Mediator*

LeROY LAMBERT
*New York Attorney, Blank Rome, LLP*

THIRD EDITION

informa

LONDON

2007

Chapter 16

# Demurrage

## Demurrage and damages for detention

**16.11** The demurrage clause in the Gencon 1976 form is rarely left intact in modern charters It provides for only 10 running days on demurrage It is only that period during which the damages for delay in loading or discharging are liquidated at the rate stipulated in the charterparty Once that period has passed, the owner is entitled not to demurrage but to damages for detention at large Those damages will be such as to compensate the owner for his actual loss, subject to the ordinary rules of remoteness and causation,[1] and may be greater or less than the demurrage rate, but the burden of proving his loss lies on the owner It is the potential for a claim for damages for detention at large which explains the insertion of those words in the lien clause, so that the owner has a lien for damages at large as well as demurrage

**16.12** By contrast with the Gencon 1976 form, the great majority of charterparties impose no express limit on the period of demurrage [2] In those circumstances the demurrage rate applies throughout the entire period of detention, and the owner is not entitled to claim damages at large after the expiry of a reasonable time on demurrage

*The Inverkip* was chartered to load grain at New Orleans or Galveston and was ordered to Galveston. but before she arrived there it was struck by a tidal wave and, with the agreement of the owner, the charterer redirected her to load at Newport News. where she was delayed beyond the agreed laydays for loading because of the difficulty in obtaining a substitute cargo as well as other causes The owner claimed damages for detention at large for the delay in obtaining a substitute cargo on the grounds. first, that the agreed demurrage rate only applied during a "reasonable" period of detention beyond the laydays. and. secondly. that it only applied to delay in loading as such. and not to the breach of the separate obligation to provide a cargo

The Court of Appeal rejected both these arguments and held that the charterer's sole liability was to pay demurrage at the agreed rate In the absence of stipulation to the contrary the agreed rate of demurrage applied without limit of time, until the delay was such as to frustrate the contract. or the owner was entitled to and did treat the charterer as having repudiated the contract The fact that the charterer may also have been in breach of the separate obligation to provide cargo was immaterial, since the only loss caused to the owner by that breach was the delay in loading, and the agreed demurrage rate applied to all such delay. whether it resulted merely from the failure to load within the laydays, or from breach of some separate obligation

(*Inverkip Steamship Co* v *Bunge* [1917] 2 K B 193 )

Thus, in the absence of a stipulation limiting the time on demurrage, and questions of frustration and repudiation apart, demurrage at the agreed rate accrues continuously until the completion of the functions that would have stopped laytime running [3] The corollary is that the provision for demurrage will normally prevent the owner from treating the charter as terminable for breach of duty to load in the laytime alone, and he must wait until the delay is sufficient, or it is clear that it is bound to become sufficient, to frustrate the adventure, or the charterer renounces the charter [4] It is arguable that clause 7, by fixing the time on demurrage as 10 days, produces a different result, and entitles the owner to terminate the charter after the expiry of the 10 days However, it is unlikely that the provision would be interpreted as having this effect

**16.13** The second point of general importance decided in *Inverkip Steamship Co* v *Bunge* is that the demurrage provisions of the charter apply to all situations where the loss suffered by the owner is a detention of the ship by reason of a failure to load or discharge within the laydays, and it matters not that the charterer may have been in breach of some other obligation, so long as that breach resulted in no other kind of loss This principle has been applied in *Chandris* v *Isbrandtsen-Moller*,[5] where the charterer loaded dangerous cargo in breach of the charter, and *The Delian Spirit*,[6] where the charterer failed to indicate a berth reachable on arrival In both cases the only consequence was a failure to load or unload within the laydays, and it was held that the situation was governed by the laytime and the demurrage provisions of the charter, with demurrage payable at the agreed rate after the expiry of laytime So long as the relevant period of delay is covered by the agreement as to demurrage, the owner is limited to a claim for demurrage even where the delay is deliberately caused, unless and until he justifiably terminates the charter on the ground of repudiation The exclusivity of demurrage as a remedy may be of importance where, for example, there is a string of charterparties containing arbitration clauses; unlike courts, arbitrators have no inherent power to order that a party to one arbitration within the string should pay any costs incurred in another arbitration likewise within the string but an arbitrator can award costs as damages, where otherwise appropriate Where the liability of a party is solely for demurrage it will not normally be possible to make such an award [7]

**16.14** Where, however, in addition to the failure to load or discharge within the laytime, there is a further obligation which has been broken causing additional loss, then the owner is not necessarily restricted to his claim for demurrage

*The Sagatind* was chartered to load a full and complete cargo of timber at Archangel at a freight referable to the quantity loaded The loading took longer than the agreed laydays and was therefore completed during the winter season. which meant that the vessel was permitted only to load to her winter marks A "full and complete cargo" was less than it would have been if the vessel had loaded within the laydays and so the owner received less freight They claimed their lost freight from the charterer who argued that, because the loss resulted from the delay in loading. their liability was

limited to the demurrage payable under the charter

The Court of Appeal held that the owner was entitled to recover the lost freight Atkin L J said (at page 363): "The provisions as to demurrage quantify the damages. not for the complete breach. but only such damages as result from the detention of the vessel For correlative to the ship's right to receive the agreed damages is the charterer's right to detain the ship for the purpose of enabling him. if possible. to perform his broken contract and so mitigate any further damage If. however, for reasons other than the shipowner's default. the charterer becomes unable to do that which he contracted to do—namely. put a full and complete cargo on board during the fixed laydays. the breach is never repaired. the damages are not completely mitigated and the shipowner may recover the loss which he has incurred in addition to his liquidated demurrage "

Sargant L J thought that the breach of charter in failing to load what was a full and complete cargo as ascertained at the date of the vessel's arrival at Archangel was a breach which was distinct from mere delay Bankes L J , while agreeing in the result, seems to have thought also that the existence of the demurrage agreement did not exclude the additional claim for special damage

(*Akt Reidar* v *Arcos* [1927] 1 K B 352. discussed in *Total Transport Corp* v *Amoco Trading (The Altus)* [1985] 1 Lloyd's Rep 423 and *The Bonde* [1991] 1 Lloyd's Rep 136 )

**16.15** There may also be cases of pure delay, caused by the charterer's breach of a term of the charter, which are not governed by the laytime and demurrage provisions because the delay occurs before the commencement of laytime, or after the completion of loading or, less probably in practice, after completion of discharging Some examples are:

(1) failure to nominate a loading port punctually;
(2) preventing the vessel from becoming an arrived ship, for example, by failure to have cargo available[8] or, where the charter so requires, by failure to provide equipment necessary for loading[9] or failure to indicate a berth reachable on arrival[10]; and
(3) delay in nominating the discharging port, or in presenting bills of lading for signature [11]

It is, of course, perfectly possible for the charter to contain express provisions which bring these situations within the laytime and demurrage regime, or which provide that liquidated damages shall be payable at the demurrage rate or some other rate The "time lost in waiting for berth" provision of the Gencon charter is an example of the former, although it is not dependent on breach Charterers are not generally responsible for the acts of receivers after discharge, such as acts of preventing departure or arresting the vessel as security for cargo claims [12]

1 See Chap 21

2 The time limit has been abandoned in the 1994 version of the charter

3 See above para 15 5

4 *Universal Cargo Carriers* v *Citati* [1957] 2 Q B 501, affirmed on appeal [1957] 1 W L R 979

5 [1951] 1 K B 240

6 *Shipping Developments Corp* v *Sojuzneftexport (The Delian Spirit)* [1972] 1 Q B 103, where the ship was an arrived ship during the period of delay

7 *Suisse Atlantique Société d'Armement Maritime* v *N V Rotterdamsche Kolen Centrale* [1965] 1 Lloyd's Rep 166, [1967] 1 A C 361

8 *Agrimpex* v *Soc Financiera de Bienes Raices (The Aello)* [1961] A C 135

9 *Rashtriya Chemicals* v *Huddart Parker (The Boral Gas)* [1988] 1 Lloyd's Rep 342

10 *Inca Cia Naviera* v. *Monofil Inc (The President Brand)* [1967] 2 Lloyd's Rep 338, where the vessel was not an arrived ship during most of the period of delay Once she arrived, the laytime and demurrage regime took over, and damages at large ceased to accrue Contrast *The Delian Spirit*, above n 24

11 *Nolisement (Owners)* v *Bunge y Born* [1917] 1 K B 160

12 See generally *The Paros* [1987] 2 Lloyd's Rep 269 and *The Adelfa* [1988] 2 Lloyd's Rep 466

# EXHIBIT 14

Mortgagees or other plaintiffs with "priority" may come in and deprive the first plaintiff of his security.

The decision whether to issue a writ in personam and serve it out of the jurisdiction or to issue a writ in rem is one which must be taken by the plaintiff, who will be advised by his solicitor. This Court cannot dictate to plaintiffs in which of these two ways they should seek redress for the wrongs which they suffer.

The writ in this action was issued before any relevant period of limitation had expired. Its validity for service was extended quite properly, and it was served on the ship. There are no grounds for setting aside the writ or service thereof. The motion is dismissed.

---

QUEEN'S BENCH DIVISION
(COMMERCIAL COURT)

Feb. 9 and 10, 1988

---

ADELFAMAR S.A.
v.
SILOS E MANGIMI MARTINI S.p.A.

(THE "ADELFA")

Before Mr. Justice EVANS

**Charter-party (Voyage) — Non-acceptance — Receivers alleged damage to cargo — Vessel arrested — Local authorities banned landing of cargo — Owners incurred costs in securing release of vessel — Whether owners entitled to compensation from charterers.**

The owners let their vessel *Adelfa* to the charterers for the carriage of a cargo of maize to Tripoli.

The vessel arrived at Tripoli on Aug. 21, 1981, but no discharging berth was available until Oct. 19 and laytime for discharging expired on Sept. 12.

Discharging commenced but on Oct. 20 it was stopped. The receivers claimed that there was wet-damage to the cargo and they refused to take delivery.

On Oct. 28 the receivers arrested the vessel and on or before Nov. 2 the local authorities imposed a ban on the landing of the maize. The local Court on Nov. 26 upheld the receivers' claims and imposed a liability on the owners of $3.7m.

In the event the owners, after prolonged negotiations with the receivers and a third party secured the release of the vessel by March 1982 by paying $2.5m. The vessel was released and she proceeded to Singapore where the original cargo was discharged and delivered to or to the order of the third party.

The owners sought to recover this sum from the defendant charterers. They began arbitration proceedings claiming at first only demurrage for the period from the expiry of laytime until the vessel left Tripoli in March 1982. That claim was settled by agreement and the owners then claimed damages or compensation on the basis of restitution.

The umpire found that there was no repudiatory or renunciatory conduct by the charterers such as the owners alleged; that the charter-party was frustrated by the ban on discharge at latest by the date of judgment on Nov. 26 and that the owners' predicament flowed from the arrest of the vessel, a matter for which no responsibility could possibly attach to either party.

The owners appealed contending that there was repudiatory or renunciatory conduct by the receivers for which the charterers were responsible

commencing with the failure to discharge the vessel within the laytime and continuing until the vessel ceased to be detained; alternatively the owners' losses all flowed from and were caused by the charterers admitted breach in failing to complete discharge during laytime and if the charter was frustrated then the charterers were liable to compensate the owners on the basis of restitution in whole or in part for the losses which they suffered

———*Held*, by Q.B. (Com. Ct.) (EVANS, J.), that (1) the question whether the delay caused or likely to be caused by an event, frustrated a contract was primarily a question of fact in every case; according to the umpire's finding, the prospect of delay caused by the ban when it was first imposed became transformed into impossibility of performance within any commercially acceptable period; the fact that the contract provided for the consequence of delay, or did not excuse the charterer from liability for such delay did not necessarily mean that the charterers became liable for the consequences of non-performance when the transformation occurred; and the umpire's holding of frustration was not wrong as a matter of law (*see* p. 471, cols. 1 and 2);

(2) the charterers had undertaken that the cargo would be discharged within an agreed period and they would clearly be liable if this was not done; even if the discharging operation had become the sole responsibility of the receivers and could be described as delegating the charterers' contractual duty, it did not follow that the charterers became responsible vicariously or otherwise for the receivers and all that they did or failed to do; the charterers were liable in demurrage for failure to discharge within the laytime but the vessel was detained by her arrest and subsequent judgment and there was no undertaking, express or implied, that cargo receivers would not arrest the vessel or seek to do so at the discharging port (*see* p. 471, col. 2);

(3) there were no grounds for implying a term that the vessel would not be detained except for discharge by the charterers or those who undertook the discharging operation on their behalf; the owners had failed to establish a repudiatory breach of the charter resulting in the detention of the vessel (*see* p. 471, col. 2; p. 472, col. 1);

(4) the owners had to prove that the loss which they had incurred was caused by the charterers failure to discharge the cargo within the laytime and that it was not too remote in consequence of that breach; there was no finding to this effect and no such conclusion could be drawn from the umpire's findings; the owners' loss represented the cost of securing the release of the vessel; that arrest was caused by the receivers' act and even if the arrest was based on the assumption that the cargo suffered serious damage while waiting off Tripoli it was impossible to say as a matter of law or of fact that the loss was caused by the charterers' breach which had occurred on Sept. 12, when the laytime expired (*see* p. 472, col. 2);

(5) the charterers were not liable for the arrest or its consequences and there was no basis on which they could be held liable to contribute towards the owners' costs (*see* p. 473, col. 1)

---

The following cases were referred to in the judgment:

Alexander (William) & Sons v. Aktieselskabet Dampskibet Hansa, (H.L.) [1920] A.C. 88.

Aktieselskabet Reidar v. Arcos Ltd., (C.A.) (1926) 25 Ll.L.Rep. 513; [1927] 1 K.B. 352;

*Altus*, The [1985] 1 Lloyd's Rep. 423;

Cantiere Navale Triestina v. Russian Soviet Naptha Export Agency, (C.A.) (1925) 21 Ll.L.Rep. 204; [1925] 2 K.B. 172;

Cargo ex Argos (1873) L.R. 5 P.C. 134;

Chandris v. Isbrandtsen-Moller Co. Ltd., (C.A.) (1950) 84 Ll.L.Rep. 347; [1951] 1 K.B. 240; (1950) 83 Ll.L.Rep. 385; [1951] 1 K.B. 240;

Econolines Inc. v. Mohammed Al-haddad, A.M.C. 242 [1980];

*Medina Princess*, The [1965] 1 Lloyd's Rep. 361;

*Nema*, The (H.L.) [1981] 2 Lloyd's Rep. 239; [1982] A.C. 724;

*Nolisement* (Owners) v. Bunge y Born, [1917] 1 K.B. 160;

Suisse Atlantique Société d'Armement Maritime S.A. v. N.V. Rotterdamsche Kolen Centrale, (H.L.) [1966] 1 Lloyd's Rep. 529; [1967] 1 A.C. 361;

Transoceanica Societa Italiana di Navigazione v. H. S. Shipton & Son, (1922) 10 Ll.L.Rep. 153; [1923] 1 K.B. 31;

*Winson*, The (H.L.) [1982] 1 Lloyd's Rep. 117; [1982] A.C. 939;

---

This was an appeal by the plaintiff owners, Adelfamar S.A. from the arbitration award in which the umpire held that the defendant charterers Silos e Mangimi Martini S.p.A. were not liable to compensate the owners for the losses suffered resulting from the arrest of the vessel *Adelfa*

Mr. Kenneth Rokison, Q.C. and Mr. A. M. D. Havelock-Allan (instructed by Messrs. Hill Dickinson & Co.) for the plaintiff owners; Mr David Johnson, Q.C. and Mr. Nicholas Hamblen (instructed by Messrs. Middleton Potts) for the defendant charterers.

The further facts are stated in the judgment by Mr. Justice Evans.

Judgment was reserved.

Friday Feb. 19, 1988

---

JUDGMENT

**Mr. Justice EVANS:** The plaintiffs' vessel, *Adelfa*, suffered a series of misfortunes after arriving at Tripoli with a cargo of maize on Aug. 21, 1981. No discharging berth was available until Oct. 19. The laytime for discharging meanwhile had long since expired, on Sept. 12. No sooner had the discharging begun then it was stopped, on Oct. 20, and the receivers refused to take delivery of the cargo. They were complaining about wet-damage to the maize. The umpire has found that there was some damage of that kind, caused by water which condensed in the upper parts of the holds during the long period of waiting before discharge began. But the impression which —

> ... someone had formed ... that there had been a serious ingress of water into the vessel's holds whilst she was on passage to Tripoli [was] quite incorrect ... [Reasons par. 6].

On Oct. 28 the receivers arrested the ship in support of their claim which, presumably, was for breach of the bills of lading contracts or for breach of duty by the ship in the course of the voyage. Then, on or before Nov. 2, the local authorities imposed a ban on the landing of the maize. Matters came to a head on Nov. 26 when the local Court upheld the receivers' claim. That judgment, in addition to imposing liability on the plaintiffs and the ship for $3.7 million, which was claimed as the full value of the cargo, also signalled what the umpire called the death-knell of any remaining hopes that the ban against discharge might be lifted and that the cargo might after all be discharged in Libya.

Beyond doubt, the plaintiff shipowners were in a grave predicament, and they obtained no help from the charterers, the present defendants, who had sold and received payment for the cargo and who saw no reason why they should become involved. It was in fact a double predicament, because the shipowners could not recover their vessel from the port without satisfying the judgment, which would involve paying at least $3.7 m. to the receivers of the cargo, nor could they discharge the cargo at that port in any circumstances which could be foreseen, whether or not the ship became free from arrest.

The umpire found that the receivers' complaints, apart from minimal surface damage which had resulted from the delay, were wholly unjustified. There was a certain amount of wetting and discoloration, confined to the top layer of bags in each of the holds, but this was the inevitable result of the ship awaiting discharge for over two months in the ambient temperature conditions (par. 23). A degree of insect infestation was also minimal (par. 24). Moreover, the master did all that could reasonably be expected of him (par. 31). The cargo remained sound for a further six months or more, before it was eventually discharged at Singapore (par. 24). There was, however, a possibility, according to survey reports which became available in Tripoli, that the cargo might be affected with the toxic substance known as alfatoxin. This by-product of the mould growth aspergillus flavus is poisonous and can have fatal effects on animals, possibly also presenting a health hazard to humans. The umpire recognized that these reports could have given the Libyan authorities some grounds for believing that the cargo should not be permitted into Libya (par. 25).

However this may be, the fact that the receivers' claims were unjustified did not lessen the gravity of the situation for the plaintiffs. The ban against discharge, and the arrest in support of the judgment, were facts of life with which they had to come to terms, if they were to recover free use of their ship. After prolonged negotiations with the receivers and a third party they achieved this, but only by March 1982 and only at a cost of $2.5 m. In return for this payment, the third party supplied a fresh cargo of maize to the receivers; the vessel was released and after a drydocking she proceeded to Singapore where the original maize cargo was discharged and delivered to or to order of the third party.

The plaintiffs seek to recover this sum from the defendants as charterers of the ship for the voyage in question. They began arbitration proceedings in which at first they claimed only demurrage or damages for detention of the ship at Tripoli from the expiry of the laytime (Sept. 12) until the vessel finally left Tripoli in March 1982. That claim was settled by agreement — the terms are not recorded in the award — and the plaintiffs make their claim for damages, or for compensation on the basis of restitution, in addition to that demurrage.

The umpire says in his reasons that after listening to evidence and argument for 11 working

days he reached the firm conclusion that the owners' case breaks down on the facts. He held, or found, that there was no repudiatory or renunciatory conduct by the charterers, such as the owners alleged, and that the charter-party was frustrated by the ban on discharge, at latest by the date of the judgment, Nov. 26. He held further that the owners' predicament —

> ... flowed simply from the arrest of the vessel — a matter for which, on my findings, no responsibility can possibly attach to either party. [par. 42].

The plaintiffs say that these conclusions are wrong as a matter of law, and they were granted leave to appeal on July 3, 1987. Their submissions are these: —

(1) There was repudiatory or renunciatory conduct by the receivers, for which the charterers are responsible, commencing with the failure to discharge the vessel within the laytime and continuing until the vessel ceased to be detained. The owners say that the initial refusal to discharge and the vessel's unjustified arrest and subsequent detention at the suit of the receivers, all formed part of, or flowed from this conduct, for which the charterers are responsible under the charter-party. They also say that the umpire's finding that the charter-party was frustrated by Nov. 26, if it impedes the owners' claim, is wrong in law. (2) Alternatively, the plaintiffs' losses all flowed from and were caused by the charterers' admitted breach, in failing to complete discharge during the laytime (Sept. 12). The owners accept that they have been paid demurrage as quantified damages for the detention of the ship after that date, but they say that their present claims are a separate and independent head of damage which they are entitled to recover in addition to the demurrage already paid. (3) Alternatively, if the charter-party was frustrated, the charterers are liable to compensate the owners on the basis of restitution, in whole or in part, for the losses which they suffered, in the circumstances of this case.

The charterers' response to these contentions, in essence, is this. They say that the umpire's holding and finding of frustration cannot be assailed, having regard in particular to the approach to it required by the speeches in *The Nema*, [1981] 2 Lloyd's Rep. 239; [1982] A.C. 724, and that it and the umpire's findings on causation together are fatal to the owners' damages claim. They say that in any event the owners are not entitled to recover damages for the admitted breach of the charter-party obligation to discharge within the laytime, in addition to the demurrage already paid, and that on the umpire's findings there is no basis in law for the alternative restitution claim.

I would be content to adopt the learned umpire's analysis of these issues and his conclusions upon them as my own, and to hold on that basis that the appeal must be dismissed and his award upheld. In deference, however, to the skilled submissions of Counsel, and because some of the issues may inevitably have taken on a different aspect in the course of argument before me, I should give my reasons for reaching those same conclusions.

The umpire's findings as to causation are in par. 33 of the award: —

> *What was the cause of the non-delivery of the cargo and the arrest of the vessel?*
>
> 33. This question, so it seems to me, lies at the heart of this case.
>
> On the facts, it falls in my view to be answered in this way.
>
> The discharge was prevented by the Libyan authorities' refusal of entry to the goods. That refusal was never withdrawn and in the eyes of the Libyan authorities I have little doubt that the decision was regarded (albeit, as I consider, mistakenly) as vindicated by the El Fateh laboratory report.
>
> The arrest of the vessel was caused by the receivers' (or, to be precise, their underwriters') prosecution of proceedings for arrest of the vessel, which led to the Libyan Court's decision to confirm the arrest and to condemn the Master in damages upon grounds for which there was no reasonable justification on an objective view of the matter. A proper enquiry should have disclosed that the cargo had not suffered water damage in transit and that there was no real cause to treat the cargo as unfit for use, whether by reason of an alfatoxin taint or otherwise.

There is no express finding in the award that the arrest and subsequent detention of the vessel was what prevented the plaintiffs, until Mar. 1982, from ordering her to leave the port and discharge the cargo elsewhere, but this is no more than a commonsense conclusion and it is clearly to be inferred from the express findings, e.g. par. 42:

> ... the predicament from which the Owners had to extricate themselves flowed simply from the arrest of the vessel ...

Regarding events following the judgment of Nov. 26 the umpire found, in summary, that there was no reasonable prospect of successfully appealing against the judgment, and that the compromise agreement eventually reached

was a reasonable solution to the owners' problems, and one which could not reasonably have been made sooner than it was.

I have found it useful to consider what the owners' situation was when, or rather immediately after the judgment was given against them on Nov. 26. Their vessel was under arrest and was subject to a judgment for $3.7 m. which was said to represent the sound value of the cargo. The cargo remained on board the ship and could not be landed at Tripoli or, presumably, any other Libyan port.

I infer that the plaintiffs could have obtained the release of the ship by paying the full amount of the judgment to the receivers ($3.7 m.). They would then have been free to take the cargo away, so far as the receivers were concerned, and if they had proceeded to discharge it ashore at some neighbouring port they would have been able in fact to dispose of the cargo for their own account, unless the charterers intervened to claim the cargo or its proceeds for themselves. This would raise issues which have not been debated in these proceedings, because no such claim was made. But the factual consequence of the umpire's findings that the cargo was largely undamaged is that it had a substantial value which would have to be taken into account in any assessment of liability for the shipowners' costs of proceeding to a neighbouring port and discharging the cargo there.

In the event, the plaintiffs obtained the release of the ship and subsequently the discharge of the cargo, at Singapore, in return for a payment of $2.5 m. and, presumably, the vessel's costs of the voyage to Singapore. This arrangement was certainly unusual, and probably unique, but its relevance in my view, in the light of the umpire's findings, is merely that it quantifies the damages claim which the owners might have brought immediately after Nov. 26 and which, if brought then, would have raised the same liability issues as their claim does now.

(1) *Damages for repudiation*

The plaintiffs say that the charterer's admitted breach, which occurred when the vessel was not completely discharged during the laytime, became a repudiatory breach by the following process. First, the receivers refused to take further discharge on Oct. 20 "due to water-damaged shipment", and on the next day they wrongly asserted that the cargo was a total loss and first intimated their claim for $3.7 m. (par. 6 and 7). Then the "technical committee" inspected the cargo and recommended against its use for animal feed (par. 9). On Oct. 28 the vessel was put off the berth, and was arrested in proceedings begun by the cargo insurers (par. 10). By Nov. 2 there was a ban against entry of the cargo by the Libyan health authorities, and the receivers—

> . . . had also made clear that they were not going to take delivery of the cargo—a course that was in any case not open to them in view of the import ban which had now been imposed . . . (par. 12).

The Court judgment came as the climax of these events, the plaintiffs say, on Nov. 26. Meanwhile, the charterers displayed a "somewhat ambivalent attitude".

The umpire rejected this contention because the discharge was prevented from Nov. 2 when the cargo was refused entry by the Libyan authorities and their ban had the effect of frustrating the contract from, at latest, Nov. 26 (par. 40). He also held that the owners' predicament flowed simply from the arrest of the vessel, a matter for which "no responsibility can possibly attach to either party" including, of course, the charterers (par. 42).

The plaintiffs attack these conclusions as being wrong in law, on two separate grounds. First, they say that the discharge ban did not excuse the charterers from their absolute obligation to discharge the cargo, so that when the delay assumed frustrating proportions the charterers nevertheless remained in breach and what is more they became in fundamental breach of contract. Secondly, they say that the charterers cannot rely upon events which substantially were brought about by the receivers, for whom the charterers are responsible under the charter-party.

(i) *Frustration*

The plaintiffs' first submission is that the discharge ban was essentially an executive act, and even if its effect was to make landing the cargo in Tripoli illegal, that was not "supervening illegality" of a kind which defeats the charterers' undertaking to discharge the cargo. They contend that that is an "absolute obligation" the failure to perform which is not excused in circumstances such as these, citing Scrutton on Charterparties (19th ed.) art. 156 and, in particular, the judgment of Sir Edward Pollock M.R. in *Cantiere Navale Triestina v Russian Soviet Naptha Export Agency*, (1925) 21 Ll.L.Rep. 204 at p. 205; [1925] 2 K.B. 172 at 196 ("The contract contained in the charter-party is absolute") and the speech of Viscount Finlay in *William Alexander & Sons v Aktieselskabet Dampskibet Hansa*, [1920] A.C. 88 at p. 94:

> . . . If the charterer has agreed to load or

unload within a fixed period of time . . . he is answerable for the non-performance of that engagement . . . [absent exceptions or fault by the shipowner]

In my respectful opinion. the passage in Scrutton and those statements of the law must be read subject to the possibility of frustration which, when it occurs. terminates the contract and with it the charterers' obligation. however widely it may otherwise extend Naturally. the width of the obligation on the true construction of the contract will be an important factor in deciding whether or not frustration has occurred, but apart from this. the question of frustration has to be considered separately and independently. whenever the issue is raised.

The plaintiffs' main attack, however. rested on the assumption that the ban, when it was first imposed. did not excuse the charterers from their liability for demurrage The contrary was not argued for the charterers and it is an assumption which I am prepared to make. The leading authority. so far as executive acts are concerned. is the *Cantiere Navale* Case. (1925) 21 Ll L.Rep 204; [1925] 2 K B 172 a decision of the Court of Appeal The charterers therefore were in breach of contract until the time when the delay. actual and potential. caused by the ban became capable of frustrating the contract. Frustration, the plaintiffs rightly say, can only occur when further performance becomes impossible without fault by either party. If there is fault. then that party is in repudiatory breach of contract, and the other party is entitled to elect whether to rescind or to affirm the contract. Here. the charterers were in breach and therefore. it is said, frustration by reason of continuance of the ban could not occur

If it is indeed the law that frustration can never occur when the event which has caused "frustrating delay" is one for which a contracting party was liable (in the sense that his liability in damages was not excused) up to the time of frustration then on the admitted facts the umpire's finding is necessarily wrong in law Short of that being the law. the umpire's decision cannot be interfered with consistently with *The Nema* approach I do not think that the law can be stated in such positive terms. The question whether an event. or the delay caused or likely to be caused by an event. has frustrated a contract is primarily a question of fact in every case. The question is whether the situation in which performance is required is radically different or not from what was provided for by the contract The event need not be unforeseen, and it may even be of a kind referred to in the contract: see Carver's Carriage by Sea (13th ed ) vol 1. par. 756 and 765. What happened here. according to the umpire's finding, is that the prospect of delay caused by the ban when it was first imposed became transformed into impossibility of performance within any commercially acceptable period. There came a time. latest Nov 26. when the prospect even of delayed performance within the contractual time-scale disappeared. The fact that the contract provided for the consequences of delay, or did not excuse the charterer from liability for such delay. does not necessarily mean, in my judgment, that the charterer became liable for the consequences of non-performance when the transformation occurred. I cannot say, therefore, that the umpire's holding of frustration is wrong as a matter of law.

(ii) *Receivers' acts*

The second submission is that the charterers are vicariously liable for the delay caused by the receivers and their various actions described above This argument in my judgment is misconceived The charterers having undertaken. subject to exceptions, that the cargo will be discharged within the agreed period. they will clearly be liable if this is not done. notwithstanding that the discharging operation has become the responsibility of the receiver or of some other party and the charterer plays no part in it himself Even if this can properly be described as delegating the charterers' contractual duty. it does not follow that the charterer becomes responsible. vicariously or otherwise. for the receivers and all that they do, or fail to do. The charterer can only be liable when there has been a failure to achieve what the charterers undertook to the shipowner would be done. There was, of course, a failure to discharge within the laytime. for which the charterers are liable in damages or in demurrage The vessel was detained by her arrest and the subsequent judgment There is no undertaking in the charter-party. express or implied. that cargo receivers will not arrest the vessel. or seek to do so at the discharging port

(iii) *Charterers' liability*

In the course of argument, Mr Rokison, Q C for the plaintiffs formulated an implied undertaking in the charter-party that the vessel would not be detained. save for the purposes of discharge. by the charterers or by those who undertook the discharging operation on their behalf vis. the receivers in the present case The authority cited was *Nolisement (Owners) v. Bunge & Born*. [1917] 1 K B 160 where the charterers were held liable for detaining the

vessel, by failing to give orders and provide bills of lading for signature, after loading was complete. That is a different situation from one where receivers (or charterers) arrest a vessel before loading or discharge is completed and I doubt whether any implied term is broken when even charterers themselves are responsible for a judicial arrest after loading or discharge is complete. On no view, in my judgment, is there any ground for implying a term in the charter-party which was broken by the receivers' actions in this case.

The facts which gave rise to the New York arbitration award in a dispute between *Econolines Inc. v. Mohammed Al-haddad* A.M.C. 242 1980 were wholly different. There was no frustration of the affreightment contract, and no relevant exception clause. The charterers therefore were liable for the breach of contract caused by the receivers' conduct, as the charterers here are liable for delay caused by the failure to discharge with the laytime.

For these reasons, I hold that the plaintiffs fail to establish the repudiatory breach of the charter-party, resulting in the detention of the vessel, which is necessary to support their damages claim. The detention was caused by the arrest, which did not involve any breach of the charter-party. Even if, as Mr Rokison, Q.C. argued, the loss which the plaintiffs suffered was caused by the delay in discharging the cargo, rather than by the arrest, then the umpire has found that the failure to discharge was caused by the ban, and that the charter-party was frustrated by Nov 26.

(2) *Damages for failure to discharge*

The question whether a shipowner can recover damages in addition to demurrage for loss caused by the charterer's breach of contract in failing to complete loading within the laydays has been much debated, particularly since the Court of Appeal decision in *Aktieselskabet Reidar v. Arcos Ltd*, (1926) 25 Ll.L Rep. 513; [1927] 1 K.B. 352. There must, of course, be a proved head of loss which is recoverable as damages for that breach and which is distinct from the loss of use of the vessel, for which on any view of the matter demurrage is the agreed rate of liquidated damages. When such further loss does exist, then I am prepared to assume in the plaintiffs' favour that a damages claim may succeed. The three distinguished Judges in *Reidar v. Arcos* (Lord Justices Bankes, Atkin and Sargent) gave differing reasons for their decision that damages were recoverable in addition to demurrage in the circumstances of that case. One view is that the damages were awarded for a breach of contract other than the failure to complete loading within the laydays, namely, the failure to load a full and complete cargo. But even on that basis the amount of cargo which the charterers were required to load has to be measured by reference to the time when the laydays expired rather than later when the vessel sailed. The view that damages are recoverable in addition to demurrage for the single comprehensive breach is supported by the judgments of Mr. Justice Devlin, (as he then was) in *Chandris v. Isbrandtsen-Moller Co. Ltd.*, (1950) 83 Ll L.Rep. 385; [1951] 1 K.B. 240 and Mr. Justice Webster in *The Altus* [1985] 1 Lloyd's Rep. 423. Authoritative statements of the law are found in *Suisse Atlantique Société d'Armement Maritime S.A. v. N.V. Rotterdansche Kolen Centrale*, [1966] 1 Lloyd's Rep. 529; [1967] 1 A.C. 361 (H.L.), likewise in the judgments of Mr. Justice Mocatta, and the Court of Appeal in that case, but these in my respectful view do not necessarily preclude the submission on behalf of shipowners that an independent head of damages may be recovered in the circumstances of a particular case

But those circumstances do not arise here. The plaintiffs must prove that the loss which they incurred was caused by the charterers' failure to discharge the cargo within the laytime and that it is not too remote in consequence of that breach. There is no finding to this effect, and in my judgment no such conclusion can be drawn from the findings which the umpire has made. The plaintiffs' loss represents the cost of securing the release of the vessel from her arrest and detention at Tripoli. The arrest was caused by the receivers' acts (par. 33). Even if the arrest was based on the assumption, mistaken or otherwise, that the cargo suffered serious damage during the period of waiting off Tripoli, it is impossible to say, as a matter of law or in fact that the loss was caused by the charterers' breach, which had occurred on Sept. 12 when the laytime expired. I must therefore reject this ground of appeal also

(3) *Restitution*

The alternative claim for restitution in whole or in part of the sums expended by the plaintiffs is difficult for them to maintain in the light of the learned umpire's findings that there was no request by the charterers and that no benefit accrued to them (par. 45). Nevertheless, if the facts found in the award do give rise to a legal right to obtain restitution from the charterers then of course I should so hold as a matter of law and allow the appeal accordingly. The plaintiffs rely upon the statement in The Law of Restitution (Goff and Jones) (3rd ed., p. 12)

and upon decided cases where following termination of the contractual adventure by frustration (*Cargo ex Argos* (1873) L.R. 5 P.C. 134) or otherwise (*The Winson*, [1982] 1 Lloyd's Rep 117; [1982] A.C. 939, completion of salvage services) the shipowner or salvor in possession of a cargo has recovered the reasonable cost of discharging and otherwise caring for it. Mr. Johnson, Q.C. for the charterers contends that in such cases, including also *The Medina Princess*, [1965] 1 Lloyd's Rep. 361 at p 522 and *Transoceanica Societa Italiana di Navigazione v H. S. Shipton & Son* (1922) 10 Ll.L.Rep. 153; [1923] 1 K.B. 31, the liability has fallen upon the owners or other persons interested in the cargo, which he contends the charterers here were not, after they sold the cargo to the Libyan receivers.

The submission raises an interesting question of law. While the charterers' contractual undertaking to discharge the vessel may have been frustrated, the charterer may nevertheless remain under some liability as bailor and there could well be circumstances in which the charterer might assert the rights of a bailor, though not himself the owner of the cargo at the material time. On the other hand, the shipowner's primary duty is towards the holder of the bill of lading and the charterer presumably could not override any instructions given by him.

However this may be, the plaintiffs here seek to recover the cost not merely of removing the cargo from the ship but also, and more importantly for them, of securing the release of the vessel from arrest and her detention in Tripoli. The charterers are not liable in my judgment for the arrest or its consequences, and I can see no basis on which they should be held liable to contribute towards the plaintiffs' costs of remedying that misfortune which came upon them. Mr. Rokison, Q.C. submitted that the costs incurred were the price of obtaining the removal of the cargo from the ship, and that obtaining the release of the ship was the first stage in that operation. But this overlooks the fact that the plaintiffs' separate and no doubt primary purpose was to obtain the ship for themselves.

Though the plaintiffs made an alternative claim for part, if not the whole of the costs which they incurred, no basis for apportionment is put forward nor found by the award. If Mr. Rokison, Q.C. is correct, and a shipowner can recover the reasonable costs of discharging his vessel following frustration of the charter-party, so that he recovers the use of his vessel free of cargo, from charterers who no longer have any interest in the cargo, then the claim could be calculated on the basis of the notional costs which would have been incurred if the vessel had proceeded to the nearest convenient and appropriate port and discharged the cargo there. This could only have been done after satisfying the judgment at a cost of £3.7 m. but that cost as I have held is not for the charterers' account. No such claim was put forward at the arbitration and there are no findings from which any such calculation can be made. I accept Mr Johnson, Q.C.'s submission that it is now too late to contemplate further proceedings whether by remission or otherwise to enable the plaintiffs to present a claim on this basis. For the same reason, I say nothing as to whether the shipowners in the unusual circumstances of this case would have had to give credit for the landed value of the cargo against any claim for the costs of discharge.

---